**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| J.R., a minor, P.P.A. MOLLY RAYMOND; B.R., a minor P.P.A. MOLLY RAYMOND; and MOLLY RAYMOND | : | |
| VS. | : | C.A. NO.: 08-137S |
| MARGARET GLORIA, Individually and in her Capacity as Social Worker; STEPHANIE TERRY, Individually and in her capacity as Supervisor, STATE OF RHODE ISLAND/ DEPARTMENT OF CHILDREN, YOUTH and FAMILIES; PATRICIA MARTINEZ, in her Capacity as the Director of the RHODE ISLAND DEPT. of CHILDREN, YOUTH and FAMILIES; | : | |

# PRETRIAL MEMORANDUM

## I. INTRODUCTION

Plaintiffs' Third Amended Complaint alleges in Counts 1 and II Negligence against Margaret Gloria in her official and individual capacities, Counts III, against Stephanie Terry in her official capacity, Counts IV, V and VI are against Margaret Gloria, Stephanie Terry, and Patricia Martinez in their official capacities and allege violations of 42 USC 1983. Count VII alleges Loss of Consortium for Molly Raymond and Dennis Drake.[1]

## II. STATEMENT OF FACTS

The Plaintiffs, minor twin children, Jarrod and Brandon Raymond, hereinafter ("the twins") born on August 10, 1992, and the biological mother, Molly Raymond and her former husband Dennis Drake, maintain Defendants negligently placed the twins in the foster home of

---

[1] Although Count VII appears in the Third Amended Complaint, Plaintiffs' Motion to Dismiss Count VII was granted and this Court entered an Order dismissing the Count on Jun 25, 2008.

Faith Sykes for 18 months from November 20, 1996 until May 27, 1998. Plaintiffs' further allege that Defendants willfully failed to remove the twins from the foster home where they were allegedly physically and sexually abused when the Defendants knew or should have known of the abuse. The alleged perpetrator was a third party who was not licensed to be in the home but who was known by DCYF as a family friend of the foster parents who assisted the Sykes with the care of the twins.

Plaintiffs further contend that the twins continue to suffer from Post Traumatic Stress Disorder (hereinafter "PTSD") as a result of alleged physical and sexual abuse in the foster home, at the hands of a third-party, Samuel Stevens (a.k.a. Thinman).

Molly Raymond, Dennis Drake, and Ms. Raymond's children have had a long history of involvement with the Department of Children, Youth and Families (DCYF).[2] By the time Brandon and Jarrod were placed in the Sykes foster home, they were already severely neglected and abused while in Ms. Raymond's and her various family members care. In fact, the twins were removed from Ms. Raymond's care on numerous occasions as a result of Ms. Raymond's inability to care for her children, in part, due to severe alcoholism, drug use and domestic violence.[3] Moreover, because the twins were considered unusually difficult to control, DCYF found many foster homes unwilling to keep the twins for any extended period of time. At the time the four-year old twins were placed in Ms. Sykes foster care, the subject of this action, Jarrod had been removed from his mother's care and placed in 8 different foster placements and

[2] DCYF first opened its file on the Molly Potter/Raymond family in 1979. In addition to the twin boys, Ms. Raymond other children are James Pelky, DOB 8/27/74; Richard Raymond DOB 7/11/79; Jeffrey and Raymond DOB 7/29/89, all of whom DCYF has had to remove from Ms. Raymond's care at various times.

[3] By October 1994, and prior to the Twins entering the Sykes foster home, DCYF had conducted twenty (20) investigations into the Raymond/Pelky/Potter family.

Brandon, had been removed from his mother's care and placed in approximately 6 different foster homes.

Pursuant to DCYF regulations, before the children were placed with Ms. Sykes, she completed a licensing application. Ms. Sykes' license shows that she lived in a two-family dwelling and was licensed for the second floor unit at 25 Hanover Street, Providence, Rhode Island.[4] The first floor was rented out and there was a basement apartment where Ms. Sykes family resided. As part of the application process, the applicant is required to give DCYF the names and birth dates of all individuals residing in the home so that appropriate background checks can be done before any children are placed in the home. Ms. Sykes did not list Samuel Stevens, the alleged perpetrator, in her licensing application.

Brandon and Jarrod lived in the Sykes home for approximately eighteen (18) months before they were removed by DCYF on May 27, 1998. According to DCYF records, on that date, a social worker and school nurse at the Gilbert School, where the twins attended, observed bruises on their inner forearms. The records indicate that the school contacted DCYF to report that the boys told them that they had been taken into the basement by "thinman", and hit on their arms with a belt. The boys were taken to the emergency room for treatment. Because of the seriousness of the allegations, DCYF immediately removed Brandon and Jarrod from the Sykes home and arranged for other placements.

