**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| J. R. a minor, P.P.A. MOLLY RAYMOND; B.R. a minor, P.P.A., MOLLY RAYMOND<br><br>Plaintiffs,<br><br>vs.<br><br>MARGARET GLORIA, Individually and in her Capacity as a Social Worker; STEPHANIE TERRY, Individually and in her Capacity as Supervisor; STATE OF RHODE ISLAND DEPT. of CHILDREN, YOUTH and FAMILIES; PATRICIA MARTINEZ, in her Capacity as the Director of the RHODE ISLAND DEPT. of CHILDREN, YOUTH and FAMILIES;<br><br>Defendants. | ) | C.A. No. 08-137S |

**PLAINTIFFS' PRETRIAL MEMORANDUM**

**JULY 31, 2008**

# TABLE OF CONTENTS


| Section | | Page |
|---|---|---|
| 1. | Background……………………………………… | 3 |
| 2. | Legal Claims and Burden of Proof……………… | 5 |
| | Negligence Claims………………………. | 5 |
| | Substantive Due Process Claims………... | 6 |
| 3. | Proposed Witness List…………………………... | 11 |
| 4. | Proposed Exhibit List…………………………… | 18 |
| 5. | Anticipated Motions In Limine…………………. | 22 |
| 6. | Proposed Jury Instructions……………………… | 24 |
| 7. | Proposed Jury Verdict Form……………………. | 40 |
| 8. | Certification…………………………………….. | 46 |

# I. BACKGROUND

The plaintiffs, J.R. and B.R. are fifteen year old twins whom, at various times in their lives (including today) were in the temporary care, custody and control of the defendant State of Rhode Island Department of Children, Youth and Families (hereinafter DCYF). On or about November 1996, as a result of alleged neglect on the part of their natural mother Molly Raymond, the DCYF placed the boys in the licensed foster home of Faith Sykes. The plaintiff boys were four and one-half years old at the time. The DCYF licensed this home with the knowledge and belief that Faith Sykes and/or her husband Marron Smith would be the caretakers of any children placed in the home. Defendant Margaret Gloria was the social worker assigned to the case and Stephanie Terry was her immediate supervisor at all times pertinent hereto.

The plaintiffs have essentially two claims, negligence against the defendants Margaret Gloria and her supervisor Stephanie Terry along with substantive due process claims pursuant to 42 U.S.C. §1982 (applying the state created danger theory) against defendants Margaret Gloria, Stephanie Terry and the DCYF. The factual basis for each of the claims flows from the same set of facts and circumstances. These defendants, having temporary care, custody and control of the minor plaintiffs through the Rhode Island Family Court placed the twins in a foster home where care was eventually provided by an unlicensed adult known to the DCYF as “thinman” (his real name is at some point determined to be Samuel Stevens). The DCYF knew of this stranger’s ongoing care of the minor children and allowed said “care” to continue for at least ten months, only ending when the children were removed from the home after showing up at school with belt marks and other abrasions on their bodies. The boys reported that these injuries were inflicted upon them by “thinman.” Following a DCYF investigation, Stevens was indicated for abuse. A third child was also removed from the Sykes home.

Several months later the boys disclosed facts related to being sexually abused by Stevens while they were in the home.

As a direct and foreseeable result of these defendants allowing a stranger to care for the twins over a prolonged period of time, the boys suffered ongoing physical and sexual abuse in the home. The evidence will show that “thinman” lived in a bedroom adjacent to the boys on the third floor of the Sykes home. The evidence will further prove that he took the boys to and from school every day, he attended their counseling appointments, fed them and bathed them, and was the contact with the DCYF case aide over a seven month period; in essence these children were always in the control of their abuser. “Thinman” admits to most of this, including taking the five year old boys into a locked basement to discipline them[1].

The DCYF, *of all agencies*, was fully aware of the risks involved when a parent allows a stranger to care for their children. DCYF policies and procedures were ignored as “thinman” was allowed to perpetrate these atrocities when he had ongoing contact with the defendants. His involvement with the children is repeatedly documented in DCYF records, records that were reviewed by the defendants, yet no action was taken to remove him or the boys from the home. The defendants did not initiate an investigation as to who he was, his role with the children or where the foster parents were. The defendants were grossly negligent and deliberately indifferent to these dangers over an extended period of time; during which time the boys were left to the severe and sadistic abuse of Samuel Stevens, aka, “thinman.”

[1] He denied using the belt or the sexual abuse.

## II. SPECIFIC LEGAL CLAIMS AND PLAINTIFFS' BURDEN OF PROOF

### A. Negligence Claims – Counts I, II and III

State actors such as the defendants named herein, are initially presumed to have tort immunity. To overcome the sovereign immunity granted these defendants under the public duty doctrine, the plaintiff's burden of proof includes establishing:

(1) that the state official(s) has knowledge of the plaintiffs or their situation;

(2) that the state official(s) acted or failed to act in some way that was potentially injurious to the plaintiffs; and

(3) that the injuries were a reasonably foreseeable consequence of the state's action or inaction. Schultz v. Foster-Glocester Regional School District, 755 A.2d 153, 155-56 (R.I. 2000)

In Schultz the Rhode Island Supreme Court held that the public duty doctrine did not shield a school district from liability arising from an injury suffered during a cheerleading practice because the injured student *was an identifiable person* to whom the school district owed a special duty of care. Id. (Emphasis added) The DCYF's temporary legal custody of J.R. and B.R. creates the requisite relationship for negligence claims against these defendants under the "special duty doctrine."[2] The evidence to be elicited from the aforementioned witnesses will, by a preponderance of the evidence, prove that these defendants knew of the plaintiffs' situation, failed to act in a way that was potentially injurious to the boys and the injuries were a reasonably foreseeable consequence of their inactions. The DCYF's own records show they knew of "thinman" caring for the boys, left the boys in his care over an extended period of time, and that the DCYF knows that placing children with strangers always

[2] The DCYF filed for summary judgment in the Superior Court, in part, based on the doctrine of sovereign immunity. That motion was denied.

creates a foreseeable risk of abuse.

**B. Substantive Due Process Claims – Counts IV, V and VI**

Courts have consistently held that the Due Process Clause does not impose an affirmative duty upon state actors to protect individuals from the acts of private citizens. DeShaney v. Winnebago County Dep't. of Social Services. 489 U.S. 189, 198-200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). But the Court in DeShaney stated that when the state takes a person into its custody and holds him there against his will the substantive component of the due process clause imposes upon it a corresponding duty to assume responsibility for his safety and general well-being. Id. at 199-200. From this case the "state created danger" doctrine has developed and is recognized in most Circuits.[3]

This Court has addressed the "state created danger" theory in Rivera v. State of Rhode Island, 402 F.3d 27 (1st Cir. 2005). Rivera was to testify in a murder trial involving Charles Pona. Although promised protection by the defendants if she were to agree to testify, Rivera was murdered just before her appearance in court. The First Circuit upheld this court's denial of liability under the theory. The First Circuit reasoned that DeShaney directs that a state's affirmative constitutional duty to protect an individual from private violence arises when there is some deprivation of liberty by state actors. Rivera at 38, citing DeShaney, 489 U.S. at 200, ("The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has

[3] *See* Pena v. DePrisco, 432 F.3d 98, 107-10 (2d Cir.2005); Kallstrom v. City of Columbus, 136 F.3d 1055, 1066 (6th Cir.1998); *Reed v. Gardner*, 986 F.2d 1122, 1126 (7th Cir.1993); Forrester v. Bass, 397 F.3d 1047, 1057-59 (8th Cir.2005); Kennedy v. City of Ridgefield, 439 F.3d 1055, 1061 (9th Cir.2006); Uhlrig v. Harder, 64 F.3d 567, 572 (10th Cir.1995); Butera v. District of Columbia, 235 F.3d 637, 648-51 (D.C.Cir.2001); *see also* Wyke v. Polk County Sch. Bd., 129 F.3d 560, 567 (11th Cir.1997) ("The language of *DeShaney* does indeed `leave room' for state liability where the state creates a danger or renders an individual more vulnerable to it."). *But see* Pinder v. Johnson, 54 F.3d 1169, 1176 n. (4th Cir.1995); Rios v. City of Del Rio, 444 F.3d 417, 422 (5th Cir.2006) (noting that "this court has frequently spoken of the `state-created danger' theory," but has never adopted it).

imposed on his freedom to act on his own behalf."). The Rivera court reasoned that the plaintiff voluntarily decided to testify and had the ability to withdraw from that position (danger), thereby falling outside the principals set fourth in DeShaney. Id.

