Q. And what kind of a report is that?
A. This is a report that reviews the history of the Raymond twins with all the information that's available about them from DCYF records, all mental health records, depositions, discussions with doctors and my interviews with them to evaluate their psychiatric condition.
Q. And what was the purpose of the report?
A. To give my medical opinion as to their psychiatric condition.
Q. And there's no date on this report. The first page --
A. I signed it --
Q. -- doesn't have a date on it.
A. Then I would say 4/7/08.
Q. So this was prepared on 4/7/08?
A. Well, my -- you know, it took a long time to prepare but the final, you know, preparation was on the 7th of April.
Q. Is this a forensic report?
A. Yes.
Q. And did anyone help you prepare it?
A. No.
Q. Now, you've provided us with a -- in response to the request, you provided us with a copy of your CV.
MS. ALLAIRE JOHNSON: I'm going to ask that that be marked as Exhibit C.

psychiatry. There were specific seminars in normal child development, and it's part of every evaluation. I also did a lot of pediatrics in medical school and during my internship, so that's another exposure to normal child development. You can't really make diagnoses about something being abnormal unless you know what a standard for normal is.

Q. And that training you received at Tufts University?

A. Yes.

Q. And --

A. And then Cambridge Hospital, which had placements in Somerville. I did a lot of work in Somerville, at the Somerville Mental Health Center. And I started an adolescent in-patient unit at Central Hospital. And treated many, many people in foster care in -- in Massachusetts it's called DSS, and at the moment I'm blocking on the -- where conduct disorder kids go who have legal problems when they're out of DSS. It will come to me but it's a, it's a different branch of child protection.

Q. So, tell us about your experience and your training while you were doing your -- it was a three-year fellowship that related to adolescent psychiatry.

A. Um, I did a lot of different things. I trained in family

therapy at the Cambridge Family Institute, which was a year long seminar.
Q. A year long seminar?
A. A year long seminar.
Q. And how many hours a week was that?
A. I think it was like a half day. What else did I do. Started the adolescent inpatient unit at Central Hospital.
Q. You founded that?
A. Yes. They didn't have a child psychiatrist there and they wanted someone to come in and develop a program for adolescents because they were just mixing them in with the general population and they didn't have anybody to evaluate them or, you know, help prepare a treatment plan for them.
Q. And that was at Central Hospital?
A. Mm-hmm.
Q. And what was it that you developed there?
A. The adolescent unit. You know, how we're going to treat the adolescent; what the protocol's gonna be; how to coordinate with outside agencies; treatment planning.
Q. And did you develop policies and procedures for that unit?
A. Yes.

Q. Did you practice in the unit?
A. Yes.
Q. And for how long?
A. For a year, maybe a little bit longer than a year.
Q. And was that -- how many hours a week?
A. At least twenty.
Q. And what did you do with the other time period?
A. You wouldn't believe it. I consulted to the Adolescent Medical Clinic at Cambridge Hospital. That's adolescents going in for health care, and I would be there and they would refer kids who came in for health care problems to see me if they were suicidal or whatever.
What else did I do.
I had outpatient patients at Somerville Mental Health Center, and at the Cambridge Guidance Center on Sacramento Street in Cambridge.
Q. So Somerville, and what was the name of the others?
A. Cambridge Guidance Center.
Q. And those were outpatients?
A. Outpatients.
Q. Medical treatment?
A. No, this was psychiatric. This was child guidance clinics.
Q. So you spent half your time on the adolescent inpatient

Jarrod?
A. I don't think I have the date written down but I went out to see him when he was still in Vermont. What was the name of the school in Vermont. The Bennington Center.
Q. And do you remember approximately when that was?
A. Approximately -- it was winter. I'm gonna say maybe early March.
Q. Was this 2008?
A. Yes. I could look in my appointment book and find the exact date, I think.
Q. How long did you meet with Jarrod?
A. I met with him for about 90 minutes total, including time alone with him in the room and time outside with other staff members.
Q. Did you interview him with anybody else in the room?
A. My dog.
Q. And why did you bring your dog?
A. Apparently he was very unstable in the time period before I came, and they were really concerned about whether or not he could even tolerate an interview with me. And I sometimes bring my dog to work, or I brought my dog to hospitals in the past when I had patients in the hospital because they can be very calming. Adults like them but kids love them. And so I asked the staff, does he like

which is I'm preparing this report to be used in a court procedure.

Q. And the report is prepared to be used in a court procedure.

A. Yes.

Q. Are there -- when you prepare a forensic report, are there specific procedures that you follow as part of that?

MR. MIRZA: Objection.

A. That I personally follow?

Q. Yes.

A. Well, I don't videotape. I do document my interactions with people and review records.

Q. Was the purpose of the -- of your report as a forensic report to evaluate the truth or accuracy of the boy's statements?

A. I'm going to say yes, as it relates to diagnosis. To understand whether or not the diagnoses that I have seen in the reports could be accurate.

Q. What about as to the factual allegations of the abuse?

A. My answer would be the same. Because PTSD as a diagnosis requires a trauma. It's not an accurate diagnosis if there is no trauma.

Q. So as part of your interview of the boys, you would be

attempting to -- you would be doing a -- when I say forensic, forensic evaluation of them to determine what they are saying is accurate?

