# 69 Sexual Abuse

Deborah Madansky
Christine Barron
Carole Jenny

I. **Description of the problem.** Sexual abuse is defined as the **engagement of a child in sexual contact or activities that the child cannot comprehend, for which the child is developmentally unprepared and cannot give informed consent, and/or that violate societal, legal, and social taboos.** The activity occurs for the **gratification of the older individual** and may include forms of anal, genital, and oral contact to or by the child, and exhibitionism, voyeurism, or using the child for the production of pornography. Force is often not involved, but coercion or threats may be.

A. **Epidemiology.**
- The true prevalence is unknown since most cases go unreported. In retrospective surveys of adults, about **25% of women and 15% of men** report sexual contact with an adult during childhood or adolescence.
- 40% of reported cases of child abuse and neglect involve sexual abuse.
- 75% of reported victims are female, but there is evidence that male victims are less likely to report.
- Male perpetrators are more common.
- The vast majority of perpetrators are known to the child.
- Sexual abuse crosses all socioeconomic, ethnic, and racial lines.

B. **Contributing factors.** Children at higher risk are those with a diminished capacity to resist or disclose, such as preverbal, developmentally delayed, or physically handicapped children, and children in dysfunctional or reconstituted families.

II. **Making the diagnosis.**

A. **Presentations of child sexual abuse.**
1. **Acute assault.** A child presenting within 72 hours of an assault should be referred to an emergency room, or child protection programs when available, where forensic specimens may be collected.
2. **In the pediatric office.**
   a. The child is **referred by protective services or law enforcement** for a medical evaluation as part of an investigation.
   b. The child is **referred by a family member** who is aware of or suspects sexual abuse.
   c. The child is **seen for a routine examination** or medical and behavioral complaint where the differential diagnosis includes sexual abuse.

B. **Signs and symptoms.**
1. **Specific indicators.**
   a. Genital or rectal pain, bleeding, trauma, or infection.
   b. Sexually transmitted diseases (Table 69-1).
   c. Developmentally inappropriate sexual behavior in young children, such as engagement in intercourse, oral sex, or sexual coercion.
2. **Behavioral indicators** are nonspecific and similar to symptoms due to other stressors. They are not indicative of specifically sexual abuse.
   a. Fears and phobias, especially of circumstances similar to the abuse.
   b. Nightmares and other sleep disturbances.
   c. Appetite disturbance or eating disorders.
   d. Enuresis or encopresis.
   e. Change in behavior, attitude, or school performance.
   f. Depression, withdrawal, or suicidality.
   g. Excessive anger, aggression, or running away.
   h. Promiscuous behavior or substance abuse.
3. Some children may have **posttraumatic stress disorder**, whose diagnostic criteria include having the following symptoms for at least 1 month's duration:
   a. **Reexperiencing the traumatic event**, such as in recurrent dreams, flashback memories, or repetitive traumatic play.

**Table 69-1** Implications of commonly encountered sexually transmitted diseases for the diagnosis and reporting of sexual abuse of prepubertal infants and children

| STD confirmed | Sexual abuse | Suggested action |
|---|---|---|
| Gonorrhea[a] | Certain | Report[b] |
| Syphilis[a] | Certain | Report |
| *Chlamydia*[a] | Probable[c] | Report |
| Condylomata acuminatum[a] | Probable | Report |
| *Trichomonas vaginalis* | Probable | Report |
| Herpes 1 (genital) | Possible | Report[d] |
| Herpes 2 | Probable | Report |
| Bacterial vaginosis | Uncertain | Medical follow-up |
| *Candida albicans* | Unlikely | Medical follow-up |

[a]If not perinatally acquired.
[b]To agency mandated in community to receive reports of suspected sexual abuse.
[c]Culture only reliable diagnostic method.
[d]Unless there is a clear history of autoinoculation.
Reprinted with permission from the American Academy of Pediatrics. Committee on Child Abuse and Neglect. Guidelines for the evaluation of sexual abuse of children. *Pediatrics* 87(2):254–260, 1991.

b. **Persistent avoidance of certain stimuli** or numbing of general responses.
c. **Persistent symptoms of increased arousal,** such as difficulty falling or staying asleep, irritability or angry outbursts, difficulty concentrating, hypervigilance, exaggerated startle, or physiologic reactivity to a memory of the event.

**C. History.**

1. The **parent or guardian** should be interviewed alone regarding his or her concerns, the child's disclosures or complaints, and a review of the child's medical, developmental, emotional, and behavioral status. The clinician should ask specifically about:
   a. The child's disclosures.
   b. Content of sexual play with peers, adults, or dolls.
   c. Masturbation or genital fondling.
   d. Genital complaints or symptoms.
   e. Toileting difficulties.
   f. Sleep disturbances (difficulty falling asleep, night waking, nightmares).
   g. Behavioral difficulties or changes.
   h. School performance.
2. The **child** should be interviewed, unless he or she has already been interviewed or is too young or unwilling to talk. Follow this sequence.
   a. **Interview the child alone,** and record the child's statements. (The parent may be the perpetrator, or even if not, children often are uncomfortable speaking to a parent.)
   b. **Sit at eye level and take time to establish rapport** with neutral topics (e.g., ask about the child's living situation, pets, school, favorite activities, etc.).
   c. **Gear the discussion to the child's developmental level,** and use his or her own terms for body parts. (For young children line drawings may be helpful.)
   d. **Introduce the topic of possible sexual abuse in a general way,** such as
      - *"Is there anything that you feel uncomfortable about that you would like to talk about?"* or *"I know you have had to leave your family and are now in a foster home. Can you tell me how that happened?"*
      - If these opening questions do not result in a spontaneous account, inquire more specifically, *"Has anyone touched you or bothered you in a way that made you feel uncomfortable?"* or *"Lots of children come to see me because someone touched them in a way they didn't like. Did that ever happen to you?"* If the child says, *"Yes,"* then ask, *"What happened?"*
      - Use **nonleading questions,** such as what, who, where, and when. Avoid any demonstration of emotion, pressure, or correction of the child. Have a "then what happened/tell me more" approach.
   e. Be aware that **disclosures may take place during the physical examination** as the affected body parts are examined.
   f. **Document what the child says verbatim** in the record. Videotaped interviews are usually conducted by protective services or law enforcement and are probably unwise in the pediatric office.
   g. **Reassure the child** that it was okay to tell you, and whatever happened was not his or her fault.

