STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
PROVIDENCE, SC. SUPERIOR COURT

* * * * * * * * * * * * * * * * * * *
JARROD RAYMOND, P.P.A. MOLLY RAYMOND, BRANDON RAYMOND P.P.A. MOLLY RAYMOND, MOLLY RAYMOND and DENNIS DRAKE,
Plaintiffs, * C.A. NO. PC01-1373
VS.

PEGGY GLORIA, Individually and in her capacity as Social Worker, STEPHANIE TERRY, Individually and in her capacity as Supervisor, STATE OF RHODE ISLAND/DEPARTMENT OF CHILDREN, YOUTH and FAMILIES, JAY LINDGREN, JR., in his capacity as Director, D.C.Y.F.,
Defendants.
* * * * * * * * * * * * * * * * * * *

DEPOSITION OF CHRISTINE BARRON, M.D., an EXPERT WITNESS in the above-entitled cause, taken on behalf of the Plaintiffs, before Julia A. Puleo, RPR, a Notary Public in and for the State of Rhode Island, at the Law Offices of Pelletier & Mirza, LLP, 469 Angell Street, Providence, Rhode Island, on April 10, 2008, at 9:30 A.M.

PRESENT:

FOR THE PLAINTIFFS....... THOMAS L. MIRZA, ESQUIRE
PELLETIER & MIRZA, LLP
-AND-
MARYANN VIOLET, ESQUIRE
AUDETTE, BAZAR, CORDEIRO & GRASSO

FOR THE DEFENDANTS....... SUZETTE I. PINTARD, ESQUIRE
SPECIAL ASSISTANT ATTORNEY GENERAL

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
(401) 946-5500

process. They have to fill out the forms. They will also have to complete foster care training, and a home study would be completed.

Q. Is that required of every adult living in a foster home?

THE WITNESS: To be present during the home visit or --

MR. MIRZA: To go through the training -- let's start with that, to go through the foster home training.

A. If they are residing in the home as an adult, yes.

Q. Is there anywhere in the record that you saw Samuel Stevens getting trained by the DCYF?

A. No, I did not.

Q. Is there anywhere in the record that you saw Mr. Booboo Lovett getting the training from the DCYF?

A. No, I did not.

Q. And your review of the records shows that both of them were living in the Sykes home?

A. My review shows that they were certainly there during the day. I can't tell you they were living there.

Q. Why can't you tell?

Q. One did not take place?

A. To remove the children, which occurred, that was appropriate, given --

Q. Why?

A. Because we hold foster families to a higher level than we hold biological parents, meaning that --

Q. Is that a DCYF policy?

A. That is correct. Meaning that, if a child tells me they've been struck in their biological home and they have no injury, they have no physical exam consistent with being struck, then that indication of physical abuse would not occur for a biological family. If a child is struck in a biological home and even has injuries, it does not mean that the child would be removed in that home. Oftentimes services will be put in place, versus in a foster home, there is no acceptance of any excessive corporal punishment, and even a statement that a child has been struck would be resulted in removal from the home during an investigation.

Q. And that's an ongoing heightened standard, from the time of the placement in the home through the time of the return of the biological parents or

the children also includes reviewing pediatric records?
A. Yes.
Q. School records?
A. Yes.
Q. Communication directly with the foster parents?
A. Yes.
Q. Communication with the children themselves?
A. Yes.
Q. Communication with the biological parents, if visitation was taking place?
A. Yes.
Q. Now your cover letter here says you are aware of the rules and regulations of the DCYF regarding foster care at that point in time, correct?
A. Correct.
Q. Are you also aware that any types of contact with the children, pediatricians, schools, needs to be put in writing at the DCYF in their system for further review?
MS. PINTARD: Objection. You can answer, if you can.
MR. MIRZA: Let me rephrase it.
THE WITNESS: Okay.
Q. Isn't it the obligation of a social worker, if she

Q. Let me ask you about the third floor. Do you know what the layout of the third floor was?

A. No, I do not.

Q. Do you know that "Thin Man" was living on the third floor, through your subsequent review of the reports?

A. Yes.

Q. Do you know that there was only two bedrooms on the third floor?

A. I know there was at least two bedrooms. I do not know what else was on the third floor.

Q. Do you know that the boys slept on the third floor?

A. Yes.

Q. Do you know that they were only five and a half years old at the time of these allegations?

A. Yes.

Q. So you've got "Thin Man" living on the third floor, and you've got the two twins sleeping on the third floor?

A. Yes.

Q. And if I told you there were no other bedrooms or bathrooms on the third floor, would that raise a red flag for you?

MS. PINTARD: Objection. You can answer.

was reviewed, I did read that, that said that that was inaccurate.

Q. And there was a recommendation by the fostering division to remove the children?

A. Yes.

Q. And it was Peggy Gloria and Stephanie Terry who determined that even though Faith Sykes said she couldn't manage the boys anymore, to keep them there, correct?

A. Correct. There was also statements where they reported to mom that they would remove the children from the Sykes home, and mom said no. I read that as well.

Q. But that's not mom's decision, is it?

A. I'm just saying that it was part of the record as well, correct.

Q. Mom's opinion has nothing to do with the DCYF's determination as to the appropriate care of the children in the home, correct; it's DCYF's obligation to determine the appropriateness of the placement?

A. Of the placement, correct.

Q. And there were some significant reports about the boys' behaviors, during the second half of their placement in the Sykes home, including urinating