UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

```
_____   )
                              )
J.R., a minor, P.P.A. MOLLY   )
RAYMOND; B.R., a minor, P.P.A )
MOLLY RAYMOND,                )
                              )
            Plaintiffs,       )
       v.                     )       C.A. No. 08-137 S
                              )
MARGARET GLORIA, Individually and )
in her Capacity as a Social Worker;)
STEPHANIE TERRY, Individually and )
in her Capacity as Supervisor;    )
STATE OF RHODE ISLAND DEPT. OF    )
CHILDREN, YOUTH, AND FAMILIES,    )
                              )
            Defendants.        )
_____   )
```

## DECISION AND ORDER

WILLIAM E. SMITH, United States District Judge.

In this case, twin boys through their mother Molly Raymond have sued a social worker and supervisor of the Rhode Island Department of Children, Youth, and Families ("DCYF"). They claim the DCYF employees were negligent and, under 42 U.S.C. § 1983, violated their substantive due process rights by failing to remove them from a foster home in which they were (allegedly) abused. After six days of trial before a jury, at the close of Plaintiffs' case, the Court granted Defendants' motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a). This decision explains in detail the Court's reasons for granting the motion.

I.   Procedural History

Some discussion of the travel of this case is helpful in order to understand its lengthy gestation, and to explain why the qualified immunity defense was not addressed earlier.   Qualified immunity is, after all, immunity from suit, not a "mere defense to liability" and in the usual course is decided before trial. Mitchell v. Forsyth, 472 U.S. 511, 526 (1985); Hunter v. Bryant, 502 U.S. 224, 228 (1991).

Plaintiffs originally brought a negligence action against Defendants in Rhode Island Superior Court in 2001.   Years of sporadic activity followed and on or about April 3, 2008, Plaintiffs amended their complaint to allege a violation of 42 U.S.C. § 1983.   After defending in state court for seven years without reaching trial, Defendants seized the opportunity to remove the case to this Court once it presented a federal question under 28 U.S.C. § 1331.   Defendants deliberately (and understandably) chose not to press the qualified immunity defense until the Rule 50 stage, because a favorable decision might result in remand of the negligence claims to state court, thus delaying final resolution.

II.   Plaintiffs' Fourth Amended Complaint

On the first day of trial, the Court inquired whether the § 1983 claims were against the DCYF employees in their individual capacities, official capacities, or both, because the Complaint was

unclear.[1] Plaintiffs' counsel responded that Defendants were named in their _official_ capacities as social worker and supervisor. While the § 1983 claim is further discussed _infra_, the reason for the Court's inquiry was that except for an _Ex parte Young_ claim for prospective, injunctive relief (inapplicable here), a § 1983 claim against a state actor in her official capacity is treated as a suit against the government entity where she works.   209 U.S. 123 (1908); Kentucky v. Graham, 473 U.S. 159, 165-67 (1985); Dirrane v. Brookline Police Dep't, 315 F.3d 65, 71 (1st Cir. 2002).   And, because Rhode Island and its agencies are not "persons" under § 1983, Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989), official capacity claims are not a viable theory for § 1983 money damages.   Any discernable claim for money damages out of official capacity liability against DCYF employees would ordinarily be dismissed because DCYF, as an arm of the State, is entitled to Eleventh Amendment sovereign immunity.   See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984) ("a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment); Quern v. Jordan, 440 U.S. 332, 341-42 (1979) (absent other waiver or consent, Eleventh Amendment immunity applies to § 1983 cases).   See discussion Section VI, _infra_.

_____

[1] The operative Complaint at that time was Plaintiffs' Third Amended Complaint. Plaintiffs voluntarily dismissed the Loss of Consortium count.

Recognizing their self-described "confusion" and "erroneous response" to the Court's questions, Plaintiffs moved to submit a Fourth Amended Complaint, adding "clarifying language" to reflect an intention to sue Defendants Margaret ("Peggy") Gloria and Stephanie Terry in their <u>individual</u> capacities. Plaintiffs argued that regardless of counsel's misstatement, the travel of the case and substance of the prior complaint reflected their intent to actually pursue individual liability.

Uncertainty in pleading § 1983 claims is not uncommon. Specificity is encouraged but when the issue is left "murky," the First Circuit looks to the "substance of the pleadings and the course of proceedings in order to determine whether the suit is for individual or official liability." <u>Powell v. Alexander</u>, 391 F.3d 1, 22 (1st Cir. 2004) (quoting <u>Pride v. Does</u>, 997 F2d 712, 715 (10th Cir. 1993)). Almost all relevant considerations here signaled an intent to seek individual liability. Plaintiffs' complaint sought punitive damages and mentioned no DCYF failures with respect to policy or custom. The allegations involved individual knowledge and inaction. Defendants asserted the qualified immunity defense (only available for individual § 1983 claims) from the beginning, and DCYF counsel was "surprised" to hear Plaintiffs state to the Court that they intended to bring only official capacity claims. There is no dispute that Defendants had notice of individual claims, as Plaintiffs' intentions "can be

4

ascertained fairly." Id. at 22-23 (quoting Biggs v. Meadows, 66 F.3d 56, 61 (4th Cir. 1995)). The Court therefore accepts the Fourth Amended Complaint as alleging individual capacity § 1983 claims against Defendants Gloria and Terry (trial proceeded on that basis).[2]

III. Factual Background

While the true inception of this case may date back as far as 1985,[3] the Court begins its summary in 1992, reviewing the facts in the light most favorable to Plaintiffs.

A.   Pre-Placement History

J.R. and B.R. (now age 16) were born to Molly Raymond on August 10, 1992.[4] Ms. Raymond has three other children: James (now age 34), Richard (now age 29), and Jeffrey (now age 19). DCYF first removed J.R., B.R. and Jeffrey from Ms. Raymond's care after an incident in March of 1994, when police responded to her home in Woonsocket, Rhode Island for a domestic incident. At trial, Ms. Raymond described this as "a family thing" involving Dennis Drake, who lived with her at the time and is said to be the twins' biological father. DCYF was notified and removed the children

---

[2] At trial, Plaintiffs voluntarily dropped their claims against current DCYF director Patricia Martinez.

[3] Some evidence indicates DCYF first opened a case on mother Molly Raymond well before the twins were born.

[4] For privacy of the non-identical minor twins, the Court uses initials.

because of the condition of the home and close confinement concerns stemming from a hook latch on an upstairs bedroom door where the twins slept.

After temporary care, the three young boys were soon returned to Ms. Raymond, who had moved to Connecticut. The Connecticut Department of Children and Families became involved in overseeing the case, and in May of 1995 expressed concerns to Ms. Terry, the DCYF Rhode Island case supervisor. DCYF received reports about Ms. Raymond's failure to follow through with offered services, domestic violence, and inability to provide basic parenting and supervision. Ms. Terry and a social worker (not Ms. Gloria) retrieved the three boys in Connecticut under the watch of the State Police, who were called because of what Ms. Terry described as past hostile and threatening encounters with Ms. Raymond and Mr. Drake.

The boys were again placed in temporary care and then returned to their mother upon her move back to Rhode Island in or around August 1995.[5] Ms. Raymond began required parenting, domestic abuse and substance abuse services, and testified that the twins were doing well in a Woonsocket head start program. In the fall of 1996, Ms. Gloria was assigned to be the social worker on the

_____

[5] Ms. Terry testified that around this time Ms. Raymond asked DCYF to come and take the boys after the twins had climbed out of a window, because she could not manage, was distraught, intoxicated, and was physically abused by Mr. Drake. Ms. Terry testified that Ms. Raymond revoked this voluntary placement days later and, over DCYF's objection, the Family Court ordered the children returned.

Raymond case for Jeffrey and the twins.  In November 1996, police and DCYF responded to another domestic dispute between Ms. Raymond and Mr. Drake, who both appeared intoxicated.  At trial, there were varying accounts of the details of this incident, including that Ms. Raymond was pushed into a car and broke the car door window and/or that she attempted to drive away before police arrived.  The children were home during the altercation, and Ms. Raymond was arrested.  The children were again removed from the home and after short-term emergency care, DCYF placed the twins (then age 4) in the licensed foster home of Faith Sykes.[6]

B.   The Sykes Foster Home

In 1996 Faith Sykes, an African-American woman, lived in a two-family dwelling in Providence.  Ms. Gloria and Ms. Terry were not involved in the placement decision.  Ms. Raymond testified that she had no problem with her Caucasian children living in a "black foster home" so long as they were cared for, although there was testimony that she told the twins to call their foster parents "monkey men" and used other racial slurs.  Ms. Terry testified to having some concern about the placement because DCYF generally tries to place minority children in minority homes.  She discussed this with a placement worker who, based on the history of the

---

[6] DCYF's decision to place brother Jeffrey in a different foster home stemmed from concern regarding his prior supervision of his younger twin brothers and his need for individual attention.

Raymond case, felt comfortable Ms. Sykes could "manage."[7]  Former DCYF licensing unit worker Linda Iaciofano referred to Ms. Sykes as an even-tempered, nice person whose home she visited and re-licensed.  Ms. Gloria said Ms. Raymond expressed an initial concern that the twins would be scared in a "black" home but then said it was fine.