DCYF conducted an investigation and Child Protective Investigator, Virginia Miller, questioned a number of individuals, including the twins, Samuel Stevens, foster mother, Faith Sykes, foster father, Marron Smith, other children living in the home, and Margaret Gloria, the DCYF social worker assigned to Ms. Raymond's case. Faith Sykes, significantly, told

[4] The apartment house of 25 Hanover Street was a two and one-half story dwelling. The basement and the first floor were considered separate entities for licensing purposes.

Investigator Miller that she owned the entire house, rented out the first floor, and kept the basement locked so the children could not access it. Ms. Sykes also reported that "only" she, the foster father ("Smitty"), her daughter and the foster children lived in the apartment. Investigator Miller "indicated" against Samuel Stevens charges of physical abuse of Brandon and Jarrod. Additionally, charges of "lack of supervision/caretaker" of Brandon and Jarrod were "indicated" against Faith Sykes. Investigator Miller's report noted that Faith Sykes had "failed to disclose that Mr. Stevens was living in her home and that the foster children were in the basement." According to the report, Mr. Stevens denied hitting the boys with a belt. The boys "recanted" their statements while at the subsequent foster placement. The allegations against both Ms. Sykes and Mr. Stevens were subsequently "unfounded" on appeal.

Approximately one year later, after Brandon and Jarrod were returned home to Ms. Raymond's care, and after DCYF dismissed a pending Termination of Parental Rights against Ms. Raymond, she reported to DCYF that the twins alleged Samuel Stevens had sexually abused them. An investigation into the new allegations of sexual abuse declared that because there was too much inconsistency in the boys' stories, the charges were "unfounded."

Molly Raymond and Dennis Drake, in support of their claim of negligence, recite a number of allegations that they contend should have given notice to the Defendants that the children would be allegedly injured if they were not removed from the foster home. These allegations, which arise from reports made to the DCYF hotline, include, complaints that the boys, on one occasion, were wearing sweat suits on a hot summer day, that the children allegedly did not appear at scheduled visits, and even that one child received a bruise on his face allegedly

at the hands of the foster father.[5] Absent from the cants allegations, however, are **any** allegations of abuse or neglect by Samuel Stevens. Various DCYF employees and investigators reviewed each of the allegations reported by Ms. Raymond and to the CANTS hotline and none of the allegations were founded.

Subsequent to the return of the twin boys to Ms. Raymond's care, they have repeatedly been referred to various inpatient residential treatment facilities including Bradley and Butler Hospital due to violent and unsafe behaviors and to the Courts for criminal activities. Plaintiffs allege that the twins current behavior is causally connected to the alleged abuse they suffered in the Sykes home and seek damages for those injuries.

## III. DEFENDANTS LEGAL CONTENTIONS

### 1. The Civil Rights Claims Under 42 § USC 1983.

These DCYF Director, Supervisor, and social caseworker ("DCYF Defendants") are entitled to qualified immunity since they were "performing in discretionary functions" and are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow vs. Fitzgerald*, 457 U.S. 800, 818 (1982).

The purpose behind granting officials such immunity is to allow them to perform their duties and act in areas where clearly established rights are not implicated "with independence without fear of consequence". *Id* at 819. Viewing the DCYF Defendants conduct from an objectively reasonable stand point, the question is whether another caseworker supervisor, or social case worker, standing in the shoes of these Defendants, would have concluded that their

[5] The DCYF record contains numerous references to complaints to the hotline and allegations made to DCYF by Ms. Raymond that the twins received inadequate care while at the Sykes foster placement. There are also notations in the records that Ms. Raymond was very angry when she learned that the twins were living with a "black" foster family.

actions violated a clearly established statutory or constitutional right. See ***Ricci v. Urso***, 974 F.2d 5, 7 (1st Cir. 1992). The qualified immunity standard also provides for mistaken judgments by "protecting all but the plainly incompetent are those who knowingly violate the law". ***Rivera v. Murphy***, 979 F.2d 259, 263 (1st Cir. 1992) quoting, ***Hunter vs. Bryant***, 502 U.S. 224, 229 (1991).

Plaintiffs contend that this case falls within the purvue of a "state-created danger claim" under *County of Sacramento v. Lewis,* 523 US 833, 851-852 that the state acted with deliberate indifference so as to shock the conscience. Plaintiffs' Rule 16 Statement pg.4. Were this Court to conclude that such a claim exists within this jurisdiction, and that the standard of deliberate indifference applied, Plaintiffs cannot prove at least two elements of this claim. Plaintiffs cannot prove that the harm was forseeable nor can they prove the state affirmatively used its authority in a way that created a danger to a citizen or that rendered a citizen more vulnerable to danger than had the state not acted at all.