The "state created danger" theory is applicable to the facts and circumstances in this case. These very young twins had no ability to act on their own behalf. They were completely vulnerable to the dangers created by their placement in this home. It is hard to conceive of a more shocking situation than the DCYF taking custody of four year old twins and allowing a stranger to care for them. The continued placement in the Sykes home, after notice of "thinman's" involvement, creates a foreseeable risk of the very harm inflicted on the plaintiffs. The many recorded red flags regarding the children's care during the months of thinman's involvement only add to the shocking nature of the defendants' failure to intervene.

The Third Circuit, which has addressed "state created danger" theories under a variety of scenarios, reviewed a substantive due process claim brought by a minor against a New Jersey Department of Human Services caseworker who placed him in the equivalent of a foster home where he was subsequently abused. Nicini v. Morra, 212 F.3d 798, 800-01 (3d Cir. 2000) (en banc). Nicini was a troubled teenager who had apparently made two suicide attempts. Id. at 801. His behaviors required the New Jersey DHS to place him in several foster homes before his placement with the eventual perpetrator. Nicini was sexually abused by one of the parents in his new foster home placement and he filed suit against the caseworker.[4] He alleged that the caseworker failed to properly investigate the background of

---

[4] The Nicini court notes that other Circuits that have found the DeShaney exception applicable to children placed in foster homes. See, e.g., Lintz v. Skipski, 25 F.3d 304, 305 (6th Cir. 1994); Norfleet v. Arkansas Dep't of Human Servs., 989 F.2d 289, 293 (8th Cir. 1993); Yvonne L. v. New Mexico Dep't of Human Servs., 959 F.2d 883, 891-93 (10th Cir. 1992); K.H. v. Morgan, 914 F.2d 846, 848-49 (7th Cir. 1990). These courts have accepted the analogy between persons the state places in foster care and those it incarcerates or institutionalizes. See, e.g., K.H., 914 F.2d at 849 ("Once the state assumes custody of a

the *foster parent,*[5] and that the caseworker knew or should have known that the placement was inappropriate.

The Third Circuit's determination that liability should not be imposed was based on the fact that the plaintiffs could point to no policies violated by the caseworker, that he conducted a background check of the perpetrator, and that his investigation was presented to the Family Court. The Third Circuit also addressed the fact that the plaintiff never informed the caseworker of the abuse as it was occurring, noting that "Nicini, albeit a minor, was not of such tender years that he was unable to communicate this information. He was fifteen years old and had left an earlier placement to find the Morra's on his own." Id at 813.

Margaret Gloria and Stephanie Terry had virtually no information as to who "thinman" was until the boys were removed. The defendants never initiated an investigation as to the appropriateness of Samuel Stevens as a caretaker, or start the application process for potential caregivers as required by DCYF policy. Margaret Gloria, the social worker assigned to the case, and her supervisor Stephanie Terry, never mention Samuel Stevens or "thinman" in their case notes during the entire period the case aide documents his constant contact with the children.

Unlike Nicini, the twins were placed in the care of a complete stranger; contrary to DCYF regulations and the norms of any responsible parent. Furthermore, the twins were five years of age when the abuse commenced and were constantly under the watchful eye of the abuser; Stevens readied them for visits, took them to and from school every day, slept in the adjacent room *and even participated in their counseling*. He admits taking these very small

---

person, it owes him a rudimentary duty of safekeeping . . ."); Yvonne L., 959 F.2d at 891-93 (discussing and approving cases imposing liability in foster care context). Nicini at 807.

[5] Samuel Stevens, aka "thinman," was not a foster parent, nor was he even an individual who had applied to be a licensed caretaker.

children into a locked basement to discipline them. There was no escaping his wrath. There was no intervention by the defendants until the children arrived at school with multiple belt inflicted bruises.

To prevail on a state-created danger claim most Circuits require that a plaintiff prove:

(1) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

(2) the harm ultimately caused was foreseeable and fairly direct;

(3) a state actor acted with a degree of culpability that was deliberately indifferent to the danger; and

(4) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general. Sanford v. Stiles, 456 F.3d 298, 304-305 (3rd Cir. 2006)

The plaintiffs will prove by sufficient evidence that child abuse is a foreseeable and fairly direct consequence of placing children in the care of strangers. Clearly, when children are placed in the care of a stranger, they immediately become foreseeable victims of abuse. The record is also clear that by failing to remove these children immediately from the care of "thinman" they rendered the children more vulnerable to the eventual abuse.

The plaintiffs aver that the degree of culpability that needs to be established in counts IV, V and VI (due process claims) of this case is *deliberate indifference*. In some "state created danger" cases the plaintiffs must demonstrate that the state's actions *shock the conscience*. Facts that satisfy this standard vary from case to case. The Third Circuit's review of cases utilizing this standard concluded that the level of culpability required to shock the

conscience increases as the time state actors have to deliberate decreases. Sanford at 309. In this matter the DCYF had notice of "thinman's" involvement with the children over many months, yet took no action.[6]

Although the Nicini court failed to find liability on the part of that caseworker, they assessed the caseworker's actions under the deliberate indifference standard. Nicini, infra at 811. The Court held that because the caseworker had "time to make unhurried judgments" in investigating whether to permit the child to remain in the foster care in which he was placed, deliberate indifference was the appropriate standard. Id. (quoting Lewis, 523 U.S. at 853, 118 S.Ct. 1708). The caseworker's investigation, after first becoming aware of concerns with the placement, took approximately thirty days. Nicini at 802. The DCYF had notice of "thinman's" involvement with the children for at least seven months and *never* initiated an investigation, therefore the deliberate indifference standard should be applied.

**C. Damages**

The children were returned to Molly Raymond in the month's following the indicated abuse. Soon they were acting out sexually and referred by the DCYF to the Providence Center for an evaluation by Dr. Savitsky. His evaluations were the first of many psychiatrists to diagnose the children with Post Traumatic Stress Disorder as a result of the sexual abuse that occurred in Sykes home.

Since then the boys have spent many years institutionalized. Their placements have included Butler Hospital, Bradley Hospital, the Brandon Center, Harmony Hill, Saint Mary's, and more. As of the date of this memo, J.R. is inpatient at Bradley Hospital while B.R. is in a treatment facility in Tennessee. The boys lives have been forever transformed by the abuse

[6] "In situations where actors have an opportunity to reflect and make reasoned and rational decisions, deliberately indifferent behavior may suffice to "shock the conscience." County of Sacramento v. Lewis, 523 U.S. 833, 851-852 (1998).

they suffered in the Sykes home. Attempts to return the children home have not been successful. Their needs are enormous as reflected by the numerous long term placements. Mental anguish, and the associated pain and suffering (permanent in nature) will compromise a bulk of the plaintiffs' damages. Future outpatient treatment costs (a conservative and optimistic outcome) over the next ten years will constitute objective damages presented on the boys' behalf.

## III. WITNESSES

To prove the plaintiff's claims the plaintiffs will call twenty-two (22) witnesses in an order yet to be determined.

Molly Raymond

Molly Raymond is the natural mother of the plaintiffs. She will testify to the children's general development prior to their placement in the Sykes foster home. Molly will also testify to the reasons for the 1996 placement, the visitation she had during the placement and the subsequent changes in the boy's behaviors when they were returned to her in late 1998. She will then testify to the boy's emotional and behavioral struggles as a result of the abuse.

Margaret Starnes

Ms. Starnes, a DCYF employee who assisted with the transportation of the plaintiffs to and from visits with their mother will testify to her repeated and ongoing contact with "thinman" and her understanding of his caretaking role with the children. Ms. Starnes memorialized these contacts in notes that were sent to her superiors, defendants Margaret Gloria and Stephanie Terry, via the DCYF reporting system. These notes, created in the normal course of business, speak to "thinman's" involvement with the children over a seven

plus month period of time. She will testify further that she was never instructed to stop delivering the children to “thinman” after visits. She will also testify to the boys’ condition prior to visits, often times disheveled, unfed, late for the visits and at times unavailable.

Phillip Steiner

Mr. Steiner was the head of the licensing department at all pertinent times hereto. He will testify to the department’s policies regarding individuals, other than actual foster parents, who are involved in the ongoing and/or regular care of foster children. He will testify that those policies were not complied with as they related to “thinman” and that Samuel Stevens was not referred to his department for the requisite training and screening.