A. Yes.

Q. And are there any procedures that you follow other than what you've already testified to as you conduct those interviews in order to ensure that you arrive at the right conclusion, whether the facts are accurate or not?

A. I do a very thorough clinical examination and use all of my abilities to assess and evaluate what people are telling me.

Q. And what would that include?

A. I'm not sure what you mean, what it would include.

Q. You said a clinical evaluation and you use all of your --

A. The clinical evaluation is basically two parts. One is to review all documentation written, and if you ever do have videotapes, that's, you know, a good thing to see. Any written documentation of all treatment or any other observations of the children. And then the interview with the child. And comparing my assessment and impressions of the child versus what I've read, and seeing if there's contradictions, confusion, overlap, etc.

Q. And the actual interviews themselves, are there any

particular -- is there any protocol that you either personally follow or are required to follow in conducting that type of a forensic evaluation?

A. No. I don't follow any particular protocol. I do a good clinical interview.

Q. Any particular procedures that you utilize in terms of the types of questions you ask or how you phrase your questions in your evaluations?

A. No.

Q. You just testified that a videotape is a good idea. Is there any reason you didn't videotape the interviews?

A. I don't think I --

MR. MIRZA: Objection as to form.

A. I didn't mean to say a videotape was a good idea.

Q. Then I misunderstood you.

A. Yeah, I think so.

Q. You don't videotape --

A. No.

Q. -- interviews?

A. No.

Q. Would there be a reason to videotape the interview?

A. Not in my mind. It was useful for me to see the boy's videotaped depositions because I got to see them in real time when they were younger.

children have any way of understanding it the way that we do as an adult in terms of where we say who's responsible and why is this happening to you. It's much more of a blur to them. They're bound to be angry at their mother under any circumstances. If the mother's neglectful, or if the mother's a wonderful mother and the children are taken away by accident, the mother will always pay. That's the person in their lives they know they can blame if anything goes wrong because they don't even know who these other people are. So it's very upsetting to children to be taken away from their parent and they will be angry at their parent when they're returned. They'll initially be sometimes very numb, and not -- will be afraid to attach again, or they'll be reluctant to attach, they may give the mother the cold shoulder. But in the adjustment period after they return, they're likely to act up and really demand the mother's attention. And some of it is anger and some of it is saying bond to me again, help me do the things that a mother does, because they need that connection.

Q. And what if once the children are returned they still don't get that connection with the mom?

A. That wouldn't be good.

Q. And what would happen to them psychiatric -- their

this day a very physical kid.
Q. On page 5 of your report you note, near the bottom, that the twins did not have any formal psychiatric assessment during this time period. This is prior --
A. Yes.
Q. -- to the time that they were four at this point?
A. Right.
Q. And again, it wouldn't be normal necessarily to have a psychiatric evaluation before you're four years old; is that right?
A. It's never normal to have a psychiatric assessment.
Q. Well, let me rephrase it. It's not usually done. Is it not usually done for a child under four or five years old to have a psychiatric evaluation?
A. Well, it would -- these kids were very closely watched by DCYF. They were very involved with the family, and DCYF was pretty active with the family. So I think if they were worried about these kids, they would have gotten them a psychiatric evaluation because they had access to do that. And they didn't ask for that for them. They did know about Jeffrey being hospitalized and, you know, Jeffrey got care when he was five years, nine months old. So I suspect if somebody said there's something really disturbingly wrong with these children, we see it right

A. Because I wanted to explain what looked dismissive to me. To elaborate on why that -- I had that impression.
Q. And what is the impact of that on your opinion in this case?
A. It doesn't have any impact on my diagnosis of the children.
Q. Is there a reason then that you included it?
A. Yes. (Pause) I'm just -- how to describe this. I do believe that the children were abused in the Sykes foster home physically and sexually, very severely. And there were a number of CANTS investigations that occurred while they were there that were -- there were worrisome signs which I elaborate on in this report during the time period that they were there. And as I went through all the records, I tried to understand how people were interpreting information that was in front of them at the time, and how this could have happened. If it did happen, how could it have happened. And when I see something like Ms. Gloria saying these allegations are like a laundry list, it doesn't imply that the complaints are being taken with the seriousness that I think they probably would need to be to look at it with a fresh eye. Even if it came up five times before, if the sixth time there's something there, that's scary. And that

A. I don't know if I can comment on that, I'm not sure of the answer to that. It wasn't the purpose of it. Whether it would qualify in some sense, I don't really know.

Q. Well, are you qualified to perform a forensic evaluation?

MR. MIRZA: Objection.

A. I thought you were asking about Dr. Savitsky.

Q. I was. Now I'm asking you if you're qualified to perform a forensic evaluation.

A. I'm sure I am.

Q. Okay. So, I'm asking you if what Dr. Savitsky did, in your professional opinion and your experience and expertise, was a forensic evaluation of the boys?

A. No. No, it was a clinical evaluation for purpose of diagnosis and treatment.

Q. And are you able to explain to me in your professional opinion what the difference is?

A. You know, and I have to review the guidelines for doing a forensic evaluation to explain it in detail, but it really would be to determine what has happened. If anything has happened and what has happened. It's more of a investigatory, assigning findings of fact.

Q. And have you conducted forensic evaluations yourself?

A. I have.