D. **Physical examination.** Do a complete physical examination. This allows a familiar context for the child, opportunities for further rapport, and screening for other problems.
  1. **Genital examination.**
    a. **Be aware of examination positions** (supine frogleg, prone knee-chest, lithotomy) and techniques (labial separation, labial traction).
    b. **Use a good light source with magnification,** such as an otoscope head, handheld or headpiece lens, magnifying fluorescent light, or colposcope.
    c. **Be aware of genital anatomy and normal developmental variations.**
      (1) All girls are born with a hymen.
      (2) Newborn hymens are fleshy and redundant secondary to maternal estrogen effect.
      (3) Prepubertal hymens have thinner tissue.
      (4) Pubertal hymens are thickened and petaled from renewal of the estrogen effect.
    d. **Be aware of normal anatomic variations.**
      (1) Most hymens fit into one of five categories: crescentic (posterior rim), circumferential (annular), fimbriated (redundant), sleevelike, or septate.
      (2) Nontraumatic variations include periurethral and perihymenal bands, small hymenal mounds adjacent to vaginal ridges, perineal midline raphe, and hymenal flaps.
    e. **Be aware of abnormal findings not due to sexual abuse** (straddle injuries, genital hemangiomas, lichen sclerosis, urethral caruncles, urethral prolapse).
    f. **Prepare the child** prior to the examination with an explanation of the examination.
    g. **Boys** should receive a careful inspection of the penis, urethral meatus, scrotum, and surrounding skin.
    h. Prepubertal girls require a careful inspection of the vulva, unless internal trauma is suspected (which requires a pelvic exam under anesthesia). Pubertal girls require a complete pelvic with a speculum.
    i. **Genital findings consistent with sexual abuse:**
      (1) **Acute:** lacerations, abrasions, ecchymoses, edema.
      (2) **Chronic:** scarring of hymen or other genital structures; absent hymen, attenuated hymen, distorted hymen, or U- or V-shaped indentations in posterior or lateral portions of the hymen
  2. **Anal examination.**
    a. Be aware of **normal anal anatomy and variations,** including smooth areas at 6 and 12 o'clock (diastasis ani), erythema, midline skin tags, increased pigmentation, venous congestion, anal dilation with feces in the rectum.
    b. **Findings consistent with sexual abuse.**
      (1) **Acute:** lacerations, edema, abrasions, ecchymoses, fissures that come out past the anal verge.
      (2) **Chronic:** scars, dilation 20 mm or more without rectal feces, altered anal contour.

E. **Laboratory tests.**
  1. When indicated by the history or physical findings, culture for **gonorrhea** in the throat, anus, and vagina/urethra, and ***Chlamydia*** in the vagina and anus.
  2. **Serologic tests for syphilis and human immunodeficiency virus (HIV)** should be performed if the history warrants (taking into account of the incubation periods: up to 3 months for syphilis; up to 6 months for HIV).
  3. **Symptomatic children** should be investigated for other genital infections, such as trichomonas, herpes, condyloma acuminata, *Gardnerella vaginalis,* and *Candida.*
  4. Consider a **urinalysis** and **urine culture.**
  5. Consider a **pregnancy test** for pubertal girls.

III. **Management.**

A. **Primary goals.** The goals of management are to provide medical treatment for injuries or infections, arrange for psychosocial support for the child and family, and protect the child from further abuse by reporting to child protective services(Table 69-2).

B. **Ongoing role of the practitioner.**
  1. **Help guide the family toward healing.**
    a. **Provide or arrange crisis intervention counseling.**
    b. **Alert the family to their possible behavioral and emotional reactions,** especially if the family constellation is disrupted.
    c. **Encourage a sense of physical security for the child after the disclosure;** reassure children who were threatened with harm that there is no danger.

Table 69-2 Guidelines for making the decision to report sexual abuse of children

| Data available | | | Response | |
|---|---|---|---|---|
| History | Physical | Laboratory | Level of concern about sexual abuse | Action |
| None | Normal examination | None | None | None |
| Behavioral changes | Normal examination | None | Low (worry) | ± Report*; follow closely (possible mental health referral) |
| None | Nonspecific findings | None | Low (worry) | ± Report*; follow closely |
| Nonspecific history by child or history by parent only | Nonspecific findings | None | Possible (suspect) | ± Report*; follow closely |
| None | Specific findings | None | Probable | Report |
| Clear statement | Normal examination | None | Probable | Report |
| Clear statement | Specific findings | None | Probable | Report |
| None | Normal examination, nonspecific or specific findings | Positive culture for gonorrhea; positive serologic test for syphilis; presence of semen, sperm, acid phosphatase | Definite | Report |
| Behavioral changes | Nonspecific changes | Other sexually transmitted diseases | Probable | Report |

*A report may or may not be indicated. The decision to report should be based on discussion with local or regional experts and/or child protective services agencies.
Reprinted with permission from the American Academy of Pediatrics Committee on Child Abuse and Neglect. Guidelines for the evaluation of sexual abuse of children. *Pediatrics* 87(2): 254–260, 1991.

d. **Parents should neither try to make children forget nor pry into details,** but rather be open to children's negative or positive expressions about the experience.
e. **Help parents avoid overprotection and maintain normal routines, physical affection, and limit setting** whenever possible.
f. **Help parents remember the needs of the rest of the family and themselves.**

2. **Monitor the child and family adjustments over time.** As the victim enters each succeeding developmental stage, new questions and feelings may arise.
3. **Be aware of local resources,** such as parent groups, offender treatment, victim witness advocates, and children's groups available to the family.

C. **Criteria for referral.**

1. **A clinician who does not have sufficient evidence** to report to child protective services but is still concerned should refer to an experienced mental health provider for a full sexual abuse evaluation.
2. **A clinician who cannot conduct a complete medical evaluation** (or if the initial evaluation raises questions) should refer to a pediatric specialist in sexual abuse.
3. **All sexually abused children should be referred to an experienced mental health provider** to evaluate the need for ongoing treatment. Even children without overt symptoms may harbor negative or confused feelings that may be revealed only in the context of a full evaluation.

IV. **Clinical pearls and pitfalls.**

- Rely on the history for the diagnosis; most sexually abused children have no physical findings. This is because they were fondled, engaged in oral sex, or had minor injuries that healed quickly. Even hymenal tears can heal without a trace. A normal examination neither rules out nor confirms the possibility of sexual abuse or prior penetration.
- Take the child's statements and behavior seriously. The incidence of genital complaints is higher than the incidence of genital findings in sexually abused children.
- Children who imitate adult sex acts or molest other children are highly suspect. (Normal sex play among peers is, "You show me yours, and I'll show you mine.")
- Make sure the parent(s) have adequate support; the child's adjustment is related to family adjustment.
- Sexually abused children may feel like "damaged goods" and need reassurance that their bodies are fine. Even if there is damage, the clinician can still honestly say that something is healed or will heal quickly.

## BIBLIOGRAPHY


### For Parents

Crow P, Butler J. *Helping Children Recover from Sexual Abuse: A Guide for Parents.* Portland, OR: Emanuel Hospital and Health Center, 1991.

MacFarlane K. *Please, No, Not My Child–Coping with Sexual Abuse of Your Preschool Child.* Los Angeles: Children's Institute International, 1983.

### For Children

### For Preschoolers

Freeman L. *It's My Body.* Seattle: Parenting Press, 1987.

### For School-Aged Children

*My Very Own Book About Me.* Spokane, WA: Rape Crisis Resource Library, 1982.

### For Adolescents

Davis L. *The Courage to Heal Workbook.* New York: Harper & Row, 1990.

### For Professionals

American Academy of Pediatrics, Committee on Child Abuse and Neglect. Guidelines for the evaluation of sexual abuse of children. *Pediatrics* 87(2):254–260, 1991.