There was much conflicting testimony about who lived in the Sykes home and when.  The DCYF license covered the second and third floors, and it is undisputed that Ms. Sykes lived there with her common-law husband, Marron Smith, and their daughter Bobbie.  The twins had a bedroom on the third floor, and the first floor was referred to as a separate apartment that Ms. Sykes would sometimes rent.  There was also a basement.  Plaintiffs claimed two men not on the foster license, William Lovikk[8] ("Bobo") and Samuel Stevens ("Thinman"), lived there at times and cared for the twins on a regular basis when Ms. Sykes was working.

DCYF foster care regulations in 1998 defined "household member" as anyone who regularly resided in the home.  Ms. Sykes testified that Thinman lived at the home sometimes when the twins were placed there, and described him as moving in and out at

_____

[7] The record is replete with evidence about the twins' use of vulgarity and extreme behavior, which was described as aggressive, out of control, hard to maintain, overly active, and beyond that of "normal" youngsters.

[8] Mr. Lovikk's name also appears in the records as "Lovett."

various times and helping by, for example, walking the twins to school. She said BoBo shared the address but did not live there "consistently" because his mother lived right behind the Sykes. Ms. Sykes testified that she never told the licensing unit when BoBo or Thinman lived in her home, but that Ms. Gloria knew about them and said DCYF would have to do a background check on persons "surrounding" the twins. B.R. testified that he did not see Ms. Sykes very often because she worked, and J.R. testified (via videoconference) that he saw Thinman and Bobo "a lot," because they were "pretty much" there the whole time.

Ms. Terry testified that she, Ms. Gloria, and DCYF case aide Mary Starnes[9] learned that BoBo and Thinman had some involvement in the home, discussed the situation, and decided Ms. Gloria would ask Ms. Sykes for information. Ms. Terry testified that although Thinman helped with care, based on the information DCYF received it was determined that neither he nor Bobo was a caretaker or household member. Sometime early on in the placement when Ms. Gloria learned of Bobo and Thinman, she asked Ms. Sykes about them and was told BoBo was William Lovikk, a friend and neighbor,[10] and Thinman was Samuel Stevens, a family friend who worked nearby as a security guard and would often be at the home between shifts. Ms. Gloria testified that she provided this information to her

_____

[9] Mary Starnes now goes by Margaret Wood.

[10] At trial, Ms. Sykes referred to BoBo as a first cousin.

9

supervisor Ms. Terry to have a "clearance" done.   Ms. Terry testified that she directed her administrator to coordinate a background check on Thinman through a verbal check with the Rhode Island Attorney General's office, and recalled discussing the clearance and fact that Thinman was a security guard with Ms. Gloria.  No one recalled whether a clearance was done for BoBo, and DCYF has no records of any background check for either man. Defendants Gloria and Terry said they knew Thinman often brought the children to the case aide's car and helped bring them up and down the stairs because the case aide had a disability, but had no reason to believe he had any role beyond helping out the foster parents.

C.   DCYF Licensing, Background Checks, and Record Keeping

Management of foster care spans different departments at DCYF, though the division of responsibility was not made clear at trial. Among others, there is a placement unit and licensing unit.  Former supervisor of the licensing unit Philip Steiner testified that a social worker "theoretically" would have to notify the licensing unit of family composition changes at a foster home, but he could not say it happens all of the time.  As part of the foster care agreement with DCYF, foster parents must notify the licensing unit of "changes in household composition."  Mr. Steiner testified that DCYF may issue a verbal warning to a foster parent whose only

10

infraction was failure to timely notify DCYF of a new household member.[11]

The evidence at trial established that at the time of the twins' placement in 1996, DCYF policy regarding background checks was cumbersome and antiquated. Regulations and/or policy required fingerprint background checks for actual foster parents, but did not require or allow fingerprinting for non-foster parents. Instead, the usual procedure was to obtain personal information such as name and date of birth from an individual along with a written consent form, which a DCYF worker would physically bring to the Rhode Island Attorney General's Office in Providence for clearance.[12]   Certain DCYF employees could also obtain background checks via telephone by calling the Attorney General's office through use of a code or password. There was conflicting testimony about whether a verbal check would generate any confirmatory paperwork. DCYF employees testified that foster care background checks from 1996 to 1998 were almost always limited to Rhode Island crimes, except for occasional instances when the Rhode Island State

---

[11] The 1998 DCYF regulations introduced at trial state that a license "shall be revoked" for various reasons, including a foster parent's failure to comply with regulations or "cooperate with the agency in its licensing process, including falsification or omission of facts."

[12] The 1998 regulations state "each applicant and adult household [member] shall have his or her name cleared with the Attorney General's Office, Bureau of Criminal Identification, for evidence of a criminal record.   Other criminal background checks may be conducted at the Department's discretion."

Police would allow a nationwide check in the context of a criminal investigation.   The much more comprehensive nationwide electronic clearance process through the FBI was not implemented until approximately 2001.

In 1997, DCYF transitioned from paper files and handwritten notes to an internal computer database in which employees entered case information.   It took a period of time for DCYF to implement the new system in full, and during the transition notes would sometimes be given to a secretary for transcription and input into the database.   Ms. Terry occasionally accessed the database for case information but primarily obtained information about anything "eventful" directly from social workers and case aides through daily office contact.   Ms. Gloria said she was responsible for reviewing case notes and would have seen some of Ms. Starnes' (the case aide) notes, but that they may not have been available in 1997 and 1998 in their entirety.

D.   Events During Sykes Placement

The twins lived in Ms. Sykes' home for approximately eighteen months from November of 1996 through May of 1998.   Ms. Raymond and Mr. Drake had supervised visits with the twins, including arranged visits through DCYF at the Providence Children's Museum.   Ms. Gloria also arranged counseling through Children's Friend and Service in Providence in early 1997, and the twins were accepted at the Providence Center for treatment related to hyperactive

12

behavior, aggression, parental substance and domestic abuse. Through the spring of 1998, Ms. Gloria received written updates from the Providence Center about the twins.

Three DCYF employees had substantial contact with J.R. and B.R. during the placement. First, case aide Starnes acted as an "adjunct" social worker responsible for transporting the twins to and from visits and appointments. Second, social worker Gloria monitored the Raymond family and was also assigned to brother Jeffrey. Third, supervisor Terry oversaw Ms. Starnes and Ms. Gloria. DCYF policy generally required a social worker to have contact with assigned children at least once every thirty days, although Ms. Gloria testified that she believed any DCYF contact, such as a through a case aide, sufficed.

During the placement, there were complaints and unfounded CANTS investigations involving the twins. CANTS, or "Child Abuse and Neglect Tracking System," is the process by which DCYF receives complaints via a public telephone hotline. Every DCYF employee is obligated to report suspicions of abuse or neglect. Once DCYF receives a CANTS report, a DCYF Child Protective Investigator ("CPI") (separate from the case aide, social worker, and supervisor already involved with a family or placement) is assigned to investigate. The social workers and aides usually receive some notification of the nature of a complaint and the outcome, but in the ordinary course do not participate in the investigation. The

13

CPI determines whether a CANTS allegation is "founded" or "unfounded." The standard in 1996 to 1998 for such a finding was whether "credible evidence" supported the allegation.[13] Ms. Gloria testified that she was not provided much information about a CANTS investigation when it was deemed unfounded.

A March 1997 case aide note reflects that J.R. said Bobo hit him, and when asked why, J.R. said "cause we be bad all the time . . . BoBo deaf - he talks with his hands, him count to 5: 1 2 3 4 5 and hits our backs." B.R. did not answer Ms. Starnes' follow up questions. A July 1997 note reports that during a visit Ms. Raymond took the twins out of sweatsuits because she felt they were inappropriate for a summer day. Ms. Raymond and Ms. Starnes saw bruising on J.R.'s back, which J.R. said was from Bobbie, Ms. Sykes' daughter. They also saw a mark on his shoulder, which J.R. said was from B.R. biting him. No marks were found on B.R. Ms. Raymond made a CANTS report that a family friend or relative who was a deaf mute named Bobo hit the twins. A CPI deemed this unfounded after the children said their bruises came from playing with Bobbie.

Ms. Gloria testified that Ms. Raymond complained to her about the sweatsuits but did not mention bruises, and that she later learned about the report of bruises and that it was deemed

---

[13] This was later changed to a somewhat more stringent "preponderance of the evidence" standard, although it was unclear when between 1997 and 1999 this change occurred.

unfounded.  Ms. Gloria testified that Ms. Sykes said the sweatsuits were a gift from Ms. Raymond to her boys, and that foster father Mr. Smith thought she would be pleased to see the twins wearing the outfits on a visit.  Ms. Gloria provided Ms. Raymond with this explanation and said she seemed satisfied.

In August 1997, the twins' counselor at Children's Friend & Service called the CANTS hotline after observing scratch marks on J.R.'s face and neck.  J.R. told the counselor that he hit his head on a bedroom door when being watched by BoBo, who is listed on the relevant DCYF CPS Report by abbreviation as a "household member" and "perpetrator."  The assigned CPI was unable to gather sufficient evidence to substantiate an allegation of "Tying/Close Confinement" or improper supervision with respect to Bobo or the foster father, Mr. Smith.  The CPI noted that both boys reported J.R. banged himself against the wall while they fought.