When the twins allegedly disclosed that Mr. Stevens hit them, DCYF immediately removed the children from the home. The children were not returned to the home at any point in time. CPI Miller's report indicates that Mr. Stevens admitted to CPI Miller that he lived in the Sykes home and assisted in the care of the twins. Even if Ms. Sykes had appropriately listed Mr. Stevens on the licensing application he would not have been disqualified from living in the home under the regulations in existence at the time. DCYF did not have any indication that Mr. Stevens posed any threat to the twins' safety. There were no allegations made against Samuel Stevens prior to the boys being removed from the home. Prior to their removal, the twins did not disclose to any person, health care provider, counselor or official to put the State on notice that Mr. Stevens might harm the boys. Based on the facts and circumstances of this case, these

DCYF Defendants were justified in proceeding in the manner in which they did and are entitled to immunity.

**2. These Defendants have absolute and discretionary immunity for placement and monitoring of neglected and/or abused children.**

It is generally recognized that the placement and monitoring of abused or neglected children is entitled to absolute judicial immunity. *Martin v. Children's Aid Society*, 215 Mich.App. 88, 544 N.W.2d 651 (1996); *Babcock v. Tyler*, 884 F.2d 497 (9th Cir. 1989); *Vosburg v. Dep't of Social Services*, 884 F.2d 133 (4th Cir. 1989); *Coverdell v. Department of Social & Health Services*, 834 F.2d 758 (9th Cir. 1987); *Meyers v. Contr Costa Co. Dep't of Social Services*, 812 F.2d 1154 (9th Cir. 1987); *Kurzawa v. Mueller*, 732 F.2d 1456 (6th Cir. 1984).

The Family Court in Rhode Island stands *in loco parentis* to abused or neglected children and is charged by the General Assembly with the responsibility of placing the children who come within its protection into the custody of a qualified person or agency. *Petition of Loudin*, 101 R.I. 35, 219 A.2d 915 (1966). Defendants, in their capacity as advisors and assistants to the Family Court, regularly execute court orders concerning the placement and monitoring of abused or neglected children.

Governmental actors like Defendants who execute court orders are clothed by absolute judicial immunity because they themselves are "integral parts of the judicial process." *Coverdell*, *supra*, *citing Briscoe v. LaHue*, 460 U.S. 325, 335, 103 S.Ct. 1108, 1116, 75 L.Ed.2d 96 (1983). Denial of absolute immunity would seriously encroach upon the judicial immunity recognized by the Supreme Court and punish the entity that obeys a court order. *Kermit Constr. Corp. v. Banco Credito Y Ahorro Ponceno*, 547 F.2d 1 (1st Cir. 1976) (finding court appointed receiver entitled to absolute immunity); *Calhoun v. City of Providence*, 120 R.I. 619, 390 A.2d 350 (1978).

The placement of abused and neglected children are discretionary acts of the state pursuant to statute.

The Rhode Island General Assembly clearly stated the social importance of its laws relating to abused and neglected children:

> to protect children whose health and welfare may be adversely affected through injury and neglect. R.I. Gen. Law § 40-11-1.
>
> [t]o secure for each child…such care, guidance, and control…as will serve the child's welfare and best interests of the state. R.I. Gen. Law § 14-1-2.

Child placement decisions, like the placement of the twins at the Sykes foster home, are protected by discretionary immunity because the government is required to weigh competing policies of "protecting the child from danger within the family and keeping the family together," decisions involving "profound social considerations and, consequently" decisions at the "policymaking level." *Olson v. Ramsey County*, 509 N.W.2d 368 (Minn. 1993); *In re: Advisory Opinion to the Governor (DEPCO) v. Rhode Island Depositors Economic Protection Corp.*, 593 A.2d 943 (R.I. 1991).

In *DEPCO*, *supra*, the court found that the General Assembly intended the Superior Court to appoint the director of the DBR as receiver unless the court found that the appointment was not in the best interests of the parties. *Id.* at 953. The Court held that such control and supervision, in the context of a program of great public purpose, was discretionary and entitled to immunity. *Id.*, citing *United States v. Gaubert*, 499 U.S. 315, 111 S.Ct. 1267, 1275, 113 L.Ed.2d. 335, 348 (1991); *Catone v. Medberry*, 555 A.2d 328, 333 (R.I. 1989).

The *Gaubert* Court explained that discretionary immunity prevents judicial "'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Gaubert*, at 323. The Court held that

discretionary actions of governmental agents involving necessary elements of choice and grounded in the social, economic, or political goals of the statute are protected. *Id.* at 323.

In this case, the Family Court had jurisdiction oversight over DCYF in the pending petitions before the Court and in the placement of Jarrod and Brandon Raymond. As a result, these defendants have absolute and discretionary immunity.