Linda Iacofano

Ms. Iacofano, a DCYF supervisor in the foster home licensing department, will testify to 1997 concerns about the appropriateness of the boy’s placement in this home. She will testify that she thought the boys should be moved but the defendants Margaret Gloria and Stephanie Terry insisted they stay in this home. She will also testify to the department’s requirements for foster parenting, third party care of foster children and issues specific to the closure of this home.

Faith Sykes

Ms. Sykes was the licensed foster mother. She will testify to the behavioral issues the boys developed in the latter stages of the placement. She will testify to the scope of Margaret Gloria’s involvement with the children, the general condition of her home, who lived there and her role in the daily care of the children. She will also testify to “thinman’s involvement with the children.

Haven Miles

Haven Miles was the boys’ counselor at the Providence Center. She will testify to the

counseling provided to the boys while in the Sykes home.

Lee Bradshaw

Ms. Bradshaw was Molly Raymond's counselor when she was at Eastman House. This counseling took place while the boys were in the Sykes home. Ms. Bradshaw received the call from DCYF about the boys being removed from the Sykes home and was told by the DCYF the circumstances surrounding the removal. She was asked by DCYF to discuss the removal and the reasons for it with Molly Raymond.

Virginia Miller

Virginia Miller is a retired DCYF investigator. She was assigned to this matter when the school reported the bruises on the boy's bodies. She will testify to her investigation, including interviews with the foster mother, "thinman", school personnel, the boys, Margaret Gloria and others. She will testify to finding the four inch wide belt used to whip the boys in the foster home basement, where the boys said it would be. She will testify to procedures she subsequently took as a result of her investigation.

Dr. Carpentier

Dr. Carpentier was the Fatima Hospital emergency room doctor who treated the boys on the date of the reported abuse. He will testify that the bruises on the boy's arms were indicative of four to five inch wide belt marks, as the hospital records indicate. He will testify that he knows the difference between belt bruises and eczema (the defendant Margaret Gloria said it was eczema without even seeing the boys, while Dr. Barron, a defense expert, claims Rhode Island emergency room doctors often times don't know the difference between bruises and eczema). He will testify that the bruises were linear in nature and on both boys' arms. He will testify that it was not eczema.

Lee Sperduti

Ms. Sperduti worked in the DCYF foster home licensing department. She will testify to the information she received regarding the removal of the twins from the Sykes home.

J.R.

J.R. will testify, either in person or via his video taped deposition[7], of the abuse he suffered at the hands of "thinman". He will testify that he was regularly whipped by "thinman" and forced to kneel on rice in the basement. He will testify that his brother was taken to the basement with him, tied up, and abused in his presence. He will testify that he could hear his brother calling for his help but was too afraid to do anything. He will testify that they were often forced to eat food from the garbage, frequently went hungry and had very little contact with the foster mother. He will testify as best he can to the subsequent hospitalizations and treatments he has endured since the abuse.

B.R.

B.R. will testify, either in person or via his video taped deposition, of the abuse he suffered at the hands of "thinman". He will testify that he was regularly whipped by "thinman" and forced to kneel on rice in the basement. He will testify to the sexual abuse perpetrated on him by "thinman". He too will testify that they were often forced to eat food from the garbage, frequently went hungry and had very little contact with the foster mother. He will testify as best he can to the subsequent hospitalizations and treatments he has endured since the abuse.

Dr. Savitsky

Dr. Savitsky is a child psychiatrist at the Providence Center. In April of 1999, DCYF and CIS referred the boys to him for a psychiatric evaluation as a result of their developing

[7] The use of the deposition in lieu of actual testimony remains contingent upon the boy's emotional status as the trial approaches. Although both wish to testify, they remain fragile and at risk for hospitalization.

sexualized behaviors. He will testify consistent with his evaluation and report in that the twins clearly exhibited symptoms consistent with sexual abuse and that the information he gathered during the evaluation resulted in his diagnosis of post traumatic stress disorder. He will further testify that the DCYF and CIS told him of the sexual abuse. He will testify that he was asked to conduct a treatment evaluation, not a forensic evaluation, because there was agreement among all present that the boys had been sexually abused in the foster home, and his subsequent independent evaluation came to the same conclusion.

Edward Degnan

Mr. Degnan was an investigator for the DCYF in early 1999 when the boys first disclosed the sexual abuse in the home. He will testify to the investigation he conducted and the conclusions/recommendations made.

Arthur McAteer

Mr. McAteer was another DCYF investigator who was assigned after a CANTS report filed by Bradley Hospital. This report was generated as a result of ongoing disclosures made by Brandon Raymond during inpatient care at Bradley. He will testify to the investigation he conducted and the conclusions/recommendations made.

Thomas Dwyer

Mr. Dwyer will testify to his role in the investigation of the allegations against Mr. Stevens, including but not limited to the information he obtained as a result thereof.

Thomas Bohan, Esq.

Mr. Bohan was Assistant Chief Legal Counsel for the DCYF in 1999. His testimony will relate to DCYF policies regarding the appeal of “indicated” abuse/neglect cases, and his role in dismissing those findings against Samuel Stevens.

Patricia Martinez

Ms. Martinez, Director of the defendant DCYF, will testify to the DCYF's charge as a state agency, it's obligations to the health, care and well being of children placed in its custody. She will also testify to the department's policies as they relate to this case and the basis for the claims the DCYF has raised in conjunction with this suit.

Dr. Rebecca Ramsey

Dr. Ramsey is a licensed Massachusetts psychiatrist with over twenty years of treating child and adult sexual abuse victims. She will testify as an expert and offer opinions, based on her review of the record and interviews, that in her opinion, the boys were severely sexually and physically abused in the Sykes home. She will further testify to the numerous other treating doctors who had this same opinion as reflected in the boy's extensive medical records. Dr. Ramsey will speak to the current and long term mental health care needs of children who have experienced the level of abuse the twins have, and what their specific long term needs will be. Her opinions will be based on accepted psychiatric methodologies for the determination of abuse and subsequent treatment plans.

Richard Greco, M.D.

Dr. Greco is listed in DCYF records as the plaintiffs' pediatrician while they were placed in the Sykes home. He will testify that the children we never brought to him for any care and he has no record of them as patients.

Stephanie Terry

Stephanie Terry will testify to her involvement as the supervisor of both Margaret Starnes and Margaret Gloria. She will testify to DCYF policies and the information she had available to her while the boys were in the Sykes home.

Margaret Gloria

Margaret Gloria will testify to her involvement as the assigned social worker. She will

testify to DCYF policies and the information she had available to her while the boys were in the Sykes home. She will also testify to her actions when the boys were removed and that in her opinion, the boys were abused in the home.

Allan Feldman, Ph.D.

Dr. Feldman is an economist at Brown University. He will testify as an expert on behalf of the plaintiffs. His testimony will focus strictly on the anticipated long term mental healthcare costs for the boys. His information as to the need for this care will be derived from the opinions of Dr. Ramsey. He will utilize methodologies commonly relied upon by economists when determining such future costs.

Office of the Child Advocate, By Way of Record's Keeper Deposition

The OCA, via the deposition, will testify to documents they received (or did not receive) from the DCYF as a result of the abuse indication and change in the boys' placement. A Motion to Quash the plaintiffs' access to these records, filed by the Office of the Child Advocate, is currently pending before Magistrate Martin.

Providence Police Department, By Way of Record's Keeper Deposition

The Providence Police Department's keeper of the records will testify that there are no records of any nature concerning reported physical or sexual abuse of the plaintiffs during all relevant time periods.

Providence School Department, By way of Record's Keeper Deposition

The plaintiffs will introduce the Gilbert Stuart School attendance records for the 1997-1998 school year.

The plaintiffs believe that their case in chief will take approximately 10 days.

## IV. PLAINTIFFS' PROPOSED EXHIBIT LIST

The Plaintiffs anticipate the utilization of the following documents at trial. This list does not include medical records, reports or other documents utilized by the plaintiffs' expert in preparing her report/opinions. This list also omits records the plaintiffs may need in cross examination of the defendants' witnesses.