Botash AS. *Evaluating Child Sexual Abuse: Education Manual for Medical Professionals.* Baltimore: The Johns Hopkins University Press, 2000.

Chadwick DL, et al. *Color Atlas of Child Sexual Abuse.* Chicago: Year Book Medical Publishers, 1989.

Heger A, Emans SJ (eds). *Evaluation of the Sexually Abused Child.* New York: Oxford University Press, 1992.

Jones DPH, McQuiston M. *Interviewing the Sexually Abused Child.* Denver: C. Henry Kempe Center for the Prevention and Treatment of Child Abuse and Neglect, 1986.

Reece RM (ed). *Child Abuse Medical Diagnosis and Management.* Baltimore: Williams & Wilkins, 1996.

Path: {Book}AAP-PPC-06-1201/Application/AAP-PPC-06-1201-356.3d
Date: 12th February 2008 Time: 18:11 User ID: elangok 1BlackLining Enabled

Chapter 356

# RAPE

*Marianne E. Felice MD; Christine E. Barron MD*

Rape is a legal definition, not a medical diagnosis; every state has statutory definitions of sexual assault and rape. Clinicians should be familiar with the statutes in their local jurisdictions. In general, *rape* refers to sexual intercourse with force or the threat of force or without a person's consent. Sexual intercourse may include penile-oral, penile-vaginal, or penile-anal penetration. The threat may be an overt physical threat, verbal threat, or an implicit threat as a result of age and power differentials between sexual partners. Rape can occur at all ages; however, this chapter focuses on adolescent victims of rape. Rape entails an assault acted out sexually, rather than a sexual act per se. Not only is rape an unchosen act for the victim, but it also causes health risks unchosen by the victim. In this chapter, information is provided on rape, not chronic sexual abuse, such as incest.

## INCIDENCE

Exact statistics on the incidence and prevalence of adolescent rape are not available because many victims never report the crime. Estimates of unreported rape range from 40% to 90%.[1] Between 40% and 60% of all rape victims are younger than 18 years, and most are adolescents.[2,3]

Female adolescents aged 16 to 19 are 4 times more likely to be sexually assaulted than women in all other age groups.[4] Worldwide, estimates indicate that between one third and two thirds of rape victims are 15 years and younger.[5] Although most rape victims are women, 5% to 10% are men.[2,6] Ninety percent of adolescent rape victims are assaulted by someone they know, and more than 50% of these cases occur on a date.[7] Survivors of prior sexual abuse are at particular risk of revictimization.[8] Adolescents who engage in high-risk behaviors, such as running away and using drugs and alcohol, are at an increased risk for rape.[9] Approximately one half of all reported rapes in the United States eventually lead to arrests; approximately two thirds of those arrested are prosecuted, and approximately one half of those prosecuted are found guilty. In other words, for every 100 reported rapes, only 16 of the perpetrators are convicted.[1]

## TYPES OF RAPES

Types of rape vary considerably based on the relationship of the victim to the assailant. The various types of rapes raise different issues that are crucial to consider when providing care for the pediatric survivor. Psychosocial sequelae of rape often vary according to the type of rape involved.

### Known Assailant

In most reported pediatric rape cases the victim knows the assailant, who may be a parent, a stepparent, an adult relative or friend of the family, a neighbor, an acquaintance, or a classmate. The victim-assailant relationship may cause conflicting family or social loyalties. In these cases, victims are less likely to report the rape. Furthermore, rape victims who know their assailants are prone to self-doubt and self-blame, and when they do report the rape, their reports may be received with skepticism and disbelief, even by the professionals to whom they turn for help.[10]

### Stranger Rape

An estimated 15% to 55% of reported rapes are committed by individuals who are not known by the victim.[11] Stranger rape is more likely to entail threats or use of violence and fear of immediate danger, and it is associated with a higher incidence of reporting the rape and of subsequent conviction of the assailant. Stranger rape is most likely to occur in areas of poverty and in high-crime districts where walking and playing pose risks of danger.

### Date Rape

Estimates of the incidence of date rape are unclear. However, in one survey of middle and high school students, nearly 20% of the girls and more than 10% of the boys reported a history of unwanted sexual activity on dates.[12] Surveys of college students indicate that approximately 25% of female students and 6% of male students report a history of sexual assault that meets the definition of rape while on a date.[6,12] Almost none of the college students in these surveys reported the sexual assault to authorities. Particularly in cases of young female adolescents (ages 10 to 15) and older men, questions of statutory rape arise, along with questions of consent, refusal skills, and exploitation.[13]

Of the various types of rape, date rape is the least likely to be reported. The fact that the incidence of date rape appears highly correlated with one or both parties having been drinking or using other drugs before the rape is of particular concern to adolescents. As would be expected, date rapes are more likely to occur on weekends between 10 PM and 1 AM, in automobiles or at the home of the assailant.[11]

Date rape may not be reported if the rape was facilitated by the administration of pharmaceuticals, including gamma hydroxybutyric acid, flunitrazepam (Rohypnol), and ketamine hydrochloride (Ketamine), known as *date rape drugs*, given that these medications cause anterograde amnesia.

Long-term issues of trust, self-blame, and vulnerability are important issues for victims of date rape, as in any other form of rape. The female date rape victim may not trust her judgment concerning men, and she may blame herself for the rape, erroneously believing that she did not resist clearly or did not resist convincingly enough. She may be ashamed that she ended up in a situation that resulted in rape. These thoughts of guilt may be reinforced by the response and degree of support provided by parents, guardians, and friends. Parents' and friends' understanding and support of the victim is a significant prognostic factor for recovery. The tendency for victims to have reservations about reporting date rape is easy to understand.

Path: {Book}AAP-PPC-06-1201/Application/AAP-PPC-06-1201-356.3d
Date: 12th February 2008 Time: 18:11 User ID: elangok 1BlackLining Enabled



Unfortunately, such secrecy also applies to discussing the incident in general, making catharsis, as well as verbal and emotional support from others, difficult to obtain.

### Gang Rape

Gang rape typically involves a group of young men raping a solitary female victim. This type of rape may be associated with ritualistic behavior, as well as displaced rage on the part of the assailants. Issues of sexualized rites of passage apply both to stereotypical adolescent gangs and to college fraternities. Victims of college campus gang rapes are more likely to drop out of college after the rape than to pursue legal recourse,[11] avoiding confrontation with the perpetrators at the long-term expense of the victims.