Ms. Raymond once told Ms. Gloria that the twins said they ate out of the garbage.  Ms. Gloria testified that she went to the home to talk to Ms. Sykes, who laughed and said one of the boys took the other's leftover dessert from the garbage.  Ms. Sykes explained that she told the twins to ask for more instead of eating out of the garbage, and that the boys thought eating out of the garbage was funny so they repeated it over and over.  There was also testimony that in 1997 B.R. reported to Ms. Raymond during a visit that his "bum" hurt, and that together she, Ms. Terry and Ms.

Starnes noticed his rectum seemed red.  Ms. Raymond testified that Ms. Terry said she would talk to Ms. Sykes because perhaps B.R. was not being wiped properly.

References to Thinman begin to appear in the records in October of 1997, about halfway through the placement.  Ms. Sykes testified that Thinman accompanied her to a counseling session with the twins.  In December of 1997, a clinical supervisor at the Providence Center addressed a letter regarding the twins to Samuel Stevens at the Sykes' address, mistakenly referring to Faith Sykes as Mr. Stevens' wife.  Ms. Starnes' notes show Thinman assisted with getting the twins ready for visits and often greeted them upon return.  She listed Thinman as a foster family relative, and a March 1998 note mentions the "Thinman foster home."  Ms. Gloria testified to visiting the Sykes home more frequently towards the beginning of the placement as compared to the end because of difficulties with brother Jeffrey, and because counselors and Ms. Sykes told her that the twins were progressing.  Ms. Gloria also testified to having regular contact with Ms. Raymond, who told Ms. Gloria that she noticed improvement in the twins' behaviors and wondered whether Jeffrey could also be placed with the Sykes.

E.   Removal From Sykes Home

On May 28, 1998, a school teacher called DCYF after noticing what appeared to be marks or bruising on the twins' wrists.  DCYF told her to call the CANTS hotline, which she did.  On the same

day, DCYF CPI Virginia Miller was assigned to receive the complaint and investigate the abuse allegations.  The twins reported to CPI Miller that they had been hit with a belt by a man they called Thinman, and that the belt would be under the sofa in the basement at the Sykes home.  CPI Miller took the twins to the emergency room to document the injuries (bruising of a "rectangular shape").  CPI Miller went to the Sykes home and testified to seeing a belt lying across the back of a sofa in the basement.  She spoke with Ms. Sykes and Thinman, who denied hitting the twins but said he took them to the basement to separate or discipline them.  DCYF did not allow the twins to return to the Sykes home.

Days later, Ms. Gloria brought clothing to the twins' temporary placement.  The new foster mother expressed concern about the twins telling a story about throwing a baby out of a window. Ms. Gloria testified that she and the foster mother talked about the difference between a truth and a lie, and that one of the twins spontaneously said they know a lie and they "had lied on Thinman." Ms. Gloria notified CPI Miller, who re-interviewed the twins and reported that they again told her Thinman hit them.  As a result of CPI Miller's investigation, Faith Sykes was "indicated" for neglect and Thinman was "indicated" for physical abuse with subsequent injury, cuts and bruises.  This was the first and only CANTS allegation into the home that was "indicated" (or founded) during the placement.

F.    Events & Allegations Following Removal

Once Ms. Raymond graduated from a recovery program, J.R. was returned to her in December of 1998 and B.R. was returned in February of 1999.  Ms. Raymond testified that upon their return, the boys "just wasn't normal."  She testified about a time B.R. acted out sexually, when J.R. said "It's not his fault, ma.  It's what happened when 'they' was with the black people."  Ms. Raymond put the twins into counseling and together with a counselor made a CANTS report.  DCYF received this complaint in March 1999.  The complaint reported that B.R. said he was touched in his private parts at the foster home, and CPI Edward Degnan was assigned. Using the "preponderance of the evidence" standard, CPI Degnan found the allegation unfounded due to lack of credible evidence or corroboration.  In August 1999, a Bradley Hospital reporter made another CANTS report about additional abuse disclosures by both J.R. and B.R., including being tied up on closet racks.  Another CPI investigated and determined that the allegation was unfounded, noting that Bobbie said it was a game the kids played.  At trial, one or both of the twins testified to being punished in the foster home by standing on rice, made to eat out of the trash can, and tied and/or beat up with belts.  B.R. said "I was sexually abused" and J.R. testified that Thinman touched his private parts.[14]

---

[14] Whether J.R. or B.R. was abused in the Sykes home and by whom is a factual dispute the Court need not and indeed could not resolve.  DCYF challenged the reliability of the disclosures but at

Since 1998, the twins have been involved with inpatient and outpatient treatment facilities, group homes, residential programs, medications, and counselors related to extreme behavioral and mental health problems. Due to ongoing concerns about Ms. Raymond's substance abuse and mental health, DCYF filed for a termination of parental rights but dismissed it when Ms. Raymond appeared to make progress in her treatment. As of the date of trial, the twins (still minors) resided at different out-of-state treatment facilities. Plaintiffs' expert psychiatrist Dr. Rebecca Ramsey prepared a lengthy report and testified at trial. She reviewed extensive medical records and DCYF documents, read deposition transcripts, watched videotaped depositions of the twins, interviewed J.R. and B.R. and Ms. Raymond, and spoke with some of the twins' treating psychiatrists. She testified that J.R. and B.R. suffer from chronic and severe Post-Traumatic Stress Disorder ("PTSD"), as both had been exposed to a traumatic event and exhibited extreme emotional reactions.[15] The future prognosis

---

the Rule 50 stage the jury could find the twins suffered harm. Ultimately, this is irrelevant to the issues Defendants' motion presents. Equally irrelevant is evidence about events after DCYF removed the twins; the so-called "cover-up" by dismissing the indication against Thinman without a hearing and failing to report allegations to the Providence Police. Plaintiffs argued that this DCYF "conspiracy" evidence was somehow relevant to damages to rebut the challenge to the twins' disclosures. See Watterson v. Page, 987 F.2d 1, 8 n.7 (1st Cir. 1993) (conclusory conspiracy descriptions insufficient in § 1983 cases).

[15] DCYF was prepared to offer expert testimony that J.R. and B.R. do not suffer from PTSD, or if they do it is impossible to

for each boy appears grave.  Dr. Ramsey testified that neither has
successfully  lived  outside  of  a  hospital,  institution  or
residential community for any meaningful length of time.  The twins
have had trouble in their various placements, and over the past
approximately ten years each have missed an "enormous" amount of
educational, social and emotional learning.

    G.   Summary of Plaintiffs' Evidence

    Viewing the evidence in the most hospitable light, Plaintiffs'
theory of their case at trial (if proven) may be summarized as
follows.  In 1997 and 1998, Defendants knew for months that Bobo
and Thinman were involved with the twins and living at the Sykes
home.  Foster mother Ms. Sykes was often absent, and Ms. Gloria had
almost no face-to-face contact with the twins during the last six
months of the placement.  Defendants did not investigate these
"strangers," perform background checks and/or notify the DCYF
licensing unit of the change in household composition, even though
they were obligated to do so.  The foster license was never revoked
but would have been if the licensing unit had learned about Bobo

---

identify the triggering traumatic event due to their troubled
childhood and other emotional attachment disorders.  To address the
sensitive expert testimony issues inherent in child abuse cases,
the Court considered a series of motions in limine and held a
Daubert hearing.  It issued a pre-trial ruling that experts could
testify to diagnosis (that the twins did or did not suffer from
PTSD) and possible triggering events (that PTSD is or is not
consistent with children who have suffered abuse).  But,
importantly, no expert witness was allowed to opine that the twins'
PTSD was or was not caused by abuse, or that the twins were or were
not actually abused in the Sykes foster home.

and Thinman.   During this same period, there were multiple CANTS
reports and complaints by Ms. Raymond involving sweatsuits on a
summer day and instances of bruising, scratching and hitting.  All
of this cumulated in the twins suffering harm (PTSD) after being
sexually and physically abused by Thinman and/or BoBo during the
placement.  A jury could find, Plaintiffs say, that Ms. Gloria and
Ms. Terry knowingly embarked on a course of conduct that endangered
the twins by placing them with the Sykes, and/or had repeated
notice of the risk of danger such that their failure to remove the
twins amounted to conscience-shocking deliberate indifference to
their safety and well-being.  See Sec. V, infra.