**3. Plaintiffs cannot establish a prima facie case of negligence.**

To establish negligence, Plaintiffs must prove that the Defendants owed the Plaintiffs a duty to conduct themselves according to a standard of care and that the Defendants failed to meet that standard of care. The standard of care does not require that every decision or exercise of judgment or discretion by the Defendants always turn out to be successful. The test is whether the decision or exercise of judgment was appropriate at the time it was made, based on the information that was then available to a reasonably prudent social service worker operating under similar circumstances. *Bogosian v. Mercedes Benz,* 104 F.3d 472 (D.R.I. 1997); ***DiFranco v. Klein***, 657 A.2d 145 (R.I. 1995); and ***Marshall v. Tomaselli***, 372 A.2d 1280 (R.I. 1977).

Negligence is the doing of some act which a reasonably prudent person would not do, or the failure to do something which a reasonably prudent person would do, when prompted by considerations which ordinarily regulate the conduct of human affairs. It is, in other words, the failure to use ordinary care under the circumstances. A plaintiff who alleges that a defendants was negligent must prove all of the following in order to win:

(a) that the defendant owed him a legal duty to refrain from negligence;

(b) that the defendant breached that duty;

(c) that the breach of duty was the proximate cause of injury to the plaintiff; and

(d) that as a result of the foregoing, the plaintiff suffered actual loss or damages.

*Splendorio v. Bilray Demolition Co.*, 682 A.2d 461 (R.I. 1996); and *Banks v. Bowen's Landing Corp.*, 522 A.2d 1222 (R.I. 1987).

In order to prevail, Plaintiffs must prove the Defendants were negligent and that the negligence was the proximate cause of their injuries. Negligence consists of the failure of a person to comply with the rules of conduct which society imposes on a person in various circumstances. *Mandella v. Mariano*, 200 A. 478 (R.I. 1938); *Lutz Engineering Co. v. Industrial Louvers, Inc.*, 585 A.2d 631 (R.I. 1991); *Russian v. Life-Cap Tire Services, Inc.*, 608 A.2d 1145 (R.I. 1992); and *Wilson Auto Enterprises, Inc. v. Mobil Oil Corp.*, 778 F. Supp. 101 (D.R.I. 1991).

Moreover, in order for an act or failure to act to be considered negligent as to a defendant, the risk reasonably to be perceived must be within the range of comprehension. The Defendants are not bound to provide against an unusual, unlikely, remote or only slightly probable event. *Radigan v. W.J. Halloran Co.*, 196 A.2d 160 (R.I. 1963); *Mercurio v. Burrillville Racing Ass'n.*, 187 A.2d 665 (R.I. 1963); and *Hennessey v. Suhl*, 333 A.2d 151 (R.I. 1975). The Defendants owe no duty to the Plaintiffs to anticipate the unlikely or improbable. *Enos v. WT Grant Co.*, 294 A.2d 201 (R.I. 1972).

If an intervening cause was not reasonably foreseeable, then the intervening or secondary act becomes the sole proximate cause of Plaintiffs' injuries and damages. *Almeida v. Town of N. Prov.*, 468 A.2d 915 (R.I. 1983). A defendant does not owe a duty to protect a plaintiff from criminal acts of third parties. *Ferreira v. Strack*, 636 A.2d 682 (R.I. 1994).

No liability can attach to the Defendants unless the Defendants' negligence was the proximate, rather than the remote, cause of Plaintiffs' injury, and causation is established by

competent proof that but for the negligence of the Defendants, harm to the Plaintiffs would not have occurred. The proximate cause of an event is that which in its natural and continual sequence produced the event about which the plaintiff complains. The test is whether the damages to the Plaintiffs were either a direct result or a natural and probable consequence of any acts or omissions of the Defendants. *Mullaney v. Goldman*, 398 A.2d 1133 (R.I. 1979); and *Russian v. Life-Cap*, *supra*. Proximate cause may be established by showing that harm to the Plaintiff would not have occurred but for defendants' negligence. *Schenck v. Roger Williams Gen. Hosp.*, 382 A.2d 514 (1977); and *Evans v. Liguori*, 374 A.2d 774 (1977).

Plaintiffs are unable to show that the State breached any duty to these plaintiffs. First, it is questionable whether any abuse happened to these twins while they were in the Sykes foster home, given the scientific unreliability of the manner in which the alleged abuse was disclosed, the inconsistency and denials of abuse by the boys in their own statements in this case, and the lack of physical evidence.[6] Second, even if a third-party, Mr. Samuel Stevens, did actually hit the twins with a belt or otherwise abuse them, the defendants had no knowledge or even the suggestion that Mr. Stevens was likely to hit the twins in such a manner.

Finally, DCYF complied with regulations and policy. The Supervisor checked on Samuel Stevens criminal background when she learned that Mr. Stevens was in the home and his BCI was negative. The State was not required nor did it have the ability during the time at issue in this case, to obtain an NCIC background check. Moreover, although Mr. Stevens does have a criminal record in another state, that conviction is not disqualifying under the RI DCYF Foster Care Regulations in place during the relevant time period.