1. RI DCYF Foster Care Regulations (1998) (Twenty-four pages). This document provides the regulations that the Defendants should have complied with regarding the investigation, background checks, and training of foster parents and other adult caretakers/residents of foster homes. The document will be introduced through Phillip Steiner from the DCYF Foster Home Licensing Unit.
2. RIGL §14-1-34 (one page). This statute defines the procedures for background checks for prospective foster parents, and by reference to DCYF policies (Plaintiff's Exhibit 1), other adults residing in the home.
3. Phillip Steiner Case Note dated April 20, 1998 (one page). This note regards the addition of another child to the Sykes home when Samuel Stevens was residing there.
4. Linda Iaciofano Case Note to Defendant Margaret Gloria dated September 15, 1997 (one page). Ms. Iaciofano discusses issues related to the care of the boys in the Sykes home.
5. Pre-placement Fire Inspection of Foster Home dated July 25, 1996 (one page). This document, provided to Ms. Iaciofano, describes the layout of the living area of the Sykes home.
6. Linda Iaciofano Case Note undated (one page). Ms. Iaciofano discusses the reasons for the Department not placing children in the home after the plaintiffs

were removed.

7. Linda Iaciofano Case Note Response to Donald Aldridge dated July 29, 1999 (one page). Ms. Iaciofano notes her continued concerns about placing any child in the Sykes home.

8. Lee Spurduti Case Note dated June 1, 1998 (one page). Ms. Spurduti, who works in the DCYF foster home licensing unit, notifies Ms. Iaciofano and Mr. Steiner about the abuse investigation at the Sykes home.

9. Mary Starnes Contact Sheets dated October 29, 1997 thru May 16, 1998 (fifteen pages). Ms. Starnes, a case aide, transported the children to and from the Sykes home for visits with their parents. This exhibit documents the multitude of contacts the aide had with thinman (Samuel Stevens) to the point of calling it the "thinman foster home" in February 1998.

10. Haven Miles, M.S.W., The Providence Center, letter to Samuel Stevens (a.k.a. thinman) dated December 18, 1997 (one page). The twins Providence Center therapist is addressing a confidential letter to thinman.

11. Virginia Miller, DCYF CPI Investigation Report initiated May 27, 1998, completed June 3, 1998 (five pages). This report details the DCYF investigator's findings resulting from the Gilbert Stuart School's call to the abuse hotline.

12. Virginia Miller, DCYF CPI Sykes Foster Home Safety Assessment dated May 28, 1998 (two pages). CPI Miller determines that there exists a substantial risk of imminent harm to the plaintiffs and notes she changed the foster placement.

13. DCYF Child Abuse and Neglect Report Policies dated December 24, 1990 (four pages). These policies dictate the requirements the Department has in notifying local police departments of alleged abuse and neglect.

14. Our Lady of Fatima Emergency Room Report for plaintiff B. R. dated May 27, 1998 (six pages). Dr. Carpentier describes the injuries found on Brandon and his conclusions.

15. Our Lady of Fatima Emergency Room Report for plaintiff J. R. dated May 27, 1998 (six pages). Dr. Carpentier describes the injuries found on Jarrod and his conclusions.

16. Edward Degnan, DCYF CPI Investigation Report initiated March 24, 1999, (two pages). This report includes the plaintiffs' first report of the sexual abuse that occurred in the home.

17. Edward Degnan, DCYF CPI Investigation Report initiated March 24, 1999, completed July 22, 1999 (five pages). This report includes additional information pertaining to Mr. Degnan's investigation of the plaintiffs' report of the sexual abuse.

18. Arthur McAteer, DCYF CPI Investigation Report initiated August 19, 1999, completed August 20, 1999 (three pages). This report includes the plaintiffs' second report of the sexual abuse. This report was made while in treatment at Bradley Hospital in August 1999.

19. Margaret Gloria Case Note dated September 17, 1999 (one page). Margaret Gloria's "recollection" of the abuse investigation as relayed to Thomas Dwyer.

20. DCYF Admission and complete Samuel Stevens DCYF file dated July 21 2008 (12 pages)

21. Thomas Bohan letter to Samuel Stevens dated September 2, 1999 (one page). This letter schedules a conference with Mr. Stevens regarding his DCYF indications.

22. Thomas Bohan letter to Samuel Stevens dated September 20, 1999 (one page).

This letter cancels the scheduled conference with Mr. Stevens and determines after a review of the record that Mr. Stevens was not neglectful in his care of the children.

23. Psychiatric Evaluation of plaintiff J. R. by David Savitzky, M.D. dated April 12, 1999 (three pages). Dr. Savitzky, a child psychiatrist, was asked by the DCYF and CIS to evaluate J. R. This report contains his impressions and diagnosis.

24. Psychiatric Evaluation of plaintiff B. R. by David Savitzky, M.D. dated April 27, 1999 (three pages). Dr. Savitzky, a child psychiatrist, was asked by the DCYF and CIS to evaluate J. R. This report contains his impressions and diagnosis.

25. 1997-1998 Gilbert Stuart School Attendance Records for JR (two pages)

26. 1997-1998 Gilbert Stuart School Attendance Records for BR (two pages)

27. Margaret Gloria Admission, dated July 18, 2008 (two pages)

28. Margaret Gloria case notes, dated October 30, 1997 through June 18, 1998 (sixteen pages).

29. Margaret Gloria case notes, dated June 10, 1996 through October 23, 1996 (seven pages).

30. Margaret Gloria letter to Stephanie Fogli-Terry dated May 28, 1998 (two pages).

31. DCYF CANTS note dated June 14, 1998 (one page).

32. DCYF CPS Protocol Report dated August 15, 1997 (three pages).

33. DCYF Investigation Report dated August 15, 1997 (August 4, 2000) (three pages).

34. DCYF Foster Home Boarding Agreement dated August 26, 1997 (four pages).

35. Virginia Miller e-mail to Lee Sperduti dated May 31, 1998 (one page).

36. Photo of plaintiffs in 1996 prior to placement (one page).

37. Photo of plaintiffs in 1999 after placement (one page).

38. Jarrod Raymond color drawing depicting abuse dated January 3, 2006.

39. Jarrod Raymond deposition drawing depicting abuse dated January 10, 2006.

40. Dr. Rebecca Ramsey Curriculum Vitae (two pages).

41. Dr. Allan Feldman Curriculum Vitae (two pages).

42. 1997 Rhode Island KIDS COUNT Factbook, selected sections (twenty-four pages).

## V. PLAINTIFF'S ANTICIPATED MOTIONS IN LIMINE

The plaintiffs anticipate filing four motions in limine.

1. The plaintiffs will move to limit Dr. Christine Barron's expert opinion to that which she is an expert in, child abuse evaluations. Dr. Barron is a pediatrician, and Clinical Director of Hasbro Child Protection Program, and Program Director, Fellowship Program in Forensic Pediatrics, Brown University. She is not a psychiatrist nor is she an expert in DCYF protocol. Yet she opines on the children's mental health diagnosis, DCYF placement policies and protocol, RI Attorney General BCI policies, *and concludes that DCYF was not negligent in their placement of the children in this foster home*. These are opinions she is simply not qualified to provide. This motion should be addressed prior to the defendants' case.

2. The plaintiffs will move to limit Dr. Joseph Penn's expert testimony to facts occurring after the birth of the plaintiffs. His report includes prejudicial information regarding the family, including information about relatives that predate the birth of the plaintiffs. This is an attempt to introduce evidence that would

otherwise be inadmissible, mislead the jury, and confuse the issues, in violation of Fed. Rule of Evidence 403 and 404(a). Dr. Penn's proffered opinions should be limited to whether or not he believes the children sexually abused in the home and do they suffer from any mental illnesses as a result thereof.

3. The plaintiffs will move in limine for the exclusion of all evidence pertaining to the twins' prior foster home placements pursuant to Fed. Rule of Evidence 403 and 404(a). This evidence will likely be presented to demonstrate their mother's parenting issues and the children's behaviors (more inadmissible character evidence) in these homes. The plaintiffs are alleging abuse during the Sykes foster home placement. There is no counterclaim or other legal basis for these defendants to allege that anything that happened with the children prior to this placement is relevant to the plaintiffs' claims. The defendants will go to great length in this trial to disparage the Raymond family, and by association, the five year old plaintiffs. This evidence is not at all probative of the plaintiffs' claims: were the twins properly cared for while in the Sykes home. The only possible relevance of this time period is in conjunction with the psychiatric expert opinions as it pertains to the children's mental health. This motion should be addressed prior to the start of the plaintiffs' case, since many of the plaintiffs' witnesses are DCYF personnel involved with the twins prior to the Sykes placement.