### Male Rape

In this discussion, *male rape* refers to same-sex rape. Although sporadic reports have surfaced of male rape by women, data are limited.[10] The area of male rape remains understudied and is far less understood than female rape. Specific subgroups of young men are at particular risk for sexual abuse: those in institutionalized settings (such as the criminal justice system), street youth (who may engage in prostitution), young male homosexuals (who may be runaways), and youth who have a parental history of physical or sexual abuse (parents who were abused themselves may become abusers as adults).[14] The occurrence of male rape in institutionalized settings is often attributed to displaced heterosexual behavior or undifferentiated sexual orientation, along with aggressive dominance of a weaker partner.[15,16] Male rape outside institutions often occurs through coercion by an individual perceived as an authority figure to the victim.[1]

Although male rape victims are more likely than their female counterparts to sustain physical trauma,[17,18] the treatment of male victims should parallel that described for women. Issues of loss of control are particularly relevant for the male rape victim, along with subsequent symptoms of depression, anxiety, sleep disturbances, and suicidal ideation. Conflicted sexual identity is common among all male rape victims, whether they are homosexual or not. Male rape victims are often controlled by entrapment, intimidation, physical force, or any combination. The intimidation is accomplished by threats of physical harm, by brandishing a weapon, or both. Male rape victims frequently perceive the rape as a life-threatening event[18] (a perception that may result in long-term psychological problems).[16] Because of the pervasive reluctance of boys and men to report rape, the preclusion of social support and intervention is a particularly challenging issue.

## MALE PERPETRATORS

Just as female adolescents constitute a large proportion of reported rape victims, male adolescents make up a large proportion of convicted rape assailants; 40% of convicted rapists are 16 to 20 years of age, and another 25% are between 20 and 24 years of age.[1]

Perpetrators tend to fall into one of three clusters: (1) those for whom anger is the primary dynamic, (2) those for whom power or conquest is the central issue, and (3) the sadistic person, for whom anger and control are, in and of themselves, erotic.[19] For the anger-driven rapist, the act tends to be impulsive, with the intent of hurting, humiliating, and degrading the victim. Physical brutality is common. Rape functions as the outlet for anger, essentially by using sex as a weapon. The power-oriented rapist is more likely to engage in premeditated, obsessive, or stalking behavior, in which the rape essentially compensates for social and sexual incompetence or inadequacy. Aggression for the power-oriented rapist is less likely to be violent than a means of dominating his prey. Both anger- and power-driven rapists have serious deficits in social skills and the inability to interpret and respond to social cues from others. For the sadistic rapist, eroticism and violence are enmeshed; victims are typically subjected to premeditated, deliberate acts of cruelty and dehumanization. The sadistic perpetrator finds gratification in his victim's pain and powerlessness.

Although some rapists are dysfunctional sexually at the time of the rape, most rapists are sexually active with available, consensual partners outside the rape.[19] Perpetrators usually appear ordinary by most standards; most do not have symptoms of major psychiatric illnesses such as psychoses, nor does a preponderance exist of mental retardation. However, other conditions such as antisocial, schizoid, paranoid, and narcissistic personality disorders are noted more commonly among convicted rapists than in the general population.[3,14]

Alcohol and drug use have been associated with the occurrence of rape. Ironically, alcohol intoxication sometimes seems to have the effect of both diminishing a perpetrator's sense of responsibility and increasing a victim's culpability. Specifically, the perpetrator's act of rape is *excused* because he was drinking and not responsible for his actions. Whereas, victim intoxication is consistently coupled with the process of *unfounding*, or disproving, rape charges. For date rape victims, having been seen drinking with the perpetrator before the attack has serious implications in relation to public, social, and legal responses to the charges.

## RESPONSE TO RAPE

### Immediate Response to Rape By the Victim

Immediate responses to rape vary considerably, ranging from distraught histrionics to near-mute withdrawal. Most victims have intense levels of fear and anxiety. Varying levels of cognitive disorganization, *shock*, and disbelief also characterize this postrape acute phase.[19] As occurs in any crisis, many adolescents regress to previous stages of development. An adolescent rape victim who was previously self-assured and appropriately independent may become clinging and dependent on the parent or health professional.

### Immediate Response By the Family

Unlike other crime victims, the victim of rape rarely contacts the police immediately. Typically, the victim contacts an intermediary (a friend or family member) first. This individual's response is crucial in the

ensuing medical and legal processes; but most family and friends need guidance to know how best to be supportive to the victim. The disclosure of rape is usually traumatic for the family, as well as the victim. Parents may blame themselves inappropriately for the rape. In other instances, parental activities (eg, neglect) may have contributed to the rape. In either scenario, the issues are highly sensitive and need to be addressed with skill and compassion.

Familial responses to a child's rape range from denial and disbelief to shame and outrage. No guarantee exists that a family is prepared to respond appropriately to a raped child's needs at this time. In some cases, a victim's mother's financial dependence on a perpetrator may confound reactions. During the initial evaluation session, health care professionals spend therefore must some time with the family members and friends of the victim to determine their own psychological response and their ability to be supportive of the victim.

## LEGAL ISSUES

All states have laws that require physicians to report cases involving violent assault, including rape. To report statutory rape, the clinician should be familiar with state's laws regarding reporting sexual abuse and the legal age of consent. Statutory rape is defined as sexual activity of an adult with an adolescent under the age of legal consent. Reporting concerns include the possibility that reporting statutory rape can cause barriers for adolescents to obtain appropriate medical care. Clinicians have expressed the desire to use their clinical judgment in reporting cases of sexual activity that fall within the definition of statutory rape.[20] Some states require parental notification of a minor's sexual assault, and in those states, this statute overrides issues of confidentiality.

Most states permit a minor to receive treatment for sexual assault without parental consent. All clinicians must be familiar with local statutes.[21,22] Health care providers should seek additional guidance from their legal counsel or from their state attorney general's office.

Consent for treatment of rape is different than consent for collection of evidence. An adolescent patient above the legal age of consent has the ability to consent to a medical evaluation and treatment and may refuse collection of forensic evidence, or the patient may consent to both. Many victims are reluctant to give permission because they fear social isolation and possible retribution by the perpetrator. Adolescent victims who decide not to report the rape to law enforcement should be informed that if the victim wanted to pursue possible prosecution in the future, then the evidence must be collected at this time. Therefore the physician must ask the adolescent patient for permission to complete a full evidentiary examination and to release the evidence to the police. The exceptions are cases identified by state law to be child sexual abuse that requires mandatory reporting to a child welfare agency, law enforcement, or both, which does not require consent from patient or family to report.

From a medical-legal perspective, physicians must realize that their responsibility is limited to the documentation of evidence. Determining whether a rape really occurred is not the physician's role; this determination is a court decision. The physician will be of most help to the victim and the authorities by presuming that the victim is telling the truth, being thorough in the evaluation, and keeping accurate medical records.

## MEDICAL EVALUATION

Rape is a serious medical and psychological emergency for both the victim and the family. The purpose of the initial evaluation is 4 fold: (1) treatment of injury and infection, (2) prevention of pregnancy, (3) collection of evidence, and (4) psychological assessment with referral for follow-up counseling.

### General Concepts

Many metropolitan areas have treatment centers with trained interdisciplinary teams available for adolescent and child victims of rape; these treatment centers are ideal sites for an initial evaluation[23] and are usually staffed with an interdisciplinary care team, most frequently consisting of a physician, nurse, and social worker. An interdisciplinary approach is beneficial for several reasons, including the ability to provide support to the child and family simultaneously and to serve as a resource for future services. For various reasons, most pediatric rape victims do not use such specialized facilities, and they may receive medical evaluations at emergency departments or private medical offices. To minimize the physical and psychological trauma of the evaluation, eliminate the need for repeat evaluations, and maximize the probability of collecting forensic evidence, the most skilled professional available should perform the initial evaluation. The gender of the examiner is less important than the individual's comfort with adolescents and children, skill at conducting the examination, and level of compassion.