IV.  Standard of Review

Fed. R. Civ. P. 50(a) permits judgment as a matter of law when
a party is "fully heard on an issue during a jury trial and the
court finds that a reasonable jury would not have a legally
sufficient evidentiary basis to find for the party on that issue."
At the close of Plaintiffs' case, the role of the Court is not to
evaluate "the credibility of witnesses, resolve conflicts in
testimony, or evaluate the weight of evidence," but rather to view
the evidence in the light most favorable to Plaintiffs, giving them
the advantage of every fair and reasonable inference.  Criado v.
IBM Corp., 145 F.3d 437, 441 (1st Cir. 1998) (quoting Gibson v.
City of Cranston, 37 F.3d 731, 735 (1st Cir. 1994)); Richmond Steel
Inc. v. Puerto Rican Am. Ins. Co., 954 F.2d 19, 22 (1st Cir. 1992)

(plaintiff needs more than a "mere scintilla" of evidence for issue to go to jury). A Rule 50 motion should be granted when the facts and inferences are one-sided and "point so strongly and overwhelmingly in favor of the movant that a reasonable jury could not have reached" a verdict against that party. Acevedo-Diaz v. Aponte, 1 F.3d 62, 66 (1st Cir. 1993) (internal citation omitted).

While qualified immunity is generally an issue for the Court and not the jury, Hunter, 502 U.S. at 228, the current procedural posture does not "greatly influence the standard of review." Iacobucci v. Boulter, 193 F.3d 14, 23 (1st Cir. 1999). Whether before trial or at the Rule 50 stage, the Court should construe any factual disputes underlying the qualified immunity analysis in favor of Plaintiffs. See Jennings v. Jones, 499 F.3d 2, 7 (1st Cir. 2007); Morelli v. Webster, 552 F.3d 12, 18-19 (1st Cir. 2009). But see Jennings, 499 F.3d at 22 (Lynch, J. dissenting) (discussing lack of clear guidance regarding when judge may act as fact-finder in disputes underlying qualified immunity defense). According deference to the jury's possible resolution of all factual disputes in Plaintiffs' favor, the Court finds there was no constitutional violation and concludes that both Defendants are entitled to qualified immunity.

V.   Discussion - § 1983 Claims

A.   Qualified Immunity

Plaintiffs sued Ms. Gloria and Ms. Terry for money damages in their individual capacities.   Both asserted the defense of qualified immunity, which protects state actors from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).   This doctrine allows public officials to perform discretionary functions without fear of "civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." Hegarty v. Somerset County, 53 F.3d 1367, 1373 (1st Cir. 1995).

Competing policy interests collide in the qualified immunity context, especially in cases of this sensitive nature.   On one hand, the public benefits when government actors such as DCYF social workers are subjected to personal liability for abuse of authority.   The threat of personal liability ensures that rights will not be lightly violated, and people will be protected from powerful government agents.   However, there is an equally compelling interest in ensuring that these officials, with each discretionary judgment, are not so consumed by fear of liability and harassing litigation that they are unable to properly perform

their duties on the public's behalf.  <u>See</u> <u>Anderson v. Creighton</u>,

483 U.S. 635, 638 (1987); <u>Swain v. Spinney</u>, 117 F.3d 1, 10 (1st

Cir. 1997) (officials are protected from "chilling threat of

liability" if conduct is objectively reasonable).  It is against

this backdrop of competing interests that the Court undertakes the

prescribed three pronged qualified immunity analysis.

Under the familiar rubric, the Court first asks the following

question: "[t]aken in the light most favorable to the party

asserting the injury, do the facts alleged show the [official's]

conduct violated a constitutional right?"  <u>Saucier v. Katz</u>, 533

U.S. 194, 201 (2001); <u>Estate of Bennett v. Wainwright</u>, 548 F.3d

155, 167-68 (1st Cir. 2008).[16]  If the answer is yes, the Court next

determines whether the right allegedly violated was clearly

---

[16] The United States Supreme Court in <u>Pearson v. Callahan</u>, 129
S. Ct. 808, 2009 WL 128768 (Jan. 21, 2009) recently shed new light
on the <u>Saucier</u> framework by which courts <u>always</u> first determine
whether there is a constitutional violation in every qualified
immunity case.  In sum, <u>Pearson</u> turned the once mandatory first
step into a permissive one -- the Court now has discretion to
determine whether that order of inquiry makes sense, or whether the
Court can skip ahead to the question of whether the law was clearly
established and resolve the case on that prong.  <u>Id.</u> at 816-18.
Suffice it to say the Court is comfortable addressing the
constitutional question in this case for many of the reasons
discussed in <u>Pearson</u>.  Namely, the Court has the benefit of a full
factual record, the briefing on the constitutional question was
adequate, there is no indication a higher court will soon decide
the issue, resolution of the constitutional question does not rest
on "uncertain interpretation of state law," <u>id.</u> at 819, and (most
importantly) it would be extremely difficult to decide whether the
twins' rights here were clearly established in 1996 without
discussing and deciding "precisely what the constitutional right
happens to be." <u>Id.</u> at 818 (quoting <u>Lyons v. Xenia</u>, 417 F.3d 565,
581 (6th Cir. 2005) (Sutton, J., concurring)).

established at the time of the unconstitutional action. <u>Saucier</u>, 533 U.S. at 201-02. Finally, if that second answer is yes, the Court determines "whether a reasonable official, situated similarly to the defendant(s), would have understood that the conduct at issue contravened the clearly established law." <u>Savard v. Rhode Island</u>, 338 F.3d 23, 27 (1st Cir. 2003) (citing <u>Saucier</u>, 533 U.S. at 202). The substance of this query is usually referred to as "objective legal reasonableness." <u>Harlow</u>, 457 U.S. at 819. A single negative answer to any one of the three inquiries is sufficient to shield Defendants against Plaintiffs' claims under the protective cloak of qualified immunity. <u>Starlight Sugar, Inc. v. Soto</u>, 253 F.3d 137, 141 (1st Cir. 2001).

   1. Violation of a Constitutional Right

  Plaintiffs claim a violation of their right to substantive due process under the Due Process clause of the Fourteenth Amendment. Their first hurdle is to show a deprivation of a protected interest in life, liberty, or property. <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 841 n.5 (1998); <u>Pagan v. Calderon</u>, 448 F.3d 16, 32 (1st Cir. 2006). In this case, a state actor did not inflict direct harm to the twins. Thus, the Court must start with the settled principle that, as a general matter, a state's failure to protect an individual against private third-party violence does not violate substantive due process. <u>DeShaney v. Winnebago County Dep't of Social Serv.</u>, 489 U.S. 189, 197 (1989). There are two limited

25

exceptions to this rule: a "special relationship" and "state created danger." Id. at 200 (duty may arise within the special relationship exception where state "so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs"); Rivera v. Rhode Island, 402 F.3d 27, 34-36 (1st Cir. 2005) (discussing exceptions under DeShaney). It is only under these theories that a state official's failure to act may be actionable under § 1983.

The First Circuit recognizes the "special relationship" concept but has questioned the "state created danger" theory and never found it actionable. Lockhart-Bembery v. Sauro, 498 F.3d 69, 77-78 (1st Cir. 2007) (making individual more vulnerable would not create duty to protect under state-created danger); Rivera, 402 F.3d at 35 (questioning tenuous theory based on DeShaney dicta); Frances-Colon v. Ramirez, 107 F.3d 62, 64 (1st Cir. 1997) (official in a "rare and exceptional case" may affirmatively increase threat of harm); Ferreira v. City of East Providence, 568 F. Supp. 2d 197, 211 (D.R.I. 2008) (refusing to apply "rarely applicable, so-called state created danger" exception).

Although Plaintiffs argue it, the Court need not delve into the state created danger quandary for two reasons. First, as discussed in the following paragraph, for purposes of this ruling at the Rule 50 stage, the Court finds that Plaintiffs can establish a special relationship with DCYF whereby the state assumed

responsibility for the twins' liberty interest -- the right of safety in their foster care environment. Second, under either DeShaney exception, Plaintiffs face the "further and onerous" task of showing state conduct that "shocks the conscience" of the Court. Rivera, 402 F.3d at 35. At this stage of the analysis Plaintiffs' constitutional theories simply unravel.

Most Circuits recognize some type of substantive due process right for children placed into the foster care environment to be free from harm. See, e.g., Nicini v. Morra, 212 F.3d 798, 808 (3d. Cir. 2000) (en banc); Norfleet v. Arkansas Dept. of Human Serv., 989 F.2d 289, 293 (8th Cir. 1993); Yvonne L. ex rel. Lewis v. New Mexico Dep't of Human Serv., 959 F.2d 883, 893-94 (10th Cir. 1992); K.H. ex rel. Murphy v. Morgan, 914 F.2d 846, 848-49 (7th Cir. 1990); Meador v. Cabinet for Human Serv., 902 F.2d 474, 476 (6th Cir. 1990); Taylor ex rel. Walker v. Ledbetter, 818 F.2d 791, 795 (11th Cir. 1987) (en banc); Doe v. New York City Dept. of Social Serv., 649 F.2d 134, 141 (2d Cir. 1981). While there is no First Circuit case so holding, the "special relationship" analogy between persons incarcerated or institutionalized and those placed in state care through entities like DCYF with legal custody is generally accepted by federal courts that have considered the issue. See DeShaney, 489 U.S. at 195 (recognizing right to be free from unjustified intrusions on personal security); Youngberg v. Romeo ex rel. Romeo, 457 U.S. 307, 319 (1982); Monahan v. Dorchester

Counseling Ctr., Inc., 961 F.2d 987, 991-92 (1st Cir. 1992);

Germany v. Vance, 868 F.2d 9, 15 (1st Cir. 1989). For purposes of

this motion then, Plaintiffs have demonstrated sufficiently that a

special relationship existed between the state (the legal

custodian) and the Raymond twins (who were involuntarily placed in

state care). The Defendants therefore had an affirmative duty to

ensure the safety and well-being of the twins once placed with the

Sykes.[17]

To meet their burden on a substantive due process claim,

however, Plaintiffs must show more than the existence of a special

relationship and a right to safety in their foster home. They need

to prove that a state actor deprived them of their rights through

"conscience-shocking" behavior. Lewis, 523 U.S. at 846. The

question of what behavior shocks the conscience evades simple

description, but it is more -- indeed much more -- than negligence.