---

[6] See the summary testimony of Dr. Joseph Penn and Dr. Christine Barron regarding the disclosures, lack of forensic interviewing guidelines established by the American Professional Society of the Abuse of Children and National Children's Alliance, the potential contamination of the disclosures during the evaluation process, and other factors.

**4. Plaintiffs cannot causally connect damages with any alleged breach of duty.**

The causal connection between the Defendants' negligence and harm to the Plaintiffs must be established by competent evidence. *Schenck v. Roger Williams Gen. Hospital*, 382 A.2d 514 (R.I. 1977). In this case, in order for Brandon and Jarrod to prevail, they must prove by a preponderance of the evidence that their damages were proximately caused by the Defendants' negligence. Absent proof of a causal connection between the defendant's negligence and harm to the plaintiff, a verdict for the plaintiff in a negligence action would be based on conjecture and speculation. *Id.*, *Evans v. Liguori, supra*.

Proof of damages must rest on legally competent evidence establishing the nature and extend thereof and may not be the result of speculation or conjecture. *White v. LeClerk,* 444 A.2d 847 (R.I. 1982), *appeal after remand* 468 A.2d 289 (R.I. 1983). Damages must be based on reasonable and probable estimates. *Rhode Island Turnpike v. Bethlehem Steel Corp.*, 379 A.2d 344 (R.I. 1977). Damages must be proved to a reasonable certainty. *Smith v. Bileau Enterprises*, 308 A.2d 477 (R.I. 1973). An award for damages must rest on legally competent evidence establishing the nature and extent thereof; such an award may not properly be the result of speculation or conjecture. *Alterio v. Baltimore Construction Corp.*, 377 A.2d 237 (R.I. 1977); *Harris v. Town of Lincoln*, 668 A.2d 321 (R.I. 1995).

Psychic and physical injury claims must be supported by competent expert medical opinion regarding origin, existence and causation. *Vallinoto v. DiSandro*, 688 A.2d 830 (R.I. 1997).

When the only evidence offered to establish a causal relationship between one person's activities and another's injuries is the testimony of a medical expert, such evidence must speak in terms of "probabilities" rather than "possibilities." *Sweet v. Hemingway Transport Co., Inc.*, 333

A.2d 411 (R.I. 1975). Expert testimony, if it is to have any evidentiary value, must state, with some degree of positiveness, that a given state of affairs is the result of a given cause. *Id.*

The Plaintiffs are obligated to mitigate their damages by following Court orders, including orders to attend and participate in counseling. *Romano v. Allstate Ins. Co.*, 458 A.2d 339 (R.I. 1983).

In this case, the Plaintiffs cannot prove to a reasonable degree of medical certainty, that the twins current psychiatric condition was proximately caused by the alleged "abuse" by Mr. Stevens. There is ample evidence that the twins had a predisposition for long- term mental and physical issues given their biological makeup and their abusive and neglectful upbringing at the hands of their own biological mother and her family. In fact, the twins were removed from their mother's care many times prior to placement in the Sykes foster home because of her alcohol and drug abuse, criminal activities, and inadequate supervision. These factors are a significant cause if not the only cause of the twins' current psychological condition and Plaintiffs are unable to establish, to the requisite degree of medical certainty, that if in fact they were hit or "abused" by Mr. Stevens, that those actions caused their current and future condition.

## IV. WITNESSES

DCYF may call the following witnesses at the trial of this matter.

**1. Dr. Joseph Penn, Board Certified in General, Child and adolescent Psychiatry and Neurology, an expert for the State, will testify consistent with his report and will render the following opinions:**

Dr. Penn will testify regarding the differences in the method of evaluating youths who may have been abused, depending upon whether the evaluator is conducting a forensic (i.e., evaluations that are intended to address a legal issue or question) or a clinical evaluation (i.e.,

outpatient or inpatient evaluation and treatment with no associated civil or criminal litigation or other legal involvements).

Dr. Penn will testify about the increased scientific research, legal scrutiny, and emphasis regarding the increased concern that appropriate interviewing techniques be utilized to avoid contamination of children's statements or allegations and testify regarding the suggestibility of children.

Dr. Penn will also give his opinion that Dr. Savitzky and other subsequent mental health professionals' who have generated clinically driven (and not forensically-based) diagnoses of Brandon and Jarrod as having PTSD and their direct correlation or causal relationship to alleged events within the Sykes' foster home is problematic. Dr. Penn will further testify that Dr. Savitzky and other mental health treatment provider's diagnoses were clinically-based or clinically-driven, within a clinical setting, not a legal context, and were performed solely to identify treatment services. He will further testify regarding the multiple major differences in role, agency, purpose, methods employed, data collected and relied upon in a purely clinical evaluation for purposes of a clinically driven diagnostic evaluation and treatment versus a forensic psychiatric evaluation of a child or adolescent who has claimed physical or sexual abuse, and of particular relevance in this case, when such claims are first identified or reported via a second party (Molly Raymond). He will give his professional opinion, there is no current objective data to support the allegation that the twin(s) suffered "anal rape on a daily basis" and that the medical and mental health records and other collateral documents do not support this allegation.