4. The plaintiffs will also move, prior to the start of their case, for the exclusion of any evidence related to the placement and mental health issues of Jeffrey Raymond. Jeffrey is an older sibling who was in DCYF care before, during and subsequent to the twins' placement in the Sykes home. Jeffrey, a minor at all times

pertinent hereto, did have diagnosed mental health illnesses. Prior to the twin's placement in the Sykes home, they did not. The plaintiffs see no relevance in testimony related to Jeffrey's independent mental health issues and placements. Jeffrey had different social workers and was placed in different homes. Furthermore, he is not a party to this litigation and has not authorized the release of any confidential health care information. Nor have the defendants sought a release. Should this motion be granted, the plaintiffs will need to redact DCYF case notes regarding Jeffrey which have been intermingled with the plaintiffs notes in multiple exhibits.

5. The plaintiffs' will be calling thirteen (13) current or past DCYF employees as witnesses. The plaintiffs seek in limine, the court's approval to treat each of these witnesses as adverse. Federal Rules of Evidence 611(c) reads in pertinent part "[w]hen a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading question." This request includes the questioning of Faith Sykes, the foster mother, who is now employed by the DCYF.

## VI. PLAINTIFF'S PROPOSED JURY INSTRUCTIONS

### Direct and Circumstantial Evidence

Since your role is to decide the facts of the case you should be aware that facts may be proved by two types of evidence. One type is direct evidence and the other is indirect evidence. When we speak of indirect evidence we are speaking of what is often called circumstantial evidence or circumstantial proof.

Direct evidence is testimony by a witness about what the witness personally saw or

heard or did. Circumstantial proof, that is, indirect proof, means proof of certain facts from which one can find or determine another fact.

You may consider both direct and circumstantial evidence in deciding this case. If you believe that certain or particular circumstances or facts have been proven at trial then you may accept as true any fact which you believe is logically and reasonably deduced from those facts or circumstances. The law permits the jury to give as much weight and consideration to facts proved through circumstantial evidence as those proved by direct evidence. Where direct evidence in support of the truth of a particular fact is at odds with the circumstantial evidence, you are fee to give as much weight or as little to the circumstantial proof if you believe that the evidence and your assessment of the credibility of the witnesses warrant it. Evidence need not be discounted simply because it is circumstantial or indirect. Oury v Greany, 107 R.I. 427, 267 A.2d 700 (R.I. 1970); Waldman v Shipyard Marina Inc., 102 R.I. 306, 230 A.2d 841 (1967).

**Impeachment of Witness**

A witness may be impeached, that is, his or her credibility may be brought into question by showing that on some prior occasion he or she made a statement about a material issue that contradicts the testimony he or she gives at trial. If you find, from all the evidence, that a witness did, at some prior time make a statement that contradicts his or her trial testimony, then you may consider that contradiction when determining the credibility of the witness, or the weight that you will give to his or her testimony. You should also consider, though, any explanation the witness gives for the contradiction, whether the contradiction was a significant one and in what context the witness gave the earlier statement. Foster v Dalton, 71 F.3d 52 (1st Cir. 1995); Gadoury v United States, 187 B.R. 816 (D.R.I. 1995); Vargas Manufacturing Co. v Friedman, 661 A.2d 48 (R.I. 1995)

**Burden of Proof – General**

**Burden on Plaintiff**

In this case, like most, the law places the burden of proof on the plaintiffs. All this means is that the law imposes upon the plaintiffs the obligation or responsibility of proving their claim. The law requires that one who advances a proposition has the burden of sustaining its validity. Because the plaintiffs are advancing the proposition that the defendants should be held responsible for some harm caused to them, it is the plaintiffs who have the responsibility of producing evidence which leads you to believe that what the plaintiffs claim is more likely true than not. The defendants, on the other hand, have no obligation to produce evidence concerning the plaintiffs' claims. The defendants do not have to disprove what the plaintiffs claim is true. The burden is on the plaintiffs to prove each of the elements of their claim to you. DiLibero v Swenson, 592 A.2d 42 (R.I. 1991); Paramount Office Supply Co. Inc. v D.A. MacIssac, Inc., 524 A2.d 1099 (R.I. 1987)

**Negligence Defined**

Generally, negligence is the failure of one person, acting in a given set of circumstances, to exercise that degree of care for the safety, interest or property of another person that a reasonably prudent person would ordinarily exercise in the same or similar circumstances. Negligence may result from not doing something that a reasonably prudent person would do or it may result from doing something that a reasonably prudent person would not do under the same or similar circumstances.

In other words, when a person either by acting or not acting in a given set of circumstances, fails to exercise the degree of care for the safety/interest/property of another person that a reasonably prudent person would have used under the same or similar

circumstances, you have negligence. When we say that a person was acting with due and reasonable care, we mean that this person was not negligent.

**Proximate Cause**

Negligence and the legal term "proximate cause" work together. We refer to "proximate cause" as a necessary element of negligence. The concept is that even if a person has been negligent that person will not be held responsible or liable unless that negligent conduct caused actual harm to someone else. If a person is negligent but that negligence is not a substantial or moving cause of some harm, then the person should not be held responsible for his or her negligence. Only where a person's negligence causes harm do we hold the person responsible for that harm. There must be a link or connection between the negligence and the harm in order to hold a person responsible.

The question is to what extent did the negligent conduct cause the harm? The law requires that the connection or link between the negligent conduct and the resulting harm be legally sufficient, that is, something more than insubstantial or insignificant.

Proximate cause means a cause that in a natural, continuous and unbroken sequence produces an event or injury and without which the event or injury would not have occurred. The proximate cause of an event or injury is a substantial, primary or moving cause without which the event or injury would not have happened. Causes that are merely incidental are not proximate causes. Unless the defendants negligence is a proximate cause of some harm caused to the plaintiffs then the defendants cannot be held responsible to the plaintiffs for negligence.

A cause that is a proximate cause may be the sole or only cause of an event or injury. Or, it may be one of two or more or even several causes of an event or injury some of which are a proximate cause and some of which are not. A cause is a proximate cause even if it

comes together with or unites with some other cause and produces the event or injury. The test is whether the particular cause at issue is a substantial cause or whether it is merely incidental. If you find the defendant(s) was negligent you must then consider whether the negligence was a proximate cause of the plaintiff's injuries. Wells v Uvex Winter Optical, Inc., 635 A.2d 1188 (R.I. 1994); Ouellette v Carde, 612 A.2d 687 (1992); Restatement (Second) of Torts, § 433 (1965).

**Special Relationships – Duty to Act for the Protection of Others**

Generally, the fact that a person realizes or should realize that his/her action is necessary for the aid or protection of another does not in itself impose upon him/her any duty to act. There are, however, special circumstances in which a person will have a duty of affirmative action for the air or protection of another.

In this case, the parties had a special relationship. The minor plaintiffs were in the temporary care, custody and control of these defendants. Under the circumstances of this case, these defendants owed a duty to the plaintiffs to protect the plaintiffs against unreasonable risk of harm arising from the acts of third persons. These defendants were required to exercise ordinary care in discharging that duty and in acting toward the plaintiffs safety. In other words, the defendants were required to exercise that degree of care that a reasonably prudent person would exercise under the same or similar circumstances. However, the greater the risk of harm presented by the circumstances, the higher degree of care necessary to constitute ordinary care.

The plaintiffs do not need to prove that the defendants knew of the actual abuse. The plaintiffs must only prove that the defendants, under the specific circumstances of this case, knew of an obvious *risk* of serious harm and were deliberately indifferent to that *risk.*

The law does not say what a reasonably careful person would ordinarily do or would

not do under the circumstances as shown by the evidence in this case. This is for you, the jury, to decide.

I must caution you, though, that the defendant is not a guarantor of the plaintiff's safety and cannot be held liable if he/she neither knew of nor should have known of the unreasonable risk of injury. Nor were the defendants required to take any action beyond that which was reasonable under the circumstances. Nor were the defendants required to take any action until they knew or should have known of the unreasonable risk of harm.

Restatement (Second) of Torts, § 314 (1965).