The rape evaluation can be long and tedious, but it should never be rushed. Although the youngster is coping with personal outrage and physical and psychological pain, the patient is expected to tolerate and cooperate with uncomfortable procedures that may feel similar to the acts of intrusion and aggression experienced previously. The approach to the evaluation should be calm, gentle, and private. Rape protocols, if available, are helpful and will serve to minimize the chance for error or omission in the evidence-collection process. Most jurisdictions have printed standardized forms for the evidence-procurement process [5]; these forms are available in each state's *forensic evidence kit*. Before examining a victim, the clinician should become familiar with these forms.

The clinician should avoid making inappropriate assumptions about the victim based on the patient's psychological state. Many victims are in a state of shock or denial immediately after the event. How a patient responds in the emergency room varies and depends on numerous factors, including developmental maturity. Appearing physically mature but functioning cognitively at the level of a preadolescent is not uncommon for a 13-year-old child. Therefore the patient's psychological state should not alter the

Path: {Book}AAP-PPC-06-1201/Application/AAP-PPC-06-1201-356.3d
Date: 12th February 2008 Time: 18:11 User ID: elangok 1BlackLining Enabled



physician's approach to care. Furthermore, the clinician should not attempt to minimize the victim's sense of personal guilt, shame, and anxiety by offering reassurance immediately. Taking a few minutes to empathize with the patient and acknowledge the patient's feelings before proceeding with the evaluation helps both the patient and the physician. Particularly in cases in which acute trauma may compromise a pediatric patient's existing coping skills, the establishment of the patient's safety is crucial. The clinician should never leave the patient alone, if at all possible.

Taking whatever time is necessary at the beginning of the evaluation to explain the process of the examination and allow for questions is always prudent, particularly for rape victims who never had previous sexual relationships or a prior gynecologic examination; such is also the case for more experienced patients who understandably may still be anxious and fearful of anticipated pain and discomfort. Whenever possible, the clinician should allow the patient some control over the proceedings; the patient should set the pace of the examination. The clinician should be careful to inform the patient in advance of what tasks must be accomplished. The patient should be the one who signals when to begin the procedure. If the victim becomes visibly agitated with the proceedings, then the clinician should stop and allow the patient to regain composure before continuing with the examination. At no point should a physician continue to examine a child or adolescent against the patient's will.

Whenever applicable, making reference to prior experience with other similar-aged rape survivors may help establish that the patient is not the only child or adolescent to whom this ordeal has happened; it also establishes that the physician is not shocked at such circumstances and has some practical knowledge with which to anticipate concerns.

After obtaining consent from the patient, the physician should obtain a detailed and relevant history, followed by a thorough general physical examination and a gentle but complete pelvic examination. A female nurse or assistant must be present during this process; for some young adolescents, having a parent present during the examination is usually helpful if the parent is reassuring, rather than openly distraught during the procedure. Some aspects of the evaluation will change depending on the temporal proximity of the evaluation to the alleged event. The following guidelines are recommended for evaluations conducted within 72 hours of the assault. Modifications are necessary if the evaluation is conducted after this time. In some centers the interdisciplinary team obtains the history simultaneously and together so that the victim does not have to repeat the history unnecessarily.

## History

History taking necessarily entails asking some very personal and potentially awkward questions. The patient should be assured of privacy and offered respectful compassion. The history should include the time, date, and location of both the event and the examination. Recalling the event may be emotionally traumatic for the patient; thus beginning with a relevant, but relatively neutral, medical history is sometimes useful. Such information as medical history, physical and behavioral symptoms, and a thorough menstrual history—including the age of menarche; the date of the last menstrual period; the frequency of menses; sexual activity if relevant; previous pregnancies, miscarriages, and abortions; and the use of contraceptives and feminine hygiene products—is important. Additional history should include parental response to disclosure, fear of parental reaction and risk of running away, and fully exploring past and current suicidal ideation.

Next, the event itself should be the focus. Questions should be asked calmly and with sensitivity and patience. The victim's own words should be recorded whenever possible. The medical chart is a legal document and will be subjected to the same scrutiny as any other form of evidence. Only the historical facts, without embellishment or interpretation, should be recorded.

The patient should be asked about the use of intoxicating substances before or during the event, as well as whether any loss of consciousness that may have occurred. The clinician needs to ask whether weapons or restraints were used during the assault. The patient should be asked to describe in detail the location of the event, the appearance of the perpetrator, the type of sexual contact and the positions used, the use of force (by both the perpetrator and the victim), the removal of clothing and the manner in which it was removed, and what measures, if any, the patient took to cleanse or relieve himself or herself (eg, bathing, douching, changing clothes, urinating, defecating). Whether the assailant used a condom or any other means of contraception should be determined. Finally, the physician should ask about the presence of clinical symptoms in the musculoskeletal, gastrointestinal, and genitourinary system.

## Physical Examination

A detailed history and physical examination, as well as specimens for forensic and laboratory evaluation, should be obtained for all rape victims. Particular focus should be placed on the evaluation of the oral cavity, the genitals, and the anus.

Although a complete physical examination from head to toe is warranted, 40% to 60% of sexual assault victims will have no visible physical injuries.[17,18] Inspection of the entire body may provide the corroborative evidence necessary to convict the perpetrator, and follow-up examinations may reveal emerging bruising or injuries in areas initially noted to have tenderness or swelling but no visible bruising on the initial examination.

The patient's physical appearance and emotional state and the condition of the patient's clothing should be noted. If the patient is wearing in the same clothing worn at the time of the event, then its condition should be noted and each piece saved in a separate, labeled bag. Applying a fluorescent lamp to the clothing and skin may illuminate the presence of dried semen. Semen fluoresces best at wavelengths of 420 and 450 nm, when viewed through orange goggles. A Wood lamp emits light at only 360-nm wavelength. Therefore specialized alternate light sources that emit

wavelengths at 420 and 450 nm, such as a Bluemaxx, should be used. Although this type of lamp will improve the detection of dried semen, many other substances will fluoresce as well; thus confirmation of semen cannot be made with this method.[24] These specimens should be marked for later analysis for the presence of seminal vesicle–specific antigen. Next, a topical survey of the body, documenting any evidence of recent trauma or bruising, should be done. The use of photographs may be useful during subsequent litigation. Use of a diagram to indicate locations of visible injuries can be helpful. The clinician should use the fluorescent lamp to identify any fluorescent areas on the skin and obtain swabs of these areas.

Particular attention should be given to the examination of the head and neck. Compression injuries of the neck are fairly common if force is used. This type of injury may lead to obstruction of venous return from the head, causing the development of neck bruising or petechial hemorrhages in the eyelids and conjunctiva. The inner surface of the lips may have tiny abrasions resulting from forced pressure applied to the mouth by the perpetrator to prevent the victim from screaming. Common injuries to the mouth include torn frenulums and palate petechiae.