See Coyne v. Cronin, 386 F.3d 280, 289 (1st Cir. 2004) (quoting

Lewis, 523 U.S. at 849 (negligently inflicted harm is

---

[17] It is undisputed that Defendants acted as state officials
with legal custody of J.R. and B.R. at all relevant times.
Compare Burton v. Richmond, 370 F.3d 723, 727-78 (8th Cir. 2004)
(en banc) (no special relationship where state did not have custody
or control but "merely assisted"). The Court rejects the argument
that DCYF's obligation vanished once the Sykes took physical
custody of J.R. and B.R. The notion that DCYF could relegate the
duty to protect these boys from third parties undermines the basic
principle mandating its duty in the first place. See Germany v.
Vance, 868 F.2d 9, 15 (1st Cir. 1989) (workers failed to inform
girl in DYS custody living in private homes, including a foster
home, that charges against her were fabricated, potentially
violating right of access to courts).

"categorically beneath the threshold" of a constitutional violation)); DePoutot v. Raffaelly, 424 F.3d 112, 118-19 (1st Cir. 2005) (shock the conscience standard does not "replicate, or even draw upon, negligence law;" even state law violations in bad faith are not necessarily "extreme" enough).   In varying terms, "the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Lewis, 523 U.S. at 847-48 n.8; DePoutot, 424 F.3d at 119 ("requisite arbitrariness and caprice" must be "stunning, evidencing more than humdrum legal error") (quoting Amsden v. Moran, 904 F.2d 748, 754 n.5 (1st Cir. 1990)).   While this standard is somewhat imprecise, it is a very high hurdle.   See McConkie v. Nichols, 446 F.3d 258, 260-62 (1st Cir. 2006); Cummings v. McIntire, 271 F.3d 341, 344 (1st Cir. 2001); Hasenfus v. LaJeunesse, 175 F.3d 68, 72-74 (1st Cir. 1999).

The degree of culpability necessary to shock the conscience can shift with the circumstances of each case.   Plaintiffs posit that "deliberate indifference" is the appropriate standard here. While this is correct, it is important to stress something Plaintiffs gloss over and Defendants confuse.   Deliberately indifferent behavior may in some circumstances suffice to shock the conscience, but it is by no means per se conscience-shocking. Lewis, 523 U.S. at 850-52.   The distinction lies with whether state actors have the luxury of time, forethought and "reasoned and

rational decisions." <u>See</u> <u>Rivera</u>, 402 F.3d at 36. If they do, deliberate indifference may rise to the level of a conscience-shocking constitutional violation. <u>Id.</u> If they do not, however, as with a high speed police chase, conduct must be far worse than indifferent to be actionable under the conscience-shocking § 1983 standard: state actors must "<u>intend</u>[] to injure in some way <u>unjustifiable</u> by any government interest." <u>Lewis</u>, 523 U.S. at 849 (emphasis added).

The ultimate question is still whether the allegedly indifferent conduct is conscience shocking. As noted, this requires something much greater than negligence, even under Plaintiffs' theory of extended inaction when Defendants had the luxury of time over the eighteen month placement. <u>See</u> <u>Estelle v. Gamble</u>, 429 U.S. 97, 104-106 (1976) (deliberate indifference to prisoner's rights requires "wanton infliction of pain" that offends "evolving standards of decency."); <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994) (clarifying deliberate indifference standard for challenges to prison conditions and adopting subjective standard whereby official is actually aware of facts and infers a substantial risk of harm); <u>DesRosiers v. Moran</u>, 949 F.2d 15, 19 (1st Cir. 1991) (deliberate indifference requires a "culpable state of mind" where "[defendants] intended wantonly to inflict pain . . . . it is recklessness not in the tort-law sense but in the appreciably stricter criminal-law sense, requiring actual knowledge

of impending harm, easily preventable"). Courts usually require subjective knowledge of impending harm; proving that a defendant "should have known" is not enough. <u>Farmer</u>, 511 U.S. at 843 n.8; <u>Watson v. Caton</u>, 984 F.2d 537, 540 (1st Cir. 1993). Overall, "[t]he risk, the knowledge, and the failure to do the obvious, taken together, must show that the defendant is 'deliberately indifferent' to the harm that follows." <u>Manarite ex rel. Manarite v. City of Springfield</u>, 957 F.2d 953, 956 (1st Cir. 1992); <u>see</u> <u>also</u> <u>Young v. City of Providence</u>, 404 F.3d 4, 28 (1st Cir. 2005) (actor must disregard a "known or obvious" risk of serious harm).

These cases make clear that deliberate indifference is potentially one way to prove conscience shocking conduct in a § 1983 case. And, courts have applied this standard to cases with facts in the same ballpark as those in this case. <u>See</u>, <u>e.g.</u>, <u>Nicini</u>, 212 F.3d at 810-11 (summarizing foster care cases applying deliberate indifference standard); <u>White ex rel. White v. Chambliss</u>, 112 F.3d 731, 737 (4th Cir. 1997) (deliberate indifference to child's rights implies "at a minimum that defendants were plainly placed on notice of a danger and chose to ignore the danger notwithstanding the notice"); <u>Taylor</u>, 818 F.2d at 796-97 (officials may be liable not based on "incidental injuries or infrequent acts of abuse" but on a showing of "actual knowledge of abuse or that agency personnel deliberately failed to learn what

was occurring"); Doe, 649 F.2d at 145 (requiring "some knowledge triggering an affirmative duty to act").

At trial, Plaintiffs advanced two related theories to prove deliberate indifference. First, they averred that had Defendants followed proper policy, the Sykes foster license would have been revoked in 1997 because DCYF knew Ms. Sykes lied about un-related adults living in the home. If the license had been revoked, the theory goes, Thinman (or BoBo) would have never been able to care for or abuse the twins. Second, Plaintiffs contended that Defendants lacked sufficient contact with the twins, ignored the fact that Thinman and Bobo provided care, failed to conduct background checks of these household members, and ignored "red flags" of abuse.

Plaintiffs' license revocation theory is fundamentally flawed because even when viewed in a pro-plaintiff light, it is a negligence theory at best. See Daniels v. Williams, 474 U.S. 327 (1986) (mere negligence is always insufficient for substantive due process liability). Plaintiffs' evidence might well be sufficient to prove negligence: DCYF regulations provide that a foster license shall be revoked for certain reasons and, presuming the jury believed Ms. Sykes lied to DCYF about the presence of Thinman or Bobo, this could or should have warranted revocation months before Thinman entered the picture. (The Court disregards at this stage, as it must, conflicting testimony from Mr. Steiner that DCYF

32

may have only issued a verbal warning). But, this evidence does not come close to shocking the conscience; rather, it is a classic "but for" causation theory of negligence. Plaintiffs acknowledge this theory has nothing to do with background checks or known risk of danger, and admit the policy violations in and of themselves are insufficient. They nonetheless urge that the totality of circumstances amounts to deliberate indifference because the DCYF licensing unit expressed "concerns" about placing J.R. and B.R. with the Sykes, and Defendants knew of these "concerns." Even when viewed in the most favorable light, these additional circumstances piggybacked on a policy violation cannot constitute evidence of deliberate indifference, especially where these "concerns" never involved suspicions of abuse.[18] See Romero ex rel. Estate of Romero v. Wayne County Family Independence Agency, 2005 WL 1563328, *5 (E.D. Mich. June 30, 2005) ("reservations" about placement did not make defendant deliberately indifferent to rights of young foster child who aspirated while strapped in a car seat and died).

This leaves Plaintiffs' second theory: that Defendants failed to learn about the twins' "real" caretakers and ignored the so-called red flags. Upon careful scrutiny of the evidence offered at

---

[18] Instead, the concerns Ms. Iaciofano expressed in a September 1997 email to Ms. Gloria involved her belief that Ms. Raymond was teaching the twins to speak and act inappropriately with respect to the Sykes being African-American, as well as the twins' "serious behavior problems" such that the Sykes were very "stressed with this placement."

trial, a jury could not have concluded that Defendants were deliberately indifferent to the constitutional rights of J.R. and B.R.