Dr. Penn will give his professional opinion that several of Brandon and Jarrod's past mental health providers have failed to consider major relevant past, current, or concurrent

stressors. Some have attributed all of these youth's presenting symptoms or problem behaviors to the alleged trauma in question (while in the Sykes' foster home placement) without taking into account the above described past history and multiple other sources of trauma and stress. Additionally some clinicians appear to have learned of the alleged trauma history and automatically given these youths a definitive or presumptive PTSD diagnosis in the mental health records, or inferred a cause and effect relationship without clearly documenting the supporting/required DSM-IV criteria, without considering other diagnoses or alternatively, confusing preexisting psychopathology with recent-onset PTSD. Dr. Penn will further testify that there is limited corroboration of PTSD symptom severity and clarification of symptom onset.

Dr. Penn will testify regarding his review of the records, interviews of collateral sources, depositions and observations of the twins, mental evaluations of the twins and the verbalized ambivalence to Dr. Penn regarding their perception of their mother, Molly Raymond's interests and motivation; "all she cares about is the trial, the money."

Based on his evaluation, review of available records, and interview of collateral historians to date, Dr. Penn will testify, to a reasonably degree of medical and psychiatric certainty, that at the present time, due to the presence of multiple confounding variables and a pattern of negative exacerbating factors (principally on the part of Molly Raymond and other family members), it is not currently possible to establish, to a reasonable degree of medical/psychiatric certainty that Jarrod and Brandon Raymond's current or past identified mental health conditions, including PTSD (posttraumatic stress disorder), or any other psychic harm or damages, are a result of their placement in the Sykes' foster home.

**2. Dr. Christine E. Barron, MD, Child Abuse Pediatrics Fellowship Director, Hasbro Children's Hospital, Clinical Director, Child Protection Program, Hasbro Children's Hospital. Assistant Professor Pediatrics, Warren Alpert Medical School at Brown University**.

Dr. Barron will testify as an expert for the State consistent with her report and render the following opinions:

Brandon and Jarrod Raymond were victims of chronic neglect, physical abuse, and exposure to domestic violence, inappropriate sexual activity, alcohol abuse and substance abuse while in the care of their mother. In her expert opinion, all of these experiences can lead to severe mental illness in children, which can persist to adulthood.

Because of their severe behavior problems, Brandon and Jarrod Raymond required many different foster placements and foster families found them difficult and disruptive. The twins' mother, Molly Raymond, has a long history of substance abuse, criminal activity, and involvement with DCYF. DCYF removed the twins from Molly Raymond's home because of Molly's abuse and neglect and child maltreatment.

During the time the boys were in the Sykes' home (eighteen months), their behavior improved. During the time the boys were in the Sykes' home, they were both enrolled in group therapy at the Providence Center. The therapist documented no disclosures of abuse during this time, and noted no symptoms suggesting physical or sexual abuse.

The evaluations completed by Drs. Savitsky and Plaintiff's expert, Dr. Ramsey, did not follow standard protocols for sexual abuse evaluations used to assure that the results of the evaluations are not tainted by the mother's influence and her suggestions of abuse. Their practice and procedures did not conform to accepted community and national standards. There is no documented spontaneous disclosure to a professional trained in the evaluation of alleged sexual abuse by Brandon or Jarrod Raymond.

The alleged physical abuse is poorly documented. Because of the lack of documentation, I cannot substantiate that allegation.

There is insufficient evidence to conclude that Brandon and Jarrod were victims of child maltreatment while placed within the Sykes foster home. Dr. Barron will further testify that it would also be impossible and improper to assign the twins continued psychiatric illnesses and behaviors on this placement given all the other circumstances of their lives as evidenced and described in the DCYF records and medical records. Dr. Barron will testify that DCYF acted in accordance with existing laws and policy in the initial placement and continued placement of Brandon and Jarrod Raymond into the Sykes foster home.

**3. Stephanie Terry, DCYF Caseworker Supervisor.**

Will testify regarding DCYF involvement with the Raymond family, removals of the twins from the mother's home, the considerations regarding filing termination of parental rights petitions in the family court, service plans, court appearances, considerations of placements, her review of Ms. Raymond's complaints to CANTS regarding the twins care while in foster placement at the Sykes home. Ms. Terry will also testify her observations of the twins behavior when removed from Ms. Raymond's care, her observations of the supervised visits with Ms. Raymond and the twins while they were in the Sykes foster home. She will also testify regarding the foster care licensing regulations as to foster parents and caregivers and the DCYF procedures to request BCI clearance of persons living in foster homes.