**Special Duty**

If, after your deliberations you find that the plaintiffs have proved by a preponderance of the evidence that the defendants Margaret Gloria and/or Stephanie Terry, in their capacity as DCYF employees were negligent and that their negligence was a proximate cause of the plaintiffs' injuries then you must consider whether such facts and circumstances have been proved so as to create or trigger a special duty running from the defendants to the plaintiffs. If you find the following facts and circumstances have been proved by a preponderance of the evidence then the law requires that the state actor to be held liable for the negligence and your verdict must be for the plaintiffs on their claims in Count I, and/or Count II and/or Count III. If you find that the plaintiffs have not proved by a preponderance of the evidence that the following facts and circumstances are true then the state actors cannot, as a matter of law, be held liable to the plaintiffs for their negligence:

a. Did one or more of the state's officials have some form of prior contact with or knowledge about the plaintiffs and/or the plaintiffs' situation before the incident?

b. Did the state actor thereafter fail to act in some way that it knew or should have known was potentially injurious to these plaintiffs?

c. Was the injury or harm to the plaintiffs a reasonably foreseeable consequence of the state actor's inaction?

If, after your deliberations you find that the answer to all three of these questions is "yes", then you are instructed that the state actors are liable to the plaintiffs for their negligence and you must return your verdict for the plaintiffs. If after your deliberations you find the answer to any one of these three questions is "no", then you are instructed that the state actors cannot be held liable to the plaintiffs for their negligence and you must return your verdict for the defendants.

**Violation of the Plaintiff's Civil Rights**

The Plaintiffs in this case have also alleged that the defendants Margaret Gloria, Stephanie Terry and the DCYF have violated their civil rights in Counts IV, V and VI respectively, and that these violations created a danger to them that subsequently resulted in their injuries. The plaintiffs submit three jury instruction options.

**A.** To find the defendants liable for the violation of civil rights claims the plaintiffs must prove, by a preponderance of the evidence that:

1) the defendant(s) was objectively aware of a serious risk of harm;

2) the defendant(s) recklessly disregarded the risk of harm and;

3) this conduct was more than mere negligence.

Ray v. Foltz, 370 F.3d 1079, 1083-84 (11th Cir. 2004) The Ray case is a claim against the Florida Department of Children and Families for alleged child abuse while the plaintiff was placed in a foster home.

**B.** To find the defendants liable for the violation of civil rights claims the plaintiffs must prove, by a preponderance of the evidence that:

1) the defendants Margaret Gloria, Stephanie Terry and/or the DCYF, created or increased a danger faced by the children,

2) the failure of the defendant(s) to protect the children from the danger was the proximate cause of their injuries, and

3) the defendant(s) failure to protect the children must shock the conscience [deliberate indifference].

King v. East St. Louis School Dist., 496 F. 3d 812, 817-818 (7th Cir. 2007) The Seventh Circuit established this criteria after review of their law and that of their "sister circuits."

**C.** To find the defendants liable for the violation of civil rights claims the plaintiffs must prove, by a preponderance of the evidence that:

1) a relationship between the DCYF and these plaintiffs existed such that the plaintiffs were foreseeable victims of these defendant's acts as opposed to a member of the public in general.[8]

2) the defendants Margaret Gloria, Stephanie Terry or the DCYF, were deliberately indifferent to a known risk of serious harm to these plaintiffs. In this case deliberately indifferent means that these defendant's actions or inactions amounted to a conscious disregard of a known or obvious danger. [9]

---

[8] This prong is specifically identified by the Sanford court and is not found in either of the other two proposed versions. It need not be incorporated here should the court decide the wording of the Sanford standards is preferable. This language simply establishes the requisite relationship between the plaintiffs and the defendants. The defendants had temporary legal custody of the children at all times pertinent hereto.

[9] The Sanford court speaks to a variety of standards found in other cases regarding deliberate indiffernce. "*See, e.g.*, Kennedy v. City of Ridgefield, 439 F.3d 1055, 1062 (9th Cir. 2006) (stating that a state official must "act with deliberate indifference to the known or obvious danger") (citation omitted); Board v. Farnham, 394 F.3d 469, 478 (7th Cir.2005) ("[W]e have articulated the test for deliberate indifference for Fourteenth Amendment purposes to be `a

3) the harm ultimately caused was foreseeable and fairly direct; and

4) these defendants affirmatively used their authority in a way that created a danger to the plaintiffs or that rendered the plaintiffs more vulnerable to danger than had the state not acted at all.

Sanford v. Stiles, 456 F.3d 298, 304-305 (3rd Cir. 2006) This case pertains to a teenager who committed suicide while receiving counseling from the local school district.

If, after your deliberations you find that the answer to all (three/four) of these questions is "yes", then you are instructed to find that the state actor(s) are liable to the plaintiffs for a violation of these plaintiffs' civil rights and you must return your verdict for the plaintiffs. If after your deliberations you find the answer to any one of these (three/four) questions is "no", then you are instructed to find that the state actors cannot be held liable to the plaintiffs for civil rights violations and you must return your verdict for the defendants.

**Obstruction of Justice – Failure to Report Abuse Indications– Admission of Wrongful Conduct**

The plaintiffs allege that the defendants, after investigating the reports of the physical abuse of the twins in the Sykes home, by removing them immediately from the home and indicating abuse against Samuel Stevens and institutional neglect against Faith Sykes, had the following statutory duties pursuant to Rhode Island law:

(d) The department shall forward immediately any reports of institutional child abuse

---

conscious disregard of known or obvious dangers.'") (citations omitted); Christiansen v. City of Tulsa, 332 F.3d 1270, 1281 (10th Cir.2003) ("[A] plaintiff must demonstrate that . . . the risk was obvious or known . . . [and] defendants acted recklessly in conscious disregard of that risk. . . .") (internal quotation marks and citation omitted). In contrast, the Sixth Circuit, for example, has utilized a purely subjective standard. *See, e.g., McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 469 (6th Cir.2006) (noting that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference")" Sanford at fn. 13.

and neglect to the child advocate who shall investigate the report in accordance with chapter 73 of title 42, and also to any guardian ad litem and/or attorney of record for the child.

(e) In the event that after investigation the department takes any action regarding placement of the child, the department shall immediately notify the child advocate of such action.

(f) In the event that after investigation the department has reasonable cause to know or suspect that a child has been subjected to criminal abuse or neglect, the department shall forward immediately any information as it relates to that knowledge or suspicion to the law enforcement agency. R.I.G.L. 40-11-7(d)(e)(f).

The testimony reflects that the defendants failed to comply with each of the aforementioned laws. The failure to comply with these statutes may be considered an admission of wrongful conduct by the defendants if you believe the failure to comply with these statutes resulted in the loss, destruction or concealment of relevant evidence. McCormick on Evidence, § 265 (Fourth Edition)

**Obstruction of Justice – Failure to Report Sexual Abuse Allegations – Admission of Wrongful Conduct**

The plaintiffs allege that the defendants, on two separate occasions, after investigating reports of the alleged sexual abuse of the twins, were required to report the alleged abuse to the Providence Police for further investigation pursuant to their own policies. Those policies state:

2. Unless there are extenuating circumstances to the contrary, the police must be notified of any Level 1 [sexual molestation] allegation, regardless of the initial findings, after the first contact with the family. Only the Investigative Supervisor can authorize not calling the police. Any reason for not contacting the police must be documented in writing in a Case

Activity Note.

The testimony reflects that the defendants failed to comply with the aforementioned policies on two occasions. The failure to comply with this policy may be considered an admission of wrongful conduct by the defendants if you believe the failure to comply with the policy resulted in the loss, destruction or concealment of relevant evidence. McCormick on Evidence, § 265 (Fourth Edition)

**Spoliation/Destruction of Evidence**

During this trial you have heard testimony that one of the parties destroyed evidence. When evidence is destroyed we call it "spoliation" of that evidence. Under certain circumstances the spoliation of evidence may give rise to an adverse inference that the destroyed evidence would have been unfavorable to the position of the party who destroyed it. Spoliation of evidence may be innocent or intentional, or somewhere between the two.

It is the unexplained and deliberate destruction of relevant evidence that gives rise to an inference that the thing destroyed would have been unfavorable to the position of the spoliator. If you find that the DCYF destroyed the Susan Fink Legal Consult Report and did so deliberately then you are permitted to infer that the jury's consideration of that evidence would have been unfavorable to the DCYF's position in this case.