The breasts may show bite marks or bruises. The clinician should swab all bite marks to collect genetic markers (ABO group) and photo-document these injuries because the bite impression may be matched to a potential perpetrator. Tanner staging to determine the victim's level of sexual maturation (breasts and pubic hair in female patients, genitalia and pubic hair in male patients) should also be performed.

## Genital Examination

### *Female Patient*

After the initial physical examination, the patient can be draped and placed in the lithotomy position. If the patient seems too anxious and a speculum examination is not required to investigate for a source of undiagnosed internal bleeding, then the supine frog-leg position may be a suitable alternative. A speculum examination is not necessary for younger adolescents or children, unless active vaginal bleeding is present, which is a rare occurrence. In these rare instances of active vaginal bleeding, performing the pelvic examination with the patient under sedation or under general anesthesia may be necessary.

The pelvic examination should begin with inspection of the thighs and perineum for evidence of trauma, bruising, semen, or blood. Appropriate forensic evidence should be taken at this time (Box 356-1). General inspection of the external genitalia should be performed, with documentation of any erythema, edema, ecchymosis, or abrasions noted.

In some cultures, an intact hymen is important as an indicator of virginity, and the patient and parents will be concerned with its structural integrity. An intact hymen does not rule out the diagnosis of rape. Acute injuries to the hymen such as bruising, petechiae, or acute transactions should be documented by describing any active bleeding and the location, as though a face of a clock were superimposed over the hymen (eg, acute swelling and transaction of hymen with active bleeding at 8 o'clock position). The entire rim of the hymen must be visualized; proper labial traction along with saline-moistened cotton swab rolled around the edges of the hymen is necessary.[25] The use of a light source or the application of aqueous toluidine blue (1%) to the posterior fourchette may help locate and identify acute tears [26] Many experts use colposcopy, which provides a light source, magnification, and photo-documentation of the examination. Colposcopy or photo-documentation with a camera is essential in providing documentation of the examination, and images can later be evaluated by expert review.[27,28]

Older female adolescents should be able to undergo a speculum examination of the internal genitals, which will allow a clear view of the vaginal walls, fornices, and cervix. Appropriate specimens for culture and forensics should be obtained (see Box 356-1).

**BOX 356-1 Recommended Procedures for Collecting Forensic Data**

Forensic evidence kit: Complete forms for authorization and release of evidence, history, and physical examination. Individual envelopes will be completed if indicated by the history provided.

Additional tests:
- Pregnancy test
- Syphilis screening
- HIV test
- Cultures for gonorrhea (oral, urethral, vaginal, and anal)
- Cultures for *Chlamydia* (urethral, vaginal, and anal)
- Wet mount for detection of *Trichomonas* and spermatozoa

### *Male Patient*

The testes, epididymis, vas deferens, penile shaft, foreskin, and glans penis should be examined thoroughly for the presence of infection or trauma.

## Anal Examination

A history of sodomy in both male and female victims indicates the need to conduct a thorough anal inspection. The clinician should document any erythema, ecchymosis, abrasions, or rectal bleeding noted. Aqueous toluidine blue (1%) may be applied to help visualize acute microtrauma to the perianal area.[25]

## Summarizing the Examination

When the physical examination is complete, the patient should be given ample time to dress and regain composure before discussing any findings. Most patients will benefit from knowing that their genital anatomy is normal. Several studies have demonstrated that over 90% of anogenital examination are normal.[29-31] Discussing physical findings, treatment options, and plans for follow-up is also important.

## Forensic and Laboratory Information

The recovery of laboratory and forensic data is probably the most controversial aspect of the evaluation,[32]

Path: {Book}AAP-PPC-06-1201/Application/AAP-PPC-06-1201-356.3d
Date: 12th February 2008 Time: 18:11 User ID: elangok 1BlackLining Enabled



especially when recovery of semen and sperm is involved; nonetheless, the finding of male ejaculate is neither predictive nor essential for criminal conviction. In one study, physical evidence of rape was found in only 23% of all of the cases that resulted in felony convictions.[33] Forensic evidence identified in younger victims is more often obtained from the child's clothing, bed linens, or both.[34] The newest developments in forensic science have occurred in the laboratory analysis of semen and include the demonstration of quantifiable levels of acid phosphatase and a positive monoclonal antibody test, the MH5 enzyme-linked immunosorbent assay (specific for seminal vesicle antigen) in vaginal fluids.

### Sexually Transmitted Infection

Most patients are concerned about the risk of acquiring a sexually transmitted infection (STI) as a result of the rape. This risk is related directly to the health status of the assailant and the victim, the site of the assault, and the infectivity of the disease in question. Overall, the risk of contracting an STI from a single encounter is small.[35,36] Repeat assaults or assaults by more than one assailant increase the risk of infection.[36] Many adolescent victims of rape, however, also engage in high-risk behaviors that put them at increased risk of having a preexisting STI. Additionally, as many as 50% of sexual assault survivors do not return for follow-up appointments.[37] The Centers for Disease Control and Prevention recommends using prophylactic antibiotics for treating potential sexually acquired infections (see Chapter 322, Sexually Transmitted Infections).[38,39] A prophylactic hepatitis B vaccination against possible exposure is recommended.

Regardless of the antibiotics given, the clinician must emphasize to the patient that the incubation period for STIs varies and that a high possibility exists that an infection may not be detected or may be missed or treated inadequately at the time of the evaluation examination. Therefore, although baseline studies should be obtained at the initial evaluation, medical follow-up is absolutely crucial. After 2 weeks the patient should be reexamined for the presence of an STI. Serial testing for syphilis, human papillomavirus, and HIV infection should be performed after the assault in most cases.

### Pregnancy

The occurrence of pregnancy after rape is strongly influenced by whether a female patient is in the fertile interval of her menstrual cycle, as well as the possible sexual dysfunction of the assailant (eg, failure to maintain an erection or to ejaculate).[3,14,40] Many adolescents, however, have irregular menstrual cycles; therefore the occurrence of ovulation for any particular cycle may be in question. If the assault occurred within 5 days of the evaluation, then emergency contraception (see the discussion of postcoital *morning after* contraception in Chapter 156, Contraception and Abortion) should be offered to the patient after a negative pregnancy test has ruled out the presence of an already existing pregnancy.[41] Two types of emergency contraceptive medications are available. The 1st type contains only progestin. Plan B® is a progestin-only emergency contraceptive that reduces the risk of pregnancy by 89%.[41] Because Plan B® contains only progestin, it has less side effects of nausea or vomiting. The 2nd type contains both progestin and estrogen. Most brands of the daily oral contraception pill contain both progestin and estrogen that reduces the risk of pregnancy by 75%.[42] When medication containing both progestin and estrogen is used, antiemetics should be offered because of the frequent side effects of nausea and vomiting. The occurrence of pregnancy after unprotected exposure should be strongly suspected when menses does not occur within 4 weeks of the rape, at which point the patient should return for a repeat evaluation.[42]

## PSYCHOLOGICAL ASSESSMENT

The psychosocial and emotional implications of rape in children and adolescents are complex. This circumstance is tempered further by the young person's stage of development and the family's response to the rape. For example, young adolescents who are just beginning to grapple with their own sexuality may believe that they deserved to be raped because of having begun to experience sexual urges. A female child who sees her mother respond with tearful distress to the news that her child was raped may feel guilt not just because of the rape but also because of the emotional trauma inflicted on the mother.