While by no means uncontradicted, Plaintiffs presented evidence that, if credited, could support a finding that social worker Gloria knew Thinman and BoBo lived in the Sykes home but failed to conduct any background checks.[19] Ms. Gloria testified that she reviewed CANTS reports that listed BoBo as a "caretaker" or "household member." The case aide's notes beginning in October 1997 referenced Thinman, even calling it the "Thinman foster home." Ms. Sykes testified that she told Ms. Gloria the men lived there. But, even assuming this knowledge and accepting that Ms. Gloria did not notify the licensing unit or obtain a background clearance,[20] nothing links the mere presence of these men to actual knowledge of a substantial risk of harm to the twins. It is this evidentiary chasm that dooms Plaintiffs' second theory.

---

[19] While much of this evidentiary discussion in the context of Plaintiffs' failure to establish a constitutional violation applies to both Defendants, the primary focus was on Ms. Gloria. The Court addresses below additional challenges for Plaintiffs with respect to their § 1983 supervisory liability claim against Ms. Terry.

[20] The Court stretches to give Plaintiffs this inference at the Rule 50 stage, although Defendants' testimony that a state background check on Thinman was obtained via phone through the Rhode Island Attorney General's Office and came back clear stands largely uncontroverted. It is possible the jury could disbelieve Defendants and credit Mr. Steiner's testimony that a verbal check would have nonetheless generated paperwork.

For starters, no evidence was offered as to what a Bureau of Criminal Investigation ("BCI") check would have revealed about anyone in this case.   Further, no evidence was offered as to what a nationwide or fingerprint search would have turned up, even crediting Plaintiffs' theory that DCYF could have tried harder to obtain such information.   Plaintiffs offered no evidence that Bobo or Thinman was a criminal, dangerous, or in any way unfit to be around J.R. and B.R.[21]   Moreover, even if one could find a scintilla of such "danger" evidence, the record lacks evidence to prove Ms. Gloria (or Ms. Terry) <u>knew</u> such facts.   <u>Cf.</u> <u>Roes v. Florida Dep't of Children & Family Servs.</u>, 176 F. Supp. 2d 1310, 1313-14, 1322 (S.D. Fla. 2001) (allegations sufficient to support finding of deliberate indifference where caseworker knew natural son living in home was arrested for sexual misconduct, knew natural daughter had been sexually abused years earlier with foster mother's knowledge, and failed to visit home despite disturbing reports of behavioral problems).   Here, the case aide notes mentioning Thinman do not even hint at inappropriate conduct.

The most that can be said of the evidence is this: perhaps Ms. Gloria ignored an unknown yet possible risk (a "hunch") that BoBo

---

[21]   Thinman (Samuel Stevens) reportedly had two criminal convictions in North Carolina in the 1980s involving forgery and breaking and entering.   Assuming such information could provide notice of a substantial risk of harm, Plaintiffs never offered evidence of this fact despite a favorable pre-trial ruling on the relevance of out-of-state convictions.

or Thinman had dangerous or sexual propensities and would hurt the twins.  But, if that tenuous theory has any legs at all, they are grounded in negligence -- not conscious disregard of risk.  <u>See</u> <u>Burton</u>, 370 F.3d at 729 (failure to investigate "rises at most to the level of negligence" and does not shock the conscience); <u>Nicini</u>, 212 F.3d at 814 (failure to do background check beyond what agency policy required not conscience-shocking); <u>DeAnzona v. City</u> <u>& County of Denver</u>, 222 F.3d 1229, 1236 (10th Cir. 2000) (not paying attention to child who drowned was "risky," "tragic" and "possibly even negligent" but due process claim failed absent evidence counselor acted with wanton disregard of danger).

Plaintiffs are left to rely on unfounded CANTS investigations and several verbal complaints made over the course of eighteen months (none of which involve Thinman).  Plaintiffs say these complaints and concerns are the red flags that establish culpable knowledge.  Yet again, however, these flags are barely a pale shade of yellow even when viewed in their most favorable light.  What matters is what Defendants knew during the period <u>before</u> May of 1998, when it is undisputed that DCYF removed the twins after a substantiated investigation into marks on their wrists.  Plaintiffs offered no evidence on which a jury could rely to find that before May of 1998, Defendants knew or strongly suspected that the twins' conditions were deteriorating or that they were at risk for

substantial harm, let alone that DCYF was deliberately indifferent to their situation.

Although the point was very much contested, the Court will assume Ms. Gloria knew the details of the unfounded CANTS complaints about bruising and BoBo providing care, and that she performed no follow up in the foster home in response to these allegations or Ms. Raymond's comments about the sweatsuits or eating out of the garbage (even though Ms. Gloria testified that she asked Ms. Sykes about these events). Furthermore, while again contested, Plaintiffs introduced Ms. Gloria's notes from December 1997 and early 1998 from which a jury could find lack of sufficient contacts with the twins. Jurors could also credit the twins' school records as reflecting poor attendance of which Ms. Gloria was not aware.[22]

All of this might support a finding of misunderstanding, lack of adequate and effective communication, lack of oversight, or even indifference to daily events at the Sykes home.[23] Though perhaps troubling, this is not the same as finding Ms. Gloria knew or "hid

---

[22] This schooling argument rings of negligence: "If Defendants had followed policy . . . they would have learned of the children's poor attendance records. They would have learned the boys were at home with Thinman. But they did not." See Docket No. 51 (Plaintiffs' Opposition to Defendants' Rule 50 Motion).

[23] The Court should note, however, that social workers at Rhode Island DCYF have for many years complained of caseload burdens. The Court is not drawing a conclusion one way or another as to whether this evidence proves these things; rather, a reasonable jury could so find.

her head in the sand" to prevent learning that J.R. and B.R. were in danger. Compare Rayburn ex rel. Rayburn v. Farnesi, 70 F. Supp. 2d 1334, 1338-39, 1345-46 (N.D. Ga. 1999), reversed on other grounds, Rayburn ex rel. Rayburn v. Hogue, 241 F.3d 1341 (11th Cir. 2001) (caseworker entitled to summary judgment despite mother's concerns about foster home abuse, knowledge of unfounded allegations of abuse, knowledge of bruising said to be due to "horseplay," alleged threats by foster mother, and one foster home visit in two months); Burton, 370 F.3d at 729 (failure to respond to abuse reports or conduct home study not egregious); Lewis v. Anderson, 308 F.3d 768, 773-76 (7th Cir. 2002) (no liability for officials who placed child in prospective adoptive family absent evidence they knew of or suspected abuse, even where they "might have learned about disqualifying information if they had conducted a more thorough inquiry" and knew parent slapped another child).

The proposition that several unfounded independent CPI investigations over eighteen months involving very active young boys and scrapes, bruises, bite marks, warm clothing on a summer day and even "hitting" involving BoBo correlate to the type of evidence recognized as possibly leading to knowledge of abuse or, at minimum, a clear risk, is simply not reasonable.[24]   Indeed,

---

[24] Strong policy considerations are at play here as well.  If Plaintiffs' suggestion that unfounded CANTS investigations must be viewed as red flags of abuse is accepted, DCYF social workers would be forced to question every CPI finding out of fear that the worker would still face liability if the CPI's conclusion proved wrong in

courts have refused to extend liability in this area of substantive due process law on much worse facts. See S.S. ex rel. Jervis v. McMullen, 225 F.3d 960, 962-63 (8th Cir. 2000) (en banc) (decision to return young girl to father's care not actionable despite knowledge that father allowed convicted child molester to be present during visits, substantiated hotline reports of neglect, psychological evaluation stating child could be at risk, and inappropriate child sexual behavior and complaints of genital pain); Lintz v. Skipski, 25 F.3d 304, 306-07 (6th Cir. 1994) (failure to remove children from foster home not deliberately indifferent upon reports children acted out sexually, therapist notes reporting children said someone hurt them, and detailed allegation of oral sexual abuse to therapist involving adopted son in foster home). Plaintiffs do not argue that the CANTS procedures were constitutionally inadequate, and simple dissatisfaction with the quality of an investigation does not establish a constitutional violation. Moreover, it is not this Court's role to second guess

---

hindsight. This would, in effect, pit one side of the house against the other, which inevitably would undermine the goals of child protection and welfare. Ms. Gloria testified that social workers are not provided great detail about unfounded CANTS reports. For better or worse, this is the system in Rhode Island, and the Court is not in a position to question the propriety of DCYF workers' reasonable reliance on unfounded investigations, at least with respect to the type and quantity in this case. Whether additional or different CANTS reports (or other information possibly indicating the CANTS reports were flawed) could ever support the requisite inference of knowledge and deliberate indifference is a question best left for another day.

the CPI's findings in the context of a § 1983 action such as this. <u>Youngberg</u>, 457 U.S. at 321; <u>Johnson ex rel. Cano v. Holmes</u>, 377 F. Supp. 2d 1039, 1048-49 (D.N.M. 2004).

Finally, Plaintiffs' continued reliance on <u>Nicini</u> is misplaced. 212 F.3d 798. In <u>Nicini</u> the case worker was found to be not deliberately indifferent for failing to discover an allegedly abusive caretaker's prior conviction for corruption of a minor and distribution of controlled substances. <u>Id.</u> at 812-14. The caseworker only performed a background check within the New Jersey DYFS central registry, and plaintiffs argued he was "on notice" in part because of the natural mother's concerns that "something just seems strange about these people." <u>Id.</u> at 813-14. Plaintiffs' attempt to favorably contrast their situation with <u>Nicini</u> based on the age of the child there (fifteen) and duration of the placement (only a few weeks) is logical but unpersuasive. Even given the twins' young age and the longer duration of the Sykes placement, <u>Nicini</u> illustrates that a state actor must have something "before [her] eyes" to suggest a substantial risk of serious harm. <u>Id.</u> at 815. That evidence is missing here, and <u>Nicini</u> offers little solace.