**4. Margaret Gloria, DCYF Caseworker assigned to Molly Raymond case file.**

She will testify regarding her work as the caseworker for Molly Raymond consistent with her case dictation and her recollection, placement of the twins in the Sykes home and subsequent placements, her knowledge of services provided to the Raymond family, DCYF

review of Molly Raymond's complaints regarding the care of the twins while in the Sykes foster home. Ms. Gloria will testify that one of the twins told her he lied about Mr. Stevens hitting him.

**5. Melissa Nathaniel, Caseworker assigned to Molly Raymond's case prior to placement of the twins in the Sykes foster home**.

Ms. Nathaniel will testify regarding her interactions with the Raymond family, her \ observations of the twins behavior when they were removed and during placements, the circumstances surrounding the removal of the children from Ms. Raymond's care, Ms. Raymonds' interactions with her children, the information contained in her reports to the family court, the difficulty in keeping the twins in a foster placement due to their behavior and prior to the twins placement in the Sykes foster home.

**6. DCYF Investigator, Margaret Renzi.**

She is the CPI assigned to investigate report on January 15, 1997, and will testify regarding her investigation of the complaint that the children were hit in face with squirt gun while living in foster home. The investigation was unfounded.

She will also testify about an investigation into the Sykes home that Jarred had scratch marks on his face made to hotline on 8-15-97. The investigation was unfounded.

**7. DCYF Investigator, Albert Rondina**.

He will testify regarding his work on the CANTS investigation into the complaint that Jarrod's face was scratched.

**8. DCYF Investigator, Stephen Theriault.**

He testify regarding his investigation of a report made by DCYF case aid technician on March 6, 1997, reporting that Jarod reported Sykes family friend, Bobo, hit him on the back. The investigation was unfounded.

**9. DCYF Investigator, Edward Degnan**.

He will testify that he investigated a complaint to the hotline received on 3/24/99, that Brandon was hit and touched in his private parts while in the Sykes home. He will testify regarding his investigation and that the investigation was unfounded.

**10. Thomas M. Bohan, Former Executive Director of DCYF**.

He will testify regarding his review during the appeal process of the founded investigation against Samuel Stevens and that the indication of abuse was reversed. Mr. Bohan will testify regarding the standard for an indicated case.

**11. Thomas Dwyer, DCYF**

He will testify regarding his involvement in the appeal process review of the indicated abuse against Samuel Stevens. Mr. Dyer will testify regarding the standard for an indicated case.

**12. Phil Steiner, Supervisor, DCYF Foster Care Licensing Unit.**

He will testify regarding the licensing of foster homes and foster placements.

**13. Leanne Sperdutti, DCYF Foster Care Licensing Administrator.**

She will testify regarding the licensing of the Sykes foster home and placement and considerations relating to maintaining Jarrod and Brandon Raymond in the Sykes Foster Placement.

**14. Linda Iaciofano, DCYF Licensing.**

She will testify regarding the licensing of the Sykes Foster home and her review of the home and her renewing the Sykes Foster home license.

**15. Barbara Johnson, licensed foster parent.**

She will testify regarding her experiences with and observations of Brandon and Jarrod Raymond who were placed in her home by DCYF for approximately one day and night in May 1998 following the twins' removal from the Sykes foster home.

Barbara Johnson will testify that the twins told her they had murdered a baby girl by pushing her out a window. Brandon later said that the story was not true. Jarrod told her he was hit with a belt buckle and Brandon said it was not true. She will further testify that she became concerned for the safety of the other children in her home, including her six-year-old developmentally disabled granddaughter, that she called DCYF that day and the boys were removed at her request.

**16. Arthur McAteer, DCYF Investigator.**

He will testify regarding his investigation of Molly Raymond on July 7, 1995. He will testify that he indicated neglect against Molly Raymond after call to hotline that twins were seen walking in only their underwear on Manville Rd., under a bridge and found near the river.

**17. Jane Lopes, DCYF Investigator.**

She will testify regarding investigation of Molly Raymond.

**18. Natalie Heberman, foster placement of Jarrod and Brandon Raymond prior to placement of twins in Sykes foster home**.

She will testify that prior to placement of twins in Skyes foster home. She will testify that the twins were very active, needed extremely close and constant supervision, and that one twin held the other twin underwater while taking a bath.

**19. Henry Heberman, foster father placement of Jarrod and Brandon Raymond prior to placement of twins in Sykes foster home.**

He will testify about his observations of the twins while they were in his care and the Hebermans' request that children be removed.

**20. Molly Raymond, Mother Jarrod and Brandon Raymond**.

The state anticipates Ms. Raymond's testimony regarding her care of the twins, her relationship with the twins as it relates to the diagnosis of PTSD and diagnosis of attachment disorder.

**21. Mary Starnes, DCYF Case Aid.**

She will testify regarding her observations during her attendance at supervised visitation with Ms. Raymond and the twins and her observations during her transporting the twins to the visitations during the time the twins were living at the Sykes foster home.