In deciding whether the destruction of the Susan Fink Legal Consult Report was deliberate you may consider all of the facts and circumstances which were proved at trial and which are pertinent to that item of evidence. You may consider who destroyed it, how it was destroyed, the legitimacy or lack of legitimacy in the reasons given for its destruction, the timing of the destruction, whether the individual destroying the evidence knew the evidence might be supportive of the opposing party, whether the spoliation was intended to deprive the

court of evidence, and any other facts and circumstances which you find to be true. You may also consider the extent to which it has been shown that the spoliated evidence would, indeed, have been unfavorable to the DCYF's position. If the spoliation of the evidence is attributable to carelessness or negligence on the part of the spoliator you may consider whether the carelessness or negligence was so gross as to amount to a deliberate act of spoliation. Blinzer v Marriott International, Inc., 81 F.3d 1148 (1st Cir. 1996); Rhode Island Hospital Trust national Bank v Eastern General Contractors, Inc., 674 A.2d 1227 (R.I. 1996)

**Damages – Generally**

The plaintiffs in this case are J.R and B.R. In consideration of damages to be awarded, you should consider each of the children's circumstances, trauma and treatment individually. The plaintiffs' evidence indicates differences in the boys initial trauma, subsequent treatment and mental health. Should you decide either or both of the plaintiffs are entitled to damages, you must award them separately. Any damages you award, for either boy, will be placed in a trust for the children's benefit only.

**Burden on Plaintiff – Damages**

The burden is on the plaintiffs to prove by a fair preponderance of the evidence that they have suffered damages as a proximate result of the defendant's negligence or violation of their civil rights. The burden is also on the plaintiffs to prove by a preponderance of the evidence the extent or amount to which they have suffered one of the following elements of damages. A plaintiff must prove by a fair preponderance of the evidence the particular element of damages that they suffered and the extent of such damage. Tom Shaw, Inc. v Derecktor, 639 F.Supp. 1064 (D.R.I. 1986); Jackson v Choquette & Co., 78 R.I. 164, 80 A.2d 172 (1951);

**a. Pain and Suffering**

The plaintiffs are entitled to be compensated for the conscious pain and suffering that they endured as a result of the incident. I will define pain and suffering for you. Pain means physical pain, the kind resulting from a physical impact or injury. It includes what we ordinarily think of as physical pain as well as discomfort, stiffness, and restriction of bodily motion that is caused by the pain or discomfort brought about by moving. Pain must be conscious pain, that is, something that the plaintiff was aware of. The law does not allow a jury to award damages for pain to a person while that person is unconscious.

Suffering, on the other hand, can be equated with what we sometimes call the mental anguish that arises from physical pain or injury to the body. Suffering means recognizing the pain, the danger resulting from the pain, the knowledge that the pain and treatment for it will continue. If you find that the plaintiffs have proven that in addition to the physical pain, they have also experienced fright, anguish, nervousness, grief, anxiety, worry, humiliation, embarrassment, shock or terror, the plaintiffs are entitled to recover for this mental suffering.

In awarding any damages to the plaintiffs for pain and suffering, you must be fair and reasonable. And, it must be grounded in the evidence and not based upon speculation or conjecture. Nor may you arbitrarily pick some amount. Your award for pain and suffering should be based on the evidence that has been presented to show just how much pain and suffering the plaintiffs have endured as a result of their injuries. Arlan v Cervini, 478 A.2d 976 (R.I. 1984); New York Pattern Jury Instruction Supplement §2:280; 5 Am. Jur. Trials §95; Jacob A. Stern, Stern on Personal Injury Damages, §§2.2-2.3 and 2.7-2.8 (1991).

**b. Future Pain and Suffering**

In this case, the plaintiffs have alleged that they will continue to experience pain and suffering into the future as a result of the injuries sustained from the incident. In order to

recover for future pain and suffering, the plaintiffs must prove that they are reasonably certain to experience future pain and suffering. Your award of future pain and suffering cannot be based on possibilities or speculation. You must determine whether there is medical evidence establishing to a reasonable certainty that the plaintiffs will endure pain and suffering into the future as a result of the injuries. And, as with past and present pain and suffering, you must consider the evidence that shows the extent and severity of the pain and suffering that plaintiffs are reasonably certain to endure in the future. Markham v Cross Transportation, Inc., 119 R.I. 213, 376 A.2d 1359 (1977); Pescatore v MacIntosh, 113 R.I. 139, 319 A.2d 21 (1974);

**c. Considerations in Awarding Damages for Pain and Suffering**

The plaintiffs are entitled to be compensated for the pain and suffering they endured as a result of the incident. There is no particular formula by which to compute damages for a plaintiff's pain and suffering. There are no objective guidelines by which you can measure the money equivalent of this element of injury; the only real measuring sticks, if it can be so described, is your collective and enlightened conscience. You should consider all the evidence bearing on the nature of the injuries, the certainty of future pain and the severity and likely duration thereof.

In determining what amount to award the plaintiffs for pain and suffering, you should consider all of the facts and circumstances proved at trial including:

[the type of injuries the plaintiff sustained];

[the extent and severity of those injuries];

[the length of time the plaintiff sought and received medical treatment];

[the nature of the medical treatment plaintiff received];

[whether the plaintiff's injury was temporary or permanent];

[the age and maturity of the plaintiffs at the time of the injury]:

You may also consider the testimony of the plaintiffs in describing the nature of their pain, the intensity of the pain and how the pain affected the plaintiff's ability to do everyday activities. You may also consider any other evidence showing any objective manifestations of pain such as the medical records, other exhibits and testimony of the witnesses. Proffitt v Ricci, 463 A.2d 514 (R.I. 1983); Hayhurst v LaFlamme, 441 A.2d 544 (R.I. 1982)

**d. Present Damages for Future Medical Treatment**

These plaintiffs are entitled to be compensated for the future expenses of medical care and treatment that are made necessary by the original injuries they sustained. However, the plaintiffs are not entitled to expenses of medical care and treatment that are contingent, speculative or merely possible. The plaintiffs must prove there to be such a degree of probability that they will incur those future expenses that you can say they are reasonably certain to occur. In other words, the plaintiffs are only entitled to recover for those future expenses of medical care and treatment that they have proved are reasonably certain to become necessary as a proximate result of their injuries.

And, though the plaintiffs do not have to establish the cost of the future medical expenses with mathematical exactness, only expert testimony regarding the probable cost of the future medical treatment can support an award for future medical expenses. Shepardson v Consolidated Medical Equipment, 714 A.2d 1181 (R.I. 1998); Markham v Cross Transportation, Inc., 119 R.I. 213, 376 A.2d 1359 (1977)

**Aggravation of Preexisting Medical Condition**

The defendants must take the plaintiffs as they find the plaintiffs at the time of the injury. If these plaintiffs had a mental health condition prior to the abuse that caused the plaintiffs to endure more pain and suffering as a result of the abuse than an ordinary person in

good health would have endured, the defendant(s) are nevertheless liable to the plaintiffs for all the pain and suffering that resulted from the defendant's alleged failure to act. This includes all of the pain and suffering resulting from the aggravation of a pre-existing psychiatric condition.

It is unimportant that the condition pre-existed the accident. The defendants are liable for the natural and probable consequences of their alleged failure to act including any aggravation of a pre-existing condition.

Mangasarian v Gould, 537 A.2d 403 (R.I. 1988); Lebon v B.L.&M. Bottling Co., 114 R.I. 750, 339 A.2d 272 (1975); Golden v R.L. Greene Paper Co., 44 R.I. 226, 116 A. 577 (1922).

**Insurance and Collateral Sources - General Cautionary**

My experience is that jurors are often tempted to speculate about things such as automobile insurance, medical insurance, disability benefits, other types of insurance or benefits or how a public entity such as the defendant DCYF will pay an award. Jurors will also wonder about attorney's fees and which party will pay for them. You are instructed that you must not consider any of these things in deciding the case or in determining what amount, if any, you will award in damages. Whether or not any person or entity in this matter had or has insurance or received benefits is of no legal relevance. In fact, if you attempt to factor in the question of attorneys fees or insurance you may be accomplishing something other than what you intend. You have no knowledge of whether a person is eligible for insurance coverage, what kind, how much, or under what circumstances. The same goes for attorneys' fees. Whether a person is entitled to attorneys' fees or costs of suit is for the Court to decide at a later time.

## VII. PLAINTIFFS' PROPOSED JURY VERDICT FORM

### COUNT I – NEGLIGENCE – MARGARET GLORIA IN HER CAPACITY AS SOCIAL WORKER, DCYF

In determining whether the defendant Margaret Gloria is liable to the plaintiffs in her capacity as a DCYF social worker on Count I of the plaintiffs' complaint you must answer the following questions:

(1) Did this defendant have knowledge of the plaintiffs' or their situation;

Yes _____ or No ______. If you answered yes proceed to question two, if your answer is no, proceed to Count II.