How the youngster copes with the rape is also related to how society responds to victims of rape. Unlike most crimes, the crime of rape is often blamed on the victim rather than on the perpetrator, particularly in adolescents. Following no other crime are the victim's prior reputation, appearance, and behavior subject to such scrutiny as in rape. Running away, sexual activity, and even hitchhiking are used as justification for the rape, placing further blame on an already-troubled young victim. Providers of care must avoid compounding such punitive dynamics.

### Follow-Up Care

After the initial evaluation is complete, arrangements should be made for follow-up care, not only for the medical issues discussed previously, but also to assess the victim's ability to cope with the rape and to accept counseling concerning the rape. All rape victims and their families should be seen as soon as possible after the rape by a mental health professional who is trained to work with adolescents and who is knowledgeable about the emotional sequelae to rape.

### Short- and Long-Term Psychological Sequelae

Multiple factors will determine how a child or adolescent responds to the rape, such as level of social support, coping styles and strengths, and developmental variables and cognitive functions. How any given individual will respond to rape cannot be predicted. However, children and adolescents who have been rape victims consistently have lower levels of self-esteem after rape than the general population.[5] In addition, sexually traumatized children have been noted to have higher levels of precocious sexualization than nontraumatized children.[2,43] Confusion may exist about what is normal adult sexual behavior, sometimes leading to

inappropriate sexual, *acting-out* behaviors. Some children experience developmental arrests at the time of the trauma; such arrests are not necessarily readily apparent. Although child and adolescent studies are still too scarce to be considered definitive, apparently the earlier and more traumatic the rape is, the greater the chance is of developmental and functional impairment.[15]

Behavioral concerns frequently associated with adolescent rape sequelae include school phobias, generalized fearfulness and withdrawal, and, especially in adolescents, the onset of truancy. Suicidal ideations are not uncommon, with increased lifetime risks of major depression and suicide attempts being associated with women in the aftermath of rape.[15] For male rape victims the existing research is less clear; however, male sexual trauma in childhood may be associated with sexually abusive behavior toward other boys during adolescence.[14,16] Obviously, though not all children and adolescents who have been raped will have psychiatric sequelae, all of those who have been raped should be assessed and monitored for serious sequelae. Particularly in cases in which sexual *acting out* follows a rape, careful clinical attention to issues such as post-traumatic stress disorder and depression is required. Self-medication with various substances is an ongoing clinical hazard after rape and deserves consideration as a *red flag* for health care providers working with at-risk patients.

## SUMMARY

Rape is an act of violence that involves a disparity of power between the perpetrator and the victim. Because of its sexual context, rape is easily misinterpreted as erotic or sexual behavior, which it is not.

Adolescents who have been raped should have sensitive and thorough evaluations and follow-up assessments. From the time of initial disclosure through eventual legal outcome, many developmental, familial, and social variables can shape the experience for young survivors and their families. Long-term adjustment following rape varies considerably, with both developmental and familial factors having considerable impact.

## *TOOLS FOR PRACTICE*

### Community Advocacy and Coordination

- *Center for Adolescent Health & Law* (Web page), Center for Adolescent Health & Law (cahl.org/).
- *State Laws on Reporting Child Abuse and Neglect* (other), US Department of Health & Human Services (www.childwelfare.gov/responding/reporting.cfm).

### Medical Decision Support

- *2006 Guidelines for the Treatment of Sexually Transmitted Disease* (guideline), Centers for Disease Control and Prevention (www.cdc.gov/std/treatment/).
- *Management of Possible Sexual, Injecting-Drug-Use, or Other Nonoccupational Exposure to HIV, Including Considerations Related to Antiretroviral Therapy Public Health Service Statement* (guideline), Centers for Disease Control and Prevention (www.cdc.gov/mmwr/preview/mmwrhtml/00054952.htm).
- *Strategies for the Treatment and Prevention of Sexual Assault* (guideline), American Medical Association (www.ama-assn.org/ama1/pub/upload/mm/386/sexualassault.pdf).
- *Visual Diagnosis of Child Abuse on CD-ROM, 2nd edition* (CD-ROM), American Academy of Pediatrics (www.aap.org/bst/showdetl.cfm?&DID=15&Product_ID=4003).

## *AAP POLICY STATEMENTS*

American Academy of Pediatrics, Committee on Adolescence. Care of the adolescent sexual assault victim. *Pediatrics.* 2001;107(6):1476-1479.

American Academy of Pediatrics, Committee on Adolescence. Emergency contraception. *Pediatrics.* 2005;116(4):1026-1035.

American Academy of Pediatrics, Committee on Adolescence. Sexual assault and the adolescent. *Pediatrics.* 1994;94(5):761-765.

Havens PL, American Academy of Pediatrics, Committee on Pediatric AIDS. Clinical report: postexposure prophylaxis in children and adolescents for nonoccupational exposure to human immunodeficiency virus. *Pediatrics.* 2003;111(6):1475-1489.

Kellogg N, American Academy of Pediatrics, Committee on Child Abuse and Neglect. Clinical report: the evaluation of sexual abuse in children. *Pediatrics.* 2005;116(2):506-512.

## *RELEVANT AAP POLICY STATEMENTS*

American Academy of Pediatrics, Committee on Adolescence. Care of the adolescent sexual assault victim. *Pediatrics.* 2001;107:1476-1479. Available at: http://aappolicy.aappublications.org/cgi/content/abstract/pediatrics;107/6/1476. Accessed April 5, 2006.

American Academy of Pediatrics, Committee on Adolescence. Emergency contraception. *Pediatrics.* 2005;116:1026-1035. Available at: http://aappolicy.aappublications.org/cgi/content/abstract/pediatrics;116/4/1026. Accessed April 5, 2006.

American Academy of Pediatrics, Kellogg N, and the Committee on Child Abuse and Neglect. The evaluation of sexual abuse in children. *Pediatrics.* 2005;116:506-512. Available at: http://aappolicy.aappublications.org/cgi/content/abstract/pediatrics;116/2/506. Accessed April 5, 2006.

## *REFERENCES*

1. Neinstein LS, ed. *Adolescent Health Care: A Practical Guide.* 3rd ed. Baltimore, MD: Urban & Schwarzenberg; 1996.
2. American Academy of Pediatrics, Committee on Adolescence. Sexual assault and the adolescent. *Pediatrics.* 1994;94:761-765.
3. Raine A. *The Psychopathology of Crime.* San Diego, CA: Academic Press; 1993.
4. Rickert VI, Wiemann CM. Date rape among adolescents and young adults. *J Pediatr Adolesc Gynecol.* 1998;11:167-175.
5. Koss MP, Heise L, Russo NF. The global health burden of rape. *Psychol Women Q.* 1994;18:509-537.
6. Greenfield L. *Sex Offenses and Offenders: An Analysis of Data on Rape and Sexual Assault.* Publication No NCJ-163392. Washington, DC: US Department of Justice, Bureau of Justice Statistics; 1997.