The wrap-up is that Plaintiffs, in trying to construct federal claims, fail to transcend garden variety negligence. The proffered connections between notice of harm and inferred knowledge about danger are too ephemeral, to the extent they exist at all. However

40

unfortunate, this is not the stuff of which deliberate indifference and arbitrary, conscience shocking unconstitutional behavior is made.  No reasonable jury could conclude otherwise.  Plaintiffs therefore fail to carry their burden on the threshold prong of qualified immunity.

The discussion could end there, and the § 1983 claims could be dismissed on this basis alone.  Soto, 253 F.3d at 141; Saucier, 533 U.S. at 201 (no need to address whether right was clearly established if no violation); Velez-Diaz v. Vega-Irizarry, 421 F.3d 71, 80-81 (1st Cir. 2005) (ending analysis after first prong); Morales v. Ramirez, 906 F.2d 784, 787 (1st Cir. 1990) (finding of no constitutional violation may resolve merits and qualified immunity defense).  But there is reason in this case to move on to discuss the second and third prongs of qualified immunity, because the defense applies to the state negligence claim.  The Court will therefore assume for purposes of the following discussion that there was a constitutional violation and proceed to address the next two prongs of qualified immunity.[25]

---

[25] The Court need not resolve Defendants' alternative argument that they are entitled to absolute judicial immunity insofar as they monitored the placement pursuant to court order and subject to court approval.  See Nicini, 212 F.3d at 813 n.11 (casework immunity usually covers formulation and presentation of material to court but not investigative or administrative acts); Burns v. Reed, 500 U.S. 478, 479-80 (1991) (courts should presume "qualified rather than absolute immunity is sufficient to protect government officials").  It is also unnecessary to reach Defendants' argument about insufficient causation evidence.

## 2.   Clearly Established

The Court has previously defined the constitutional right in this case as the right of a child in state custody to be free from harm once placed in a foster home. The constitutional violation occurs when officials are aware of and disregard a substantial risk of harm to a child in foster care; that is, when officials are deliberately indifferent to the risk of harm. The second qualified immunity prong examines whether the contours of this right were clearly established in 1996. Anderson, 483 U.S. at 640.

A right is clearly established if the unlawfulness of the action (or inaction) in question is apparent and sufficiently well-defined such that a reasonable official would understand her conduct to be unconstitutional. Id.; Hope v. Pelzer, 536 U.S. 730, 741 (2002) (prior law does not have to be "fundamentally similar" or present "materially similar" facts); Hatch v. Dep't for Children, Youth & Their Families, 274 F.3d 12, 23 (1st Cir. 2001) (Supreme Court precedent and "all available case law" determines contours of the right). In 1982, Youngberg established the early foundation of the right in issue here, holding that officials must take basic steps to prevent children "wholly dependent on the State" from harm. 457 U.S. at 317; see also Eugene D. ex rel. Olivia D. v. Karman, 889 F.2d 701, 711 (6th Cir. 1989) (right to personal safety in foster home not clearly established from 1974 to 1982). Youngberg's expansive declaration, however, is the tip of

42

Case 1:08-cv-00137-S-DLM    Document 53    Filed 02/26/2009    Page 43 of 53

the iceberg. <u>Saucier</u>, 533 U.S. at 201 (analysis is "undertaken in light of specific context of the case, not as a broad general proposition").

The next contour of the right involves the "special relationship" and parallel between involuntary dependence on state-licensed foster care and other similar situations. As discussed <u>supra</u>, the First Circuit has not had occasion to address this specific question. This Court relies on the numerous cases from other Circuits, combined with First Circuit principles from <u>Germany</u>, 868 F.2d at 15 and <u>Monahan</u>, 961 F.2d at 991-92, to hold that in 1996, an objectively reasonable DCYF official should have understood the existence of a special relationship between DCYF and minor children once the state takes legal custody and places them in a foster home. <u>See</u> <u>Estate of Gilmore v. Buckley</u>, 787 F.2d 714, 720-21 (1st Cir. 1986) (recognizing "special relationship" in § 1983 cases and citing Second Circuit <u>Doe</u> foster care case).

Alas, there is a third and final layer to the clearly established analysis: the culpable mental state required for the state action (or inaction) to be unconstitutional. This is critical; not only must a state actor have notice of the child's right to be free from third-party harm in a foster home, but also what kind of action (or inaction) could constitute a violation of that right. The relevant question then is whether the now-prevailing standard of deliberate indifference was also clearly

43

established by 1996.  Anderson, 483 U.S. at 646; Saucier, 533 U.S. at 195 (state actor must have notice that conduct is "clearly unlawful").  Given the plethora of authority from the 1980s and 1990s involving foster care discussed above in the context of the first qualified immunity prong, it may be reasonable to conclude that the standard of deliberate indifference was sufficiently well-defined in 1996.  Yet, although the First Circuit and Supreme Court have spoken to relevant principles, see e.g. Cummings, 271 F.3d at 344-45 (deliberate indifference may be enough in "custodial" situations) and Estelle, 429 U.S. at 104-05 (deliberate indifference sufficient for § 1983 claim), neither has decided the correctness of this standard as applied to third-party harm to foster children.  The Court need not resolve this question.  Even if this final parameter of the right was clearly established in 1996, Defendants Gloria and Terry are still entitled to qualified immunity because, under the third and final prong, each would have an objectively reasonable basis for believing that her conduct did not abridge the twins' rights.

> 3.   Objective Legal Reasonableness

This final prong requires the Court to ask whether an objectively reasonable DCYF official exercising professional judgment would have believed or understood that her inaction with respect to the twins in the Sykes home jeopardized their

constitutional rights in 1996 through 1998. Again, without hesitation, the answer is no.

20/20 hindsight offers a poor yardstick with which to measure real world conduct. Mitchell, 472 U.S. at 535 ("hindsight-based reasoning on immunity issues is precisely what Harlow rejected"). To be sure, even if the decision to keep the twins with the Sykes was flat out wrong, the very purpose of qualified immunity is to provide officials with "a safe harbor for a wide range of mistaken judgments." Hatch, 274 F.3d at 19-20 (citing Malley v. Briggs, 475 U.S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law")); Kruse v. Hawai'i, 857 F. Supp. 741, 758 (D. Haw. 1994) (court "need not agree whole-heartedly with the conclusions reached by the social workers in order to rule that they are covered by qualified immunity; it need only find that they acted reasonably").

Reasonableness is judged in light of all the information Defendants possessed about the twins and the Sykes home from November 1996 through May 1998. Although the inaction at issue was more "reflective" than, for example, a split second judgment in police chase or a quick decision to remove a child from a parent suspected of abuse, DCYF workers monitoring foster care are by no means without some "pressurized circumstances." Carroll v. Ragaglia, 109 Fed. Appx. 459, 461 (2d Cir. 2004) (DCY employees entitled to qualified immunity on claim they investigated abuse

allegation in a "shocking" manner); <u>Carter v. Lindgren</u>, 502 F.3d 26, 32 (1st Cir. 2007) (recognizing DCYF workers' "difficult choices" when removing children from parents and need for "on-the-spot judgments on the basis of limited and often conflicting information"). For all the reasons discussed above, Ms. Gloria and Ms. Terry acted well within their discretionary judgment and qualified immunity safe harbor, <u>even if</u> they reasonably misapprehended whether it was appropriate to keep J.R. and B.R. in the Sykes home given the information and knowledge they possessed.

If this were not enough (and it is), a final critical flaw completely defeats Plaintiffs' case: they offered no evidence, expert or otherwise, on the standard of conduct that applies to a social worker or supervisor faced with similar circumstances (that is, what investigations or other steps would have been appropriate and/or what should trigger a removal decision). This is fair game (and arguably essential evidence) in any § 1983 case, to show conduct was objectively unreasonable. <u>See Young</u>, 404 F.3d at 11, 19 (describing expert testimony about police tactics being contrary to accepted standards); <u>Jennings</u>, 499 F.3d at 23 (Lynch, J. dissenting) (noting district court's reasoning regarding plaintiff's failure to present evidence that officer "deviated from the standard of conduct that should have been expected from an objectively reasonable police officer under the circumstances") (internal citation omitted); <u>Nicini</u>, 212 F.3d at 812 (describing

46

psychologist's testimony that family services specialist should have done more).   Indeed, without some evidentiary framework to work with the Court is hard pressed to envision how a judge or jury could assess <u>objective</u> unreasonableness.

In sum, Plaintiffs failed to present sufficient evidence to hold Defendants liable under a substantive due process theory. There is no constitutional violation, and qualified immunity applies.