**22. Sharon Bolles, DCYF Investigator.**

She will testify that in July 2000 she investigated a call to the hotline that the Woonsocket police apprehended Jarrod for throwing rocks at a building. She will testify that Ms. Raymond told her that Jarrod often lies.

**23. Dee Henry, Supervisor of Head Start**.

She will testify regarding the twins behavior while they were attending Head Start prior to placement in the Sykes foster home and her interactions with the Raymond family during the time the twins were enrolled.

**24. Faith Sykes, Foster Mother**.

She will testify regarding her care of the twins and their behavior while they were placed in her care.

**25. Ann Marie McAndrews, Counselor at Providence Center.**

She will testify that Jarrod and Brandon were in therapy with her during the time they were living in the Sykes foster home, that she saw them weekly, and that the twins did not make any allegations of abuse by "Thinman" or anyone in the Sykes home. She will testify regarding her observations in therapy with the twins.

**26. Karen McKenzi, Social Worker at the Gilbert Stuart School.**

She will testify regarding her observations of the boys when they were at school and they stated they were hit by Samuel Stevens.

## IV. DEFENDANTS' EXHIBIT LIST

1. CV Dr. Christine Barron
2. CV Dr. Joseph Penn
3. RI DCYF Foster Care Regulations, 1998
4. Cants Investigation Number 26
5. Cants Investigation Number 27
6. Cants Investigation #217156
7. Cants Investigation #1320749
8. Cants Investigation #250445
9. Cants Investigation #216859
10. Cants Investigation #203915
11. Cants Investigation #200130
12. DCYF File regarding Molly Raymond/Potter/Pelkey
13. Providence Center Records for Brandon Raymond
14. Providence Center Records for Jarrod Raymond

15. Hasbro Medical Records for Brandon Raymond
16. Hasbro Medical Records for Jarrod Raymond
17. 1995 Family Court Documents filed by DCYF
18. January 1998, Involuntary Termination of Parental Rights
19. Letter from Providence Childrens' Museum terminating visitation program.
20. License application for Faith Sykes and Marron Smith
21. Plaintiffs' Answers to Interrogatories.
22. Plaintiffs' Supplemental Answers to Interrogatories.
23. Plaintiffs' More Responsive Answers to Interrogatories.

## V. MOTIONS IN LIMINE

1. The State will file a Motion in Limine, to exclude the proposed testimony of Plaintiffs' proposed expert, Dr. Rebecca Ramsey, on the basis that she is not qualified and on the basis that her opinion is not based upon reliable principles and methods, and that she did not apply reliable principles and methods to the facts of this case pursuant to Federal Rules of Evidence 702, 703 and 704. If the Motion in Limine is denied, the State will request a *Daubert* hearing. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 113 S.Ct. 2786 (1993). The state will also move to exclude Dr. Ramsey from testifying regarding the issue of the duty or breach by DCYF including DCYF's standard of care on the basis of her lack of qualifications or experience and based upon her deposition testimony during which she admitted that she is not qualified to testify as an expert in those areas.

2. The State will file a Motion in Limine to exclude any evidence of Samuel Stevens' criminal conviction available through an NCIC, Interstate Identification Index on the basis that during the relevant time period, DCYF was not legally required to obtain an NCIC on persons

living in the home, and on the basis that DCYF could not obtain an NCIC during the time the twins were living in the Sykes foster home.

3. Defendants anticipate that Plaintiffs will attempt to rely upon the deposition testimony of Jarrod and Brandon Raymond. The Defendants anticipate an issue as to whether Jarrod and Brandon are availability to testify pursuant to Rule 804.

The State will file their Motions in Limine on August 18, 2008.

**VI. JURY INSTRUCTIONS**

Proposed Jury Instructions and Jury Verdict Form are filed in a separate memorandum.

**VII. TRIAL**

The State anticipates a two-week trial.

Respectfully submitted,

DEFENDANTS
By its Attorney,

PATRICK C. LYNCH
ATTORNEY GENERAL

/s/ Genevieve M. Allaire Johnson
/s/ Suzette I. Pintard

Genevieve M. Allaire Johnson, No. 5778
Special Assistant Attorney General
Suzette I. Pintard, No. 7185
Special Assistant Attorney General
150 South Main Street
Providence, Rhode Island 02903
(401) 274-4400 EXT. 2298
Fax No. (401) 222-2995

## CERTIFICATE OF SERVICE

I hereby certify that I have electronically filed the within via the ECF System and that I caused a copy to be sent electronically on this 31st day of July, 2008 to the attorney(s) of record listed below:

**Mary Ann Violette, Esquire**
mviolette@abcglawfirm.com

**Thomas L. Mirza, Esquire**
tmirza@pmlawprov.com

David N. Bazar, Esquire
dbazar@abcglawfirm.com

/s/ Genevieve M. Allaire Johnson