(2) Did this defendant act or fail to act in some way that was potentially injurious to the plaintiffs;

Yes _____ or No ______. If you answered yes proceed to question three, if your answer is no, proceed to Count II.

(3) Were the injuries the plaintiffs sustained a reasonably foreseeable consequence of this defendant's actions or inactions?

Yes _____ or No ______. If you answered yes proceed to question four, if your answer is no, proceed to Count II.

(4) Please indicate the amount of damages you award to plaintiff B.R. on Count I.

___________

(5) Please indicate the amount of damages you award to plaintiff J.R. on Count I.

___________

You may not award more than $100,000 to either plaintiff in Count I.

**COUNT II – NEGLIGENCE – MARGARET GLORIA, INDIVIDUALLY**

In determining whether the defendant Margaret Gloria is liable to the plaintiffs individually on Count I of the plaintiffs' complaint you must answer the following questions:

(1) Did this defendant have knowledge of the plaintiffs' or their situation;

Yes _____ or No ______. If you answered yes proceed to question two, if your answer is no, proceed to Count III.

(2) Did this defendant act in some way that was potentially injurious to the plaintiffs;

Yes _____ or No ______. If you answered yes proceed to question three, if your answer is no, proceed to Count III.

(3) Were the actions that were injurious to the plaintiffs done outside the scope of the defendant's duties as a DCYF social worker.

Yes _____ or No ______. If you answered yes proceed to question four, if your answer is no, proceed to Count III.

(4) Were the injuries the plaintiffs sustained a reasonably foreseeable consequence of this defendant's actions?

Yes _____ or No ______. If you answered yes proceed to question five, if your answer is no, proceed to Count III.

(5) Please indicate the amount of damages you award to plaintiff B.R. on Count II.

___________

(6) Please indicate the amount of damages you award to plaintiff J.R. on Count II.

___________

**COUNT III– NEGLIGENCE – STEPHANIE TERRY IN HER CAPACITY AS SUPERVISOR, DCYF**

In determining whether the defendant Stephanie Terry is liable to the plaintiffs in her capacity as the DCYF supervisor on Count III of the plaintiffs' complaint you must answer the following questions:

(1) Did this defendant have knowledge of the plaintiffs' or their situation;

Yes _____ or No ______. If you answered yes proceed to question two, if your answer is no, proceed to Count IV.

(2) Did this defendant act or fail to act in some way that was potentially injurious to the plaintiffs;

Yes _____ or No ______. If you answered yes proceed to question three, if your answer is no, proceed to Count IV.

(3) Were the injuries the plaintiffs sustained a reasonably foreseeable consequence of this defendant's actions or inactions?

Yes _____ or No ______. If you answered yes proceed to question four, if your answer is no, proceed to Count IV.

(4) Please indicate the amount of damages you award to plaintiff B.R. on Count III.

___________

(5) Please indicate the amount of damages you award to plaintiff J.R. on Count III.

___________

You may not award more than $100,000 to either plaintiff in Count III.

**COUNT IV –DEPRIVATION OF SUBSTANTIVE DUE PROCESS RIGHTS – 42 U.S.C. §1983, MARGARET GLORIA IN HER CAPACITY AS SOCIAL WORKER, DCYF**

In determining whether the defendant Margaret Gloria is liable to the plaintiffs in her capacity as the DCYF social worker on Count IV of the plaintiffs' complaint you must answer the following questions:

1) Was the defendant Margaret Gloria, in her capacity as a DCYF social worker, deliberately indifferent to a known risk of serious harm to these plaintiffs. In this case "deliberately indifference" means that the defendant's actions or inactions amounted to a conscious disregard of a known or obvious danger.

Yes _____ or No ______. If you answered yes proceed to question two, if your answer is no, proceed to Count V.

2) Was the harm the plaintiffs incurred a foreseeable and fairly direct result of the defendant's deliberate indifference to the known or obvious risk.

Yes _____ or No ______. If you answered yes proceed to question three, if your answer is no, proceed to Count V.

3) Did this defendant affirmatively use her authority in a way that created a danger to the plaintiffs or that rendered the plaintiffs more vulnerable to the danger.

Yes _____ or No ______. If you answered yes proceed to question four, if your answer is no, proceed to Count V.

(4) Please indicate the amount of damages you award to plaintiff B.R. on Count IV.

___________

(5) Please indicate the amount of damages you award to plaintiff J.R. on Count IV.

___________

**COUNT V –DEPRIVATION OF SUBSTANTIVE DUE PROCESS RIGHTS – 42 U.S.C. §1983, STEPHANIE TERRY IN HER CAPACITY AS SOCIAL WORKER, DCYF**

In determining whether the defendant Stephanie Terry is liable to the plaintiffs in her capacity as the DCYF supervisor on Count V of the plaintiffs' complaint you must answer the following questions:

1) Was the defendant Stephanie Terry, in her capacity as the DCYF supervisor, deliberately indifferent to a known risk of serious harm to these plaintiffs. In this case "deliberately indifference" means that the defendant's actions or inactions amounted to a conscious disregard of a known or obvious danger.

Yes _____ or No ______. If you answered yes proceed to question two, if your answer is no, proceed to Count VI.

2) Was the harm the plaintiffs incurred a foreseeable and fairly direct result of the defendant's deliberate indifference to the known or obvious risk.

Yes _____ or No ______. If you answered yes proceed to question three, if your answer is no, proceed to Count VI.

3) Did this defendant affirmatively use her authority in a way that created a danger to the plaintiffs or that rendered the plaintiffs more vulnerable to the danger.

Yes _____ or No ______. If you answered yes proceed to question four, if your answer is no, proceed to Count VI.

(4) Please indicate the amount of damages you award to plaintiff B.R. on Count V.

___________

(5) Please indicate the amount of damages you award to plaintiff J.R. on Count V.

___________

**COUNT VI –DEPRIVATION OF SUBSTANTIVE DUE PROCESS RIGHTS – 42 U.S.C. §1983, PATRICIA MARTINEZ, In Her Capacity As DIRECTOR, DCYF**

In determining whether the defendant DCYF is liable to the plaintiffs on Count VI of the plaintiffs' complaint you must answer the following questions:

1) Was the defendant DCYF, having temporary care, custody and control of the plaintiffs, deliberately indifferent to a known risk of serious harm to these plaintiffs. In this case "deliberately indifference" means that the defendant's actions or inactions amounted to a conscious disregard of a known or obvious danger.

Yes _____ or No ______. If you answered yes proceed to question two, if your answer is no, your deliberations are completed.

2) Was the harm the plaintiffs incurred a foreseeable and fairly direct result of the defendant's deliberate indifference to the known or obvious risk.

Yes _____ or No ______. If you answered yes proceed to question three, if your answer is no, your deliberations are completed.

3) Did this defendant affirmatively use her authority in a way that created a danger to the plaintiffs or that rendered the plaintiffs more vulnerable to the danger.

Yes _____ or No ______. If you answered yes proceed to question four, if your answer is no, your deliberations are completed.

(4) Please indicate the amount of damages you award to plaintiff B.R. on Count VI.

___________

(5) Please indicate the amount of damages you award to plaintiff J.R. on Count VI.

___________

**July 31, 2008**

Respectfully Submitted,
J. R., P.P.A. Molly Raymond and B. R.,
P.P.A. Molly Raymond, Plaintiffs

/s/Thomas L. Mirza
Thomas L. Mirza, Esq., RIBA No. 5653
Pelletier & Mirza, LLP
469 Angell Street
Providence, RI 02906
(401) 861-1743
(401) 861-1746
tmirza@pmlawprov.com

/s/MaryAnn Violette
MaryAnn Violette, Esq., RIBA No. 3094
Audette, Bazar, Cordiero & Grasso
35 Highland Ave.
East Providence, RI 02914
(401) 438-3800
(401) 438-3808
mviolette@abcglawfirm.com

/s/Samuel C. Bazar
Samuel C. Bazar, Esq., RIBA No. 7692
Audette, Bazar, Cordiero & Grasso
35 Highland Ave.
East Providence, RI 02914
(401) 438-3800
(401) 438-3808
mviolette@abcglawfirm.com

**CERTIFICATION**

I hereby certify that I have electronically mailed a true copy of the Plaintiffs' Pretrial Memorandum to Genevieve Allaire-Johnson, Esq., Spec. Asst. Attorney General, 150 South Main Street, Providence, RI 02903 at GAllaire@riag.ri.gov on this 31st day of July, 2008.

/s/Thomas L. Mirza