7. Heger A, Emans SJ. *Evaluation of the Sexually Abused Child: A Medical Textbook and Photographic Atlas.* New York, NY: Oxford University Press; 1992.
8. Wyatt GE, Guthrie D, Notgrass C. Differential effects of women's child sexual abuse and subsequent sexual revictimization. *J Consult Clin Psychol.* 1992;60:167-173.
9. Nagy S, Adcock AG, Nagy MC. A comparison of risky health behaviors of sexually active, sexually abused, and abstaining adolescents. *Pediatrics.* 1994;93:570-575.
10. Petrak JA. Current trends in the psychological assessment and treatment of victims of sexual violence. *Sex Marital Ther.* 1996;11:37-45.
11. Allison J, Wrightsman LS. *Rape: The Misunderstood Crime.* Newbury Park, CA: Sage Publications; 1993.
12. Erickson PI, Rapkin AJ. Unwanted sexual experiences among middle and high school youth. *J Adolesc Health.* 1991;12:319-325.
13. Elstein S, Davis N. *Sexual Relationships Between Adult Males and Young Teen Girls: Exploring the Legal and Social Responses.* Chicago, IL: American Bar Association; 1997.
14. Knight R, Rosenberg R, Schneider B. Classification of sex offenders: perspectives, methods, and validation. In: Burgess AW, ed. *Rape and Sexual Assault: A Research Handbook.* New York, NY: Garland Press; 1985.
15. Calhoun K, Atkeson B. *Treatment of Rape Victims: Facilitating Psychosocial Adjustment.* New York, NY: Pergamon; 1991.
16. Lacey HB, Roberts R. Sexual assault of men. *Int J STD AIDS.* 1991;2:258-260.
17. American Medical Association. Strategies for the Treatment and Prevention of Sexual Assault. 1995. Available at: www.ama-assn.org/ama1/pub/upload/mm/386/sexualassault.pdf. Accessed May 8, 2007.
18. Botash AS, Braen R, Gilchrist VJ. Acute care for sexual assault victims. *Patient Care.* 1994;Aug:112-137.
19. Groth N, Burges AW. Male rape: offenders and victims. *Am J Psychiatry.* 1980:137:806-810.
20. Burgess A, Holstrom L. *Rape Crisis and Recovery.* Bowie, MD: Prentice-Hall; 1979.
21. American Academy of Family Physicians, American Academy of Pediatrics, American College of Obstetricians and Gynecologist, and Society for Adolescent Medicine. Position paper. Protecting adolescents: ensuring access to care and reporting sexual activity and abuse. *J Adolesc Health.* 2004;35:420-423.
22. US Department of Health and Human Services. State Laws on Reporting Child Abuse and Neglect. Available at: www.childwelfare.gov/responding/reporting.cfm. Accessed May 8, 2007.
23. English A, Kenney KE. *State Minor Consent Laws: A Summary.* 2nd ed. Chapel Hill, NC: Center for Adolescent Health & Law; 2003. Available at: www.cahl.org. Accessed May 8, 2007.
24. Nelson DG, Santucci KA. An alternate light source to detect semen. *ACAD Emerg Med.* Oct 2002;9(10):1045-1048.
25. Jenny C, Lowen D. *The Visual Diagnosis of Child Sexual Abuse.* Elk Grove Village, IL: American Academy of Pediatrics; 1998.
26. McCauley J, Gorman RL, Guzinski G. Toluidine blue in the detection of perineal lacerations in pediatric and adolescent sexual abuse victims. *Pediatrics.* 1986;78(6):1039-1043.
27. Jones JG, Lawson L, Rickert CP. Use of optical glass binocular magnifiers in the examination of sexually abused children. *Adolesc Pediatr Gynecol.* 1990;3:146-148.
28. Bays J, Chadwick D. Medical diagnosis of the sexually abused child. *Child Abuse Negl.* 1993;17:91-110.
29. Adams JA, Harper K, Knudson S, et al. Examination findings in legally confirmed child sexual abuse: it's normal to be normal. *Pediatrics.* 1994;94(3):310-317.
30. Berenson AB, Chacko MR, Wiemann CM, et al. A case-control study of anatomic changes resulting from sexual abuse. *Am J Obstet Gynecol.* 2000;182:820-834.
31. Kellogg ND, Menard SW, Santos A. Genital anatomy in pregnant adolescents: "normal" does not mean "nothing happened". *Pediatrics.* 2004;113(4):e67-e69.
32. Young WW, Bracken AC, Goddard MA, et al. Sexual assault: review of a national model protocol for forensic and medical evaluations. *Obstet Gynecol.* 1992;80:878-883.
33. De Jong AR, Rose M. Legal proof of child sexual abuse in the absence of physical evidence. *Pediatrics.* 1991;88:506-511.
34. Christian C, Lavalle J, Dejong A, et al. Forensic evidence findings in prepubertal victims of sexual assault. *Pediatrics.* 2000;106:100-104.
35. Centers for Disease Control and Prevention. Management of possible sexual, injecting-drug-use, or other nonoccupational exposure to HIB, including considerations related to antiretroviral therapy. Public Health Service statement. *MMWR.* 47(RR17):1-14, 1198. Available at: www.cdc.gov/mmwr/preview/mmwrhtml/00054952.htm. Accessed May 8, 2007.
36. Fong C. Post-exposure prophylaxis for HIV infection after sexual assault: when is it indicated? *Emer Med J.* 2001;18:242-245.
37. Holmes MM, Resnick HS, Frampton D. Follow-up of sexual assault victims. *Am J Obstet Gynecol.* 1998;179:336-342.
38. Centers for Disease Control and Prevention. 2006 guidelines for treatment of sexually transmitted disease. *MMWR.* 2006;55(RR-36):997. Available at: www.cdc.gov/std/treatment/. Accessed May 8, 2007.
39. Centers for Disease Control and Prevention. 1993 Sexually transmitted diseases treatment guidelines. *MMWR.* 1993;42(RR-14):1-102.
40. Wilcos AJ, Weinberg CR, Baird DD. Timing of sexual intercourse in relation to ovulation. *N Engl J Med.* 1995;333:1517-1527.
41. Hatcher R, Trussell J, Stewart F, et al. Emergency contraception. In: Hatcher R, Trussell J, Stewart F, et al, eds. *Contraceptive Technology.* 17th ed. New York, NY: Ardent Media; 1998.
42. Gold MA. Emergency contraception. *Adv Pediatr.* 2000;47:309-334.
43. Friedrich W. Behavior problems in sexually abused children. In: Wyatt GE, Powell GJ, eds. *Lasting Effects of Child Sexual Abuse.* Newbury Park, CA: Sage Publications; 1998.