B.   Supervisory Liability

With no underlying constitutional violation and no subordinate liability, supervisory liability by definition fails.  <u>See Seekamp v. Michaud</u>, 109 F.3d 802, 808 (1st Cir. 1997); <u>Maldonado-Denis v. Castillo-Rodriguez</u>, 23 F.3d 576, 581-82 (1st Cir. 1994).   In any event, without repeating the entire framework, Ms. Terry's defense is even more compelling.  <u>See Camilo-Robles v. Zapata</u>, 175 F.3d 41, 43-44 (1st Cir. 1999)  (supervisory liability is a form of personal liability and qualified immunity applies).

§ 1983 supervisory liability is based on a supervisor's own acts or omissions, not through respondeant superior.  <u>See Aponte Matos v. Toledo Davila</u>, 135 F.3d 182, 192 (1st Cir. 1998); <u>Gutierrez-Rodriguez v. Cartagena</u>, 882 F.2d 553, 562-66 (1st Cir. 1989).   Plaintiffs needed evidence to show Ms. Terry was "affirmatively linked" to the constitutional violation through "supervisory encouragement, condonation or acquiescence, or gross

47

negligence amounting to deliberate indifference." <u>Aponte Matos</u>, 135 F.3d at 192 (quoting <u>Lipsett v. Univ. of Puerto Rico</u>, 864 F.2d 881, 902 (1st Cir. 1988)); <u>see</u> <u>Camilo-Robles</u>, 175 F.3d at 43-44 (supervisor must be "primary actor involved in, or a prime mover behind, the underlying violation").

Plaintiffs' case as to Ms. Terry, as with Ms. Gloria, shifted between two theories, both of which missed the mark.[26]  First, as with Ms. Gloria, Plaintiffs claim Ms. Terry harmed the twins by failing to terminate the license or conduct background checks and remove the twins.  Second, they claim she failed to effectively monitor the placement and Ms. Gloria's involvement.

There was scant evidence of direct participation or supervisory indifference by Ms. Terry, let alone an affirmative link.  Even assuming knowledge of all CANTS allegations, events in the case notes, and a failure to conduct background checks, it cannot be said that Ms. Terry knew of a grave risk of harm or "history of widespread abuse sufficient to alert [her] to ongoing violations." <u>Maldonado-Denis</u>, 23 F.3d at 582.  Once again, taking a pro-plaintiff viewpoint, the only red flag specifically directed to Ms. Terry was B.R.'s report in 1997 that "his bum hurt," when Ms. Terry and Ms. Starnes apparently examined him and believed it related to bathroom wiping.  This is insufficient evidence from

---

[26] Plaintiffs advanced no policy, custom or inadequate training theory against DCYF or Ms. Terry as a claimed policy-maker.

48

which a jury could find Ms. Terry appreciated a risk of harm to J.R. or B.R., and affirmatively acted (or deliberately failed to act) to cause a constitutional violation. At best, there was a generalized concern about the appropriateness of the placement - woefully short of the § 1983 standard.

Moreover, if the jury could find "isolated instances" of unconstitutional conduct by Ms. Gloria (which it could not), this is almost always insufficient to show supervisory indifference through ratification. <u>Maldonado-Denis</u>, 23 F.3d at 582. And, lack of diligence in monitoring subordinates is a far cry from ignoring a specific risk of serious harm. <u>See</u> <u>Camilo-Robles v. Hoyos</u>, 151 F.3d 1, 15 (1st Cir. 1998) (mere "inattentive or careless" behavior does not strip supervisor of qualified immunity). Thus, even if Ms. Terry could have done a better job on the Raymond case, she did not manifest deliberate indifference to the twins' rights through inaction or failures with respect to subordinates. It is for this very reason that qualified immunity provides "ample room for mistaken judgments." <u>Hunter</u>, 502 U.S. at 229 (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 343 (1986)).

VI.   State Law Negligence Claims

Counts I, III, VI, and VII of the Fourth Amended Complaint are framed as negligence claims against Defendants in their <u>official</u> capacities, seeking $100,000 consistent with the cap imposed by R.I. Gen. Laws § 9-31-2. Count II alleges negligence against Ms.

Gloria _individually_ and seeks unspecified damages.   There is no such individual negligence claim against Ms. Terry.

The official negligence claims against Defendants are, in essence, claims against the entity (here a state agency) and thus are claims against the State of Rhode Island.   See _Pennhurst_, 465 U.S. at 100-102; _Carter v. Lindgren_, 2006 WL 2850572, *6 n.4 (D.R.I. Sept. 29, 2006), _aff'd_, 502 F.3d 26, 33 (1st Cir. 2007) (state law claim against DCYF employees in official capacities subject to Eleventh Amendment).   And, suits in federal court against the State are barred by Eleventh Amendment sovereign immunity absent consent or waiver.   U.S. Const. amend. XI; _Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc._, 506 U.S. 139, 144 (1993) (Eleventh Amendment immunity extends to state agencies).

During argument the Court, _sua sponte_, inquired whether Defendants' removal of the case affected Eleventh Amendment immunity on the pendent state law negligence claims and, if so, whether Plaintiffs had waived such an argument.   See _Lapides v. Bd. of Regents of Univ. Sys. of Georgia_, 535 U.S. 613, 620-21 (2002) (defendants waived immunity to state claims by removing § 1983 case).   Plaintiffs offered no clear response but argued that Rhode Island waived immunity on the "official" negligence claims under the State Tort Claims Act, which provides in pertinent part, "The state of Rhode Island . . . shall . . . hereby be liable in all

actions of tort in the same manner as a private individual or corporation." R.I. Gen. Laws § 9-31-1.

While the parties here have not developed these arguments, both have some teeth. See New Hampshire v. Ramsey, 366 F.3d 1, 15 (1st Cir. 2004) (state can waive immunity by litigation conduct); Laird v. Chrysler Corp., 460 A.2d 425, 429-30 (R.I. 1983) (Rhode Island broadly waived Eleventh Amendment immunity for tort claims in federal court by § 9-31-1). Yet, the Court need not dissect either theory at this point. Even if Rhode Island waived its immunity, Defendants are protected from "official" negligence liability because Plaintiffs cannot overcome the public duty doctrine.

In the usual course, despite § 9-31-1, the State is immune from tort liability "arising out of [] discretionary governmental actions." Kashmanian v. Rongione, 712 A.2d 865, 867 (R.I. 1998). DCYF placement and monitoring of foster children is a governmental function. Plaintiffs try to fit themselves into the narrow exception to governmental immunity by arguing that Defendants owed J.R. and B.R. a special duty and engaged in "egregious conduct." Id. But this exception does not apply. Assuming a special duty, for the reasons explained at length above no reasonable jury could conclude that Defendants knew J.R. and B.R. faced extremely perilous circumstances and chose, in an egregious manner, not to remedy the dangerous predicament. Haley v. Town of Lincoln, 611

51

A.2d 845, 849 (R.I. 1992) (plaintiff has burden to overcome public duty doctrine, which encourages effective administration of governmental operations by removing litigation threat); Kuzniar v. Keach, 709 A.2d 1050, 1053 (R.I. 1998).

Finally, little more need be said about the individual negligence claim against Ms. Gloria because the qualified immunity defense is "well grounded in the law of Rhode Island." Hatch v. Town of Middletown, 311 F.3d 83, 90 (1st Cir. 2002) (discussing "recognition of a qualified immunity defense under state law analogous to the federal doctrine"). Indeed, during argument Plaintiffs' counsel acknowledged that qualified immunity "comes into play across the board" for the § 1983 and negligence claims. Ms. Gloria is shielded from tort liability for her objectively reasonable actions, thus allowing her and others to exercise reasonable discretion "freely, independently, and untrammeled by the possibilities of personal liability." Calhoun v. City of Providence, 390 A.2d 350, 356 (R.I. 1978);[27] Hopkins v. Rhode

---

[27] Calhoun and other cases suggest that if personal immunity protects a state actor, the state cannot be vicariously liable in tort under § 9-31-1 in any event. 390 A.2d at 357 (no liability if agent is immune from prosecution); Morales v. Town of Johnston, 895 A.2d 721, 728-29 (R.I. 2006) (no town liability if negligent coaches have statutory immunity); Saunders v. State, 446 A.2d 748, 751-52 (R.I. 1982) (if negligent state correctional officer was "not protected by personal immunity, the state would be liable under the doctrine of respondeat superior") (emphasis added).

<u>Island</u>, 491 F. Supp. 2d 266, 275-76 (D.R.I. 2007) (caseworker entitled to qualified immunity on federal and state tort claims).[28]

## VII. Conclusion

By all accounts, this is a tragic case for two boys whose childhoods may be forever lost, and whose futures are perilous. While the Court is sympathetic to their plight, Plaintiffs have failed to establish a constitutional violation, and Defendants are shielded from liability for their conduct by qualified immunity. For the foregoing reasons, Defendants' Rule 50 motion is GRANTED on all claims, and Plaintiffs' Fourth Amended Complaint is DISMISSED.

IT IS SO ORDERED.

William E. Smith
United States District Judge
Date: 2/26/09

---

[28] Notably, DCYF removed the <u>Hopkins</u> case but the District Court did not discuss potential Eleventh Amendment